**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

BROADCAST MUSIC, INC.,

                           Petitioner,

v.

NORTH AMERICAN CONCERT PROMOTERS
ASSOCIATION, as licensing representative of the
promoters listed on Exhibit A to the Petition,

                           Respondent.

1:18-cv-08749 (LLS)

*Related to United States v.*
*Broadcast Music, Inc.,* 64 Civ. 3787
(LLS)

---

## JOINT SUBMISSION FOR PRE-MOTION CONFERENCE

Petitioner Broadcast Music, Inc. ("BMI"), Respondent North American Concert Promoters

Association ("NACPA" and together with BMI, the "Parties"), and certain NACPA members

from which BMI is seeking discovery, including AEG Presents, LLC ("AEG") and Live Nation

Worldwide, Inc. ("Live Nation") (the "NACPA Members"),[1] by and through their respective

undersigned counsel, respectfully make this joint submission in accordance with the Court's May

29, 2019 Order (Dkt. No. 43) in advance of the pre-motion conference concerning discovery

disputes scheduled for Thursday, June 6, 2019.  The Parties and to the extent applicable, AEG

and Live Nation, respectfully submit their respective positions below regarding (A) each issue on

which a Party wishes to obtain rulings at the conference, and (B) each issue for which rulings are

---

[1] The following entities have received and responded to requests for documents from BMI:  AEG
Presents, LLC, Another Planet Entertainment, LLC, Bill Blumenreich Presents, Insomniac, Jam
Productions, Ltd., Live Nation Worldwide, Inc., Music and Event Management Inc., and
Nederlander Concerts.  In their written responses and objections, each entity objected to BMI's
attempt to propound discovery requests on them under Rule 34 of the Federal Rules of Civil
Procedure, rather than issue a subpoena under Rule 45.  Without waiving this objection, and
reserving their rights, each has been negotiating the scope of a production of documents.  Live
Nation is separately represented in this matter by Latham and Watkins LLP, as is Insomniac
Holdings, LLC; NACPA and all of its other members are represented by Weil, Gotshal &
Manges LLP.

unnecessary at this time, but clarification and discussion may be of assistance to the Parties. Following a productive conferral on June 4, 2019, the Parties have narrowed the issues for the Court's review.

## A.    ISSUES FOR THE COURT'S RULING

The Parties wish to obtain rulings at the conference on the issues described below.  The Parties set forth, for each issue: (i) each Party's position and its factual basis; (ii) the urgency of resolving the matter; and (iii) where applicable, the estimated approximate cost of responding to the request at issue, and any reasons that might exist for shifting the cost to the requesting party.[2] BMI's requests and the respective positions on those requests are set forth first, followed by NACPA's requests and the respective positions on those requests.

## ISSUES REGARDING BMI'S REQUESTS TO NACPA AND ITS MEMBERS FOR THE COURT'S RULINGS

### 1.    Live Nation's Production of Documents Sufficient to Show Their Top 100 Tours by Revenue

#### i.    The Parties' Positions

The BMI Position

BMI requests that the Court require Live Nation to produce documents sufficient to show its top 100 tours by revenue – or if no such tours exist, concerts – and the corresponding revenue for each tour, for the period from 2013 to 2018.[3]  The request should not be controversial.  BMI

---

[2] BMI understands that the only discovery issue in which cost shifting is at issue is with respect to BMI's request that AEG restore backup tapes.  *See infra* A.3.  As such, BMI only addresses the cost of production and the alleged basis for cost sharing with respect to the restoration of AEG's backup tapes.  Suffice it to say, with respect to all of its requests, BMI submits that the cost of collecting and producing the requested information is within the bounds of normal document production in a complex commercial litigation.  Consequently, BMI does not believe that there is any basis for shifting the cost of production from NACPA or the NACPA Members.

[3] Weil's May 28 letter correctly states that BMI's document request sought such data for the period from 2013 to the present.  BMI inadvertently stated in its May 23 letter that it requested such data for a ten-year period.

seeks the production of a spreadsheet or list that BMI expects could be generated by an automated system.  AEG has already agreed to provide these documents.

This information is critical to BMI's assessment of the live concert industry and the revenues Live Nation collects from the live concerts and music festivals it promotes.  BMI needs information concerning the total amount of revenue that Live Nation receives from live concerts, which would include, among others, ticket servicing fees, merchandise sales, VIP packages, and parking – all of which BMI contends should be included in the revenue base against which its licensing rate is applied.

Live Nation has not agreed to produce the requested information in any respect, and asserts that the parties have not sufficiently discussed this document request on prior meet and confers among counsel.  BMI, however, raised this issue at several meet and confers, including on May 17, 2019, and June 4, 2019, at which time Live Nation advised that it still was not prepared to resolve the topic.  Live Nation should be required to produce the requested information.

<u>Live Nation's Position</u>

This issue—and the specific request to which it relates (No. 12)—have not been addressed at any length during the meet and confer process.  Nonetheless, Live Nation is willing to provide BMI with a list of its top-100 tours.  However, production of the underlying revenue for each tour implicates the same issues identified in Live Nation's letter to the Court of May 28, 2019. In short—even putting aside the fact that this is some of Live Nation's most sensitive commercial information—Live Nation's financial records are not kept in a format that easily corresponds to BMI's many requests for financial data.  It has been exceedingly time-consuming to collect information responsive to BMI's requests for financial data, but Live Nation is now very close to producing responsive information that covers US concerts generally.  Accordingly,

the request for additional, tour-specific revenue information is premature.  Once Live Nation has produced information responsive to BMI's request for financial data regarding U.S. concerts generally, the parties can then meet and confer to determine whether any further issues remain for the Court's resolution.

### ii.     The Urgency of Resolving the Matter

The BMI Position

BMI submits that Live Nation should produce the requested information sufficiently in advance of the document production deadline to permit BMI to assess the adequacy of the information and determine whether it must propound additional document requests prior to the document production deadline.

Live Nation's Position

Live Nation respectfully submits that BMI's motion is meritless and premature for the reasons set forth above.

### 2.     AEG Should Be Required To Restore Backup Files

### i.     The Parties' Positions

The BMI Position

With limited exceptions, AEG maintains emails from January 1, 2009 through December 31, 2015 on backup tapes.  BMI requests that the Court require AEG to restore these backup tapes at its own expense.  Although AEG previously asserted that the restoration of these tapes would be prohibitively expensive, AEG did not disclose the estimated cost of any such restoration until May 28, 2019, when it advised that the expense would approximate $100,000 for restoration of back-up tapes going back to January 1, 2009.  As a further compromise to resolve the alleged burden and expense, counsel for BMI offered during a June 4, 2019 conferral to limit the restoration period for to January 1, 2013 through December 31, 2015, cutting out

4

more than half of the time period of its initial request.  AEG has continued to suggest, even with this significant narrowing, that any restoration expense should be borne by BMI.

Each of AEG's arguments in support of its position is meritless.  First, contrary to AEG's suggestion, AEG is not a third-party witness.  As noted above, AEG has a direct financial interest in the outcome of this rate court proceeding as it pays the applicable license rate to PROs.[4]  Moreover, AEG is the repository of information regarding the financial growth of the live concert industry and the negotiation of agreements with artists, vendors (including its affiliated ticketing service), and venues.

Second, as "the world's leading sports and live entertainment company" and "[o]ne of the largest music companies in the world",[5] AEG cannot insulate itself from electronic discovery by storing its emails and other electronic documents on backup tapes.  AEG made a voluntary decision to store its emails on backup tapes.  In doing so, AEG took the risk that in a rate court proceeding or other litigation, it would be asked to produce emails dating back to 2015 and earlier.  AEG's refusal to incur the costs of restoring emails from prior to 2016 stands in stark contrast to the request of NACPA, AEG's licensing representative and agent, that BMI review and produce emails dating back to 2013.

---

[4] The NACPA Members, including AEG and Live Nation, argue that they are "non-parties" and suggest that they should be subject to a reduced discovery burden.  The position is meritless.  NACPA has been named as a respondent in its capacity as an agent – a "licensing representative" in AEG's own words – for its Members.  The license rates negotiated by NACPA with PROs are for the benefit of the NACPA Members, not NACPA itself.  As such, the NACPA Members have a direct financial interest in the outcome of this rate court proceeding as those entities pay the applicable license rate to PROs.  Moreover, the NACPA Members are the principal repository of the financial information and documents on which this Court will likely base its ruling on the reasonableness of BMI's proposed licensing fee.  The NACPA Members, not NACPA, enter into contracts with artists, venues and other vendors relating to live concerts and music festivals.  Similarly, the NACPA Members, not NACPA, possess the financial data showing the revenue streams that they receive from live concerts and music festivals.

[5] *See* https://www.aegworldwide.com/; https://www.aegworldwide.com/divisions/music.

Third, in a telephone conference on May 30, 2019, AEG's counsel advised that the AEG employee with principal responsibility for the negotiation of the GMR license and AEG's arrangement with NACPA has maintained her emails on a local drive and that these emails are available for searching.  Although we appreciate AEG's offer to search her emails going back to 2009, this is not sufficient.  AEG should restore backup tapes for the remaining custodians, all of whom it proposed as having potentially relevant information.  In this regard, it is important to note that BMI's search terms directed to AEG seek more than just documents relating to the negotiation of the GMR license and AEG's arrangement with NACPA.  By way of example only, BMI understands that AEG's parent company has taken a financial interest in AXS, a ticket servicing company.  BMI seeks emails relating to any arrangements between AEG and AXS and other ticket servicing agents regarding the pricing of concert tickets and the imposition of ticket servicing surcharges.  As previously noted, BMI will seek to establish in this proceeding that ticket servicing fees represent an increasingly large percentage of the costs paid by a concert-goer.  BMI submits that these fees should be part of the revenue base against which its licensing fee is applied.

The NACPA Position

BMI's request to have AEG Presents, LLC, resort to and restore years' worth of information stored on backup tapes fails for multiple reasons, beginning with the mistaken premise that AEG should be considered a party to this proceeding.  Like other individual members of NACPA, AEG is not a party.  NACPA is the only Respondent to BMI's Petition. BMI is correct that AEG has a financial interest in the outcome of this proceeding, but it is not different in that regard to BMI's affiliates, who own the copyrights at issue, and will receive all of the royalties paid after BMI deducts a portion to reflect its overhead.  Both NACPA and BMI are licensing agents and they stand in the same posture with respect to this proceeding and the

6

license at issue:  BMI is acting on behalf of its publisher and songwriter affiliates to administer a license on their behalf, and NACPA is acting on behalf of its members to administer a license on their behalf.  AEG does not dispute that BMI is entitled to reasonable discovery from it in this proceeding, even though it is not a party, just as NACPA is entitled to reasonable discovery from and about BMI's affiliates.  The fact that AEG possesses some discoverable information, however, does not transform it into a party to the litigation.

The Court was clear at the outset of this case: every request for production should be taken "not to ask for each and every document but to ask for documents which will show the particular answer that [the requesting party is] seeking." *Initial Status Conference Tr.*, December 14, 2018, at 22:11-15.  In other words, it is "the duty of the responder is to make an honest response, but not to produce 10,000 documents." *Id.* at 22:15-16.  AEG has unquestionably offered to make an "honest" response.  Among other things, AEG has agreed to produce: (1) its annual financial information; (2) its venue and artist contracts relating to the top 5 shows in each of the past four years; (3) its contracts with ticketing vendors; (4) its agreement with Global Music Rights ("GMR") (a U.S. performing rights organization that does not license through NACPA); and (5) the underlying negotiation documents related to its license with GMR.  AEG will also be running search terms across the email files of three custodians most likely to have responsive information that currently exist on AEG's servers (which we understand to be between two and three years) and to review emails for the entire period from AEG's principal point of contact with NACPA and the chief negotiator of AEG's agreement with GMR, who has saved her emails locally.[6] NACPA is already producing the agreements that have governed AEG's relationships with

---

[6] To the extent there are additional responsive emails between AEG and NACPA, we expect those will be captured by the search of NACPA's emails.

ASCAP, BMI, and SESAC, as well as the reported revenues for each AEG concert licensed through NACPA during the past ten years.

BMI, though, wants more.  It wants to force AEG – without even explaining what it hopes to find – to undertake the expensive and cumbersome process of restoring backup tapes.[7]  This request is overbroad, disproportionate to the needs of the case, and should be rejected outright.  **First**, the vast majority of the information BMI has requested is already being collected, reviewed, and produced without the need to search many years of backup tapes.  **Second**, and as set forth above, AEG is not a Respondent in this proceeding, and outsources its license negotiations with BMI to NACPA.[8]   Given this status, it is not surprising that BMI cannot articulate what exactly it believes will be found in this backup tape data that it cannot obtain from other sources.  **Third**, BMI discounts the costs of unearthing this data. BMI initially requested that AEG restore backup tapes for the entire period going back to 2009.  AEG estimates that restoring backup dates going back to 2009 would cost approximately $170,000.  BMI recently revised its request during a May 17, 2019 meet and confer and asked for an estimate of the cost to restore backup tapes for the period of time that AEG negotiated a license

---

[7] BMI appears to take issue with AEG's regular-course email retention policy.  AEG is, of course, well within its rights to ensure that its live server is not overloaded with data extending back over a period of years.  Moreover, as a non-party that generally outsources its PRO licensing to NACPA, AEG cannot reasonably be faulted for not keeping a decades-worth of emails on its live servers on the possibility that it would one day be requested in a rate-court proceeding.  No rule or policy requires that of any company.

[8] Rule 45(e)(1)(D) provides that a non-party need not engage in discovery of electronically stored information that is "not reasonably accessible because of undue burden or cost."  Fed. R. Civ. P. 45(d)(1); *see also Go v. Rockefeller Univ.*, 280 F.R.D. 165, 175-76 (S.D.N.Y. 2012) (recognizing that backup tapes are generally "not reasonably accessible").  These protections would apply all the more so here given that BMI has failed to show good cause for requiring AEG to resort to backup tapes in light of the fulsome information AEG is already collecting and providing.  Indeed, under these circumstances, even a party would not be required to provide ESI that is "not reasonably accessible."  *See* Fed. R. Civ. P. 26(b)(2)(B).

with GMR (January 2015 to June 2016), plus one month of tapes per year for the period 2009-2014.  On Friday, we received the quote for this revised request, which is approximately $63,000 with a 4-5 week turnaround time simply to restore the data (to say nothing of the considerable cost to run search terms and review the emails that hit-upon those terms).  If BMI wishes to pursue email searches that require the restoration of archived materials, it should be required to pay all associated costs (*i.e.*, both for retrieval and attorney review).  *See, e.g., Elkharwily v. Franciscan Health Sys.*, No. 3:15-CV-05579-RJB, 2016 WL 4061575, at *3 (W.D. Wash. July 29, 2016) (denying request to restore backup tapes unless plaintiff paid all costs for retrieving and restoring tapes to an accessible format).[9]

Moving beyond the backup tape issue, BMI makes the surprising and wholly new demand for emails relating to any arrangements between AEG and AXS (and any other ticket servicing agents) regarding the pricing of concert tickets and the imposition of ticket servicing surcharges.  As noted above, this joint letter is the first time that BMI has raised AXS's revenues as a subject of discovery (beyond its request for any agreement with AEG Presents).  Indeed, BMI's document requests to AEG only asked for agreements with ticketing brokers—not communications with such entities.  Even if BMI had requested such documents, it has not (and cannot) explain why its receipt of email communications between AEG and AXS, both non-parties, is either relevant or proportional to the needs of this case.  BMI will already receive

_____

[9] The cases BMI cites regarding backup tapes, *see infra* n. 10, are unavailing as each concerns the restoration of a *party's* backup tapes.  Courts have recognized that discovery requests that cause a non-party to incur significant expense are inappropriate.  *See Tucker v. Am. Int'l Grp., Inc.*, 281 F.R.D. 85, 98-100 (D. Conn. March 15, 2012). ("[P]laintiff has failed to establish 'good cause' to compel inspection of [the non-party's] records for emails that are not 'reasonably accessible' and of questionable existence.").

sufficient financial information, including AEG's revenue from ticketing rebates, on an

annualized and aggregated basis over the relevant time period.

### ii.        The Urgency of Resolving the Matter

<u>The BMI Position</u>

The need for resolution of this issue is urgent.  In the May 28, 2019 letter from its counsel,

AEG asserts that it will take six weeks to restore the backup tapes.  Because the document

discovery deadline is being extended by (60) sixty days, AEG will only have two weeks to

review and produce relevant emails.

<u>The NACPA Position</u>

This issue is ripe for resolution.

### iii.        The Estimated Approximate Cost of the Production

<u>The BMI Position</u>

Although AEG has provided a rough estimate of $170,000, to restore backup tapes going

back to 2009, the cost to restore tapes from 2013-2015 should be less than half of that expense

(under $85,000), and no concrete estimate has been provided for review.  There is no basis for

AEG to avoid its discovery obligations and shift costs to BMI simply because AEG has

voluntarily decided to archive emails on backup tapes.[10]

---

[10] There is no reasonable basis for AEG's contention that BMI should bear the cost of AEG's restoration of back-up tapes.  The cost of restoration (estimated at under $85,000) is well within the reasonable range for complex civil litigation, particularly considering the amount at issue and that AEG is one of the world's top concert promoters.  *U.S. ex rel. Guardiola v. Renown Health*, No. 3:12-CV-00295-LRH, 2015 WL 5056726, at *4-6 (D. Nev. Aug. 25, 2015) (holding that defendant with $2.6 billion in patient revenues must restore its back-up tapes at an "infinitesimally small portion of [their] annual revenues" of approximately $136,000 and costs would not be shifted to party seeking production); *Medtronic Sofamor Danek USA, Inc. v. Nuvasive, Inc.*, No. 08CV1512 MMA (AJB), 2010 WL 11452428, at *3 (S.D. Cal. Mar. 19, 2010) (holding that party was required to restore back-up tapes at a loosely-estimated cost of $250,000 where, *inter alia*, "the amount in controversy in the instant litigation is significant").  Courts regularly refuse to shift costs of such discovery under similar

The NACPA Position

As noted above, AEG estimates that restoring backup dates going back to 2009 would cost approximately $170,000.  Restoring backup tapes for the period of time that AEG negotiated a license with GMR (January 2015 to June 2016), plus one month of tapes per year for the period 2009-2014, would cost approximately $63,000.  While AEG does not have a precise estimate to restore backup tapes for 2013-2015 because this was a proposal first suggested by BMI today, it is reasonable to estimate that restoring this period would likewise result in a cost and burden that is disproportionate to the needs of the case, as well as excessive and unduly burdensome to impose upon a non-party.  For all of the above reasons, to the extent that AEG is compelled to pull any data from backup tapes, BMI should pay the full costs of production.

**NACPA'S REQUESTED RULINGS WITH RESPECT TO BMI'S DISCOVERY-RELATED CONDUCT TO DATE**

### 3. Documents Sufficient to Show Distributions to Top 50 Publishers and Top 50 Songwriters for Each Year

NACPA Position

NACPA has requested documents sufficient to show the amounts of royalties distributed each year for concert performances licensed through NACPA to BMI's top 50 publishers and top 50 composers as well as those showing the manner in which royalties are calculated.  As BMI's response below acknowledges, it has offered only to produce an alphabetical list of both BMI's

---

circumstances, particularly where, as here, the cost of restoring the backup tapes is solely the result of AEG's own archiving decisions.  *See Guardiola*, 2015 WL 5056726, at *9 (denying cost shifting where, *inter alia*, the documents were not reasonably inaccessible); *Starbucks Corp. v. ADT Sec. Servs., Inc.*, No. 08-CV-900-JCC, 2009 WL 4730798, at *6 (W.D. Wash. Apr. 30, 2009) ("[T]he fact that a company as sophisticated as [defendant wholly owned by a Fortune 500 company] chooses to continue to utilize the [backup system] . . . should not work to plaintiff's disadvantage."); *AAB Joint Venture v. United States*, 75 Fed. Cl. 432, 440 (2007) ("[T]he Court cannot relieve Defendant of its duty to produce those documents merely because Defendant has chosen a means to preserve the evidence which makes ultimate production of relevant documents expensive.").

top publisher affiliates and its top songwriter affiliates from 2015-2017, the *aggregate* "total amount" of royalty distributions attributable to each affiliate group over the period, its publicly available "royalty distribution policy," a narrative regarding its methodology for royalty calculation, and some "form" agreements and a "mock-up . . . royalty statement"—none of which identifies a single publisher or songwriter.

These limited categories of information are simply insufficient.  NACPA requires BMI's royalty distribution information as a proxy for the size and relative importance of its top publishers and composers to NACPA and its members.  Otherwise, NACPA is unable to evaluate the effect of any one of these top affiliates withdrawing its collection from BMI's repertory, including, most prominently, the impact on BMI's share of performances by NACPA members. Additionally, BMI has made assertions about the relevance of changes in other publisher revenue streams, such as record sales, on the reasonable fee for a performance rights license for NACPA. While we do not agree with these assertions, we intend to seek third-party discovery directed toward those assertions.  In order to make informed judgments about the number of subpoenas to serve, and the affiliates to whom they should be directed, NACPA needs to understand the relative importance of the affiliates to live concerts and music festivals, as measured by the royalties they have received from BMI.

NACPA is not aware of any particular cost or burden to BMI associated with producing this basic financial information.

The BMI Position

NACPA's claims are meritless.  BMI has well-founded objections to producing the highly confidential royalty statements of – or, alternatively, the amount of royalties paid to – BMI's top 50 songwriters and top 50 publishers each year.  The manner in which royalties are calculated

and made to a songwriter or publisher are governed by BMI's published royalty distribution policy – which is available on BMI.com and has been previously produced to NACPA. BMI has also provided a detailed narrative description of how BMI distributes live concert royalties to supplement the policy. Any advances or guarantees paid to affiliated songwriters or publishers are negotiated individually with BMI affiliates and they reflect past and future anticipated overall earnings on their catalogues from all sources. They are not based on projected live concert revenues. Given the license rates currently in effect, BMI's total live concert royalty distributions from all licensed sources comprise a very small portion of BMI's annual distributions each year. Thus, live concerts constitute a very small fraction of the royalties received by songwriters and publishers. Moreover, live concert royalty distributions vary considerably each year depending on which artists are touring; there is no relationship between the total royalties distributed to affiliates year in and year out to their episodic live concert distributions.

Equally meritless is NACPA's claim of relevance for royalty statements or the total royalties paid to a top 50 songwriter or publisher. The information is completely irrelevant to establish a reasonable blanket license rate for a BMI blanket license for live concerts. Distributions to any given songwriter or publisher would have no bearing on whether BMI's proposed live concert rate for the entire BMI repertoire is reasonable. The lack of relevance of this information is matched only by its commercial sensitivity and highly personal, private nature. Individual songwriters and publishers understandably would desire that this highly personal and commercially sensitive information remains private.

In addition, if BMI's competitors knew the amounts that BMI paid its top songwriters and publishers, they could deploy that information to solicit songwriters and publishers to join a rival

PRO.  Indeed, NACPA Members could exploit this information to try to directly license works from BMI affiliates; in this regard, NACPA Members are direct competitors of BMI.

NACPA does not need this information for the purposes of this litigation. BMI has *already* produced more than sufficient information concerning these topics.  BMI has *already* produced the following documents:

- BMI's published royalty distribution policy (BMI_NACPA_0000102);

- A form publisher affiliation agreement, a form songwriter affiliation agreement, a form advance agreement, and a form guarantee agreement (BMI_NACPA_0000520; BMI_NACPA_0000598; BMI_NACPA_0000832; BMI_NACPA_0000834);

- An alphabetical list of the top 50 songwriters and the top 50 publishers who received live concert distributions from 2015 through 2017 (BMI_NACPA_0000532);

- The total amount of live concert royalties paid to the top 50 songwriters and the top 50 publishers from 2015 through 2017, and, using simple math, the percentage of this amount of the total live concert royalties paid to all of BMI's affiliated songwriters and publishers (BMI_NACPA_0000532; BMI_NACPA_0000394);

- A mock-up of a royalty statement showing the types of information included therein regarding live concert distributions (BMI_NACPA_0000200); and

- A narrative explaining the process by which BMI determines and distributes live concert royalties to its affiliated songwriters and publishers and describing any changes to its royalty distribution methodology during the relevant period (BMI_NACPA_0000403).

NACPA's reasoning for requiring any further information is unpersuasive.  *First*, to the extent NACPA desires an understanding of the percentage of royalties distributed to BMI's top songwriters and publishers, BMI has provided information sufficient for NACPA to understand

the percentage of royalties distributed to the top 50 songwriters and publishers and to the remainder of BMI's songwriters and publishers.  NACPA therefore is already in possession of the information necessary for it to determine the "relative importance of its top publishers and [songwriters] to NACPA and its members."  *Second*, NACPA's contention that it needs to know the ranking within the top 50 songwriters and publishers to determine whom to subpoena as a third-party witness is a make-weight argument.  NACPA has not articulated a single reason why the top-ranked publisher would have any more or less to offer on the change in revenue streams than the fiftieth-ranked publisher.  In any event, NACPA's request for information as a means to determine whom to subpoena does not overcome the legitimate relevancy and sensitivity arguments set forth herein.  NACPA well knows that the music publishing industry is comprised of three major publishers and several larger independent publishers.  If NACPA desires information about how publishers' royalties from mechanical incomes have changed over the years, NACPA is well aware of the publishers that would have such information.  Yet, at no point during the protracted negotiations regarding discovery did NACPA ever raise the possibility of issuing subpoenas to BMI's publishing affiliates.

To the extent that NACPA expresses a concern about the impact of one or more BMI affiliates withdrawing its songs from BMI, that concern is equally unfounded.  This court has ruled that selective withdrawal of performing rights is not permitted by the consent decree.  An affiliate would have to terminate its affiliation for all purposes in order to withdraw rights.

4.   **Data Used By BMI for Its Quarterly Distributions of Royalties for Concert Performances and Music Festivals**

The NACPA Position

NACPA has requested, *inter alia*, documents concerning the works performed at concerts and music festivals licensed by BMI, documents sufficient to identify the works in BMI's

repertory (and the share of those works owned by BMI affiliates) and changes in the repertory over time.  As BMI has made clear in a document describing BMI's distribution methodology, the data and information that BMI has used to make its quarterly royalty distributions on account of performances at concerts promoted by NACPA members and others are responsive to the requests.

As BMI notes below, it has produced quarterly performance data for the period of 2015 to Q1 2018, which appears to set forth song title, revenue, and PRO share information.  This data, however, does *not* provide the names of any of the songwriters or publishers to whom BMI is paying out its distributions with respect to those works, which is information that BMI has in its possession and readily knows.  Nor does this spreadsheet provide any information regarding the specifics of any revenue weighting that it undertakes, and which is unquestionably relevant to its distribution process.  Because NACPA cannot tell whom BMI is paying, NACPA is unable to use this data to analyze the relative value of the BMI repertory relative to ASCAP.  Moreover, even this incomplete subset of the information has been provided for only a portion of the period that NACPA has requested; NACPA requested BMI's distribution data for the period from January 1, 2014 though the end of 2018, and BMI's response below concedes that it has performance information at least for the 2014 period as well.  That BMI "amended its distribution methodology" in January 2015 does not mean that it does not have the underlying data for 2014. . This data is directly relevant to NACPA's efforts to evaluate (in combination with other information) BMI's market share and changes in its market share over time. Establishing BMI's market share will be directly relevant to evaluating NACPA's agreement with ASCAP as a benchmark for rate-setting.  What is more, BMI's counsel has indicated on several meet-and-confers that BMI itself plans on using at least some subset of this data to

conduct its own music share analysis for use in this proceeding.  NACPA should not have to wait

until expert discovery or some late stage of fact discovery for BMI to complete its analysis

before it obtains access to this key factual information that is already in BMI's possession.  Nor

should NACPA be hamstrung by the choices BMI may make about which particular slices of this

data to use for its own analysis.

NACPA is not aware of any particular cost or burden to BMI associated with producing the

information it already aggregated for purposes of making royalty distributions.  Accordingly,

NACPA requests that BMI produce this information by June 30.

The BMI Position

BMI has already produced substantial information relating to the subject matter of this

request.  BMI has produced performance data on which it distributed quarterly live concert

royalties for the period 2015 to Q1 2018 (BMI_NACPA_0000148).  To the extent NACPA seeks

data from 2014 and from Q2-Q4 2018, its request is baseless.  NACPA's sole contention in

support of this additional information is that it needs the data because "BMI's market share and

changes in its market share over time."  BMI, however, responsibly chose to collect data

beginning in January 2015 because BMI amended its distribution methodology at that time and,

as BMI has advised NACPA's counsel, any data preceding 2015 would not be relevant to any

analysis of current distribution practices.  BMI selected the cut-off date of Q1 2018 because that

was the latest available data that BMI had at the time of its data collection.  BMI is not

withholding from production performance data on which it has a present intention to rely in

expert discovery.

NACPA's concerns with respect to the granularity of the performance data that BMI has

produced are meritless.  Without exception, BMI has provided the information necessary for

NACPA to assess BMI's market share of live concerts and music festivals for more than a three-year period.  BMI also has provided the title of the musical works performed at these concerts, the tour at which each work was performed, the revenue associated with the tour, the number of times each work was performed on a tour, and the associated portion of the performances owned by BMI (as well as other PROs).  Measured against the information that BMI has already turned over, NACPA's demand for the names of the songwriters and publishers with an interest in these musical works seeks irrelevant and highly personal and commercially sensitive information. NACPA does not need the names of the songwriters and publishers to advance its argument as to what constitutes a reasonable license, and with this information, NACPA easily would be able to determine how much individual songwriters and publishers receive in royalties – among the most commercially sensitive information in BMI's possession.  Moreover, as noted above, the NACPA Members could exploit this information by seeking to enter into direct licensing agreements with BMI's affiliates.  Providing the identity of the songwriters and publishers to the NACPA Members would give them a roadmap to directly license these works, and thereby avoid paying BMI a licensing fee.

B.     **ISSUES FOR THE COURT'S CLARIFICATION AND DISCUSSION**

Rulings for the following are unnecessary at this time, but clarification and discussion may be of assistance to the Parties.  The Parties set forth, for each issue: (i) each Party's position and its reasons; and (ii) such items from (A)(ii) and (A)(iii) as may be helpful.

**NACPA'S ISSUES WHICH WOULD BENEFIT FROM CLARIFICATION AND DISCUSSION AT THE CONFERENCE**

1.     **NACPA's Need for Information About the Extent to Which BMI Has the Ability to Bind Its Affiliates for the Duration of "Licenses in Effect"**

The NACPA Position

BMI requested, and NACPA agreed to produce, the NACPA's membership agreements. Just as BMI wanted to understand the nature of the relationship between NACPA and its members, NACPA wants to understand the specific nature of the relationship between BMI and its affiliates.  Recognizing that it would be impractical to request BMI's agreements with every affiliate, NACPA limited its request to the top 50 publishers and the top 50 songwriters in terms of annual royalty distributions for each year of the relevant period.  During the meet-and-confer process, NACPA indicated its willingness to further limit the request if there is significant year-to-year variation in the publishers and songwriters in the top 50 to ensure that the total number of affiliates at issue would remain reasonable.

BMI objected to producing affiliation agreements at all and, to date, has only agreed to produce a form affiliation agreement.  This is not sufficient, because individual BMI affiliates can alter the form agreements in ways that are important and relevant to this case.  For example, NACPA understands from past testimony that BMI's form agreement includes a provision that addresses "licenses in effect," *i.e.*, final agreements with licensees.  Under such a provision, BMI retains the right to license an affiliate's works for the duration of a final license agreement, even if the affiliate withdraws from BMI during the term of that agreement.  But, as BMI has acknowledged to this Court, affiliates can strike out the licenses in effect provision.  Specifically, Mike O'Neill, President and CEO of BMI, testified in the 2015 *BMI v. Pandora Media, Inc.* rate-setting proceeding that Mariah Carey "crossed out" the licenses in effect provision from BMI's form affiliation agreement and that, as a result, BMI licensees immediately lost access to her works under their BMI licenses when she switched her PRO affiliation to SESAC.  *See* Case No. 1:13-cv-04037-LLS, Dkt. 196, at 27:17-28:21.

In contrast, NACPA understands that ASCAP's songwriter and publisher affiliates are *universally* bound to the licenses-in-effect provisions in the Compendium of ASCAP Rules and Regulations,[11] and cannot cross them out or otherwise negotiate around them. This provides assurance to NACPA that any work in ASCAP's repertory will continue to be available under the ASCAP license for the full term of its license, even if the songwriter withdraws from ASCAP. In other words, if an ASCAP writer switches PROs, NACPA members can continue to promote concerts featuring performances of that writer's music for the duration of the ASCAP license.

In NACPA's view, this is a relevant and important distinction for purposes of evaluating reasonable fees and terms for a BMI license and, accordingly, it needs to know which top affiliates have the ability to withdraw their works from the BMI repertory and the scope of a license to NACPA at any time. We are amenable to limiting the request so that it does not call for information about the top 50 publishers and songwriters for each year if that results in an unreasonably large total number, or to accepting the relevant information in forms other than copies of each individual agreement, but we do not even have sufficient information from BMI to evaluate possible limitations. We respectfully request the Court's guidance on this issue.

The BMI Position

To summarize NACPA's request more plainly: NACPA wants 100 executed affiliation agreements (50 publishers and 50 songwriters) for *each year* from 2009 through 2018. Not only is the scope of this request overbroad and disproportionate to the needs of this litigation, but the relevance of these agreements is simply non-existent in light of BMI's production to NACPA. NACPA has yet to assert any intelligible basis to connect its request for these highly sensitive

---

[11] https://www.ascap.com/~/media/files/pdf/members/governing-documents/compendium-of-ascap-rules-regulations.pdf

affiliation agreements with the matter at issue in this litigation: the reasonable rate and revenue base that should be used to determine royalties for live concert performances.

First and foremost, contrary to NACPA's stated position, BMI has *already produced* form affiliation agreements with songwriters and publishers, and as a result of conferrals with NACPA, BMI has also produced form advance and guarantee agreements.  The production of these documents satisfies NACPA's purported basis for this request – that "NACPA wants to understand the specific nature of the relationship between BMI and its affiliates."  NACPA is simply looking for leverage by seeking this highly sensitive and voluminous information.

Further, the terms of any single affiliation agreement are irrelevant to determining a reasonable rate for a license to perform BMI's catalogue.  The only information that NACPA needs to assess market share and the value of a BMI license is binary: whether a songwriter or publisher is a BMI affiliate or is not.  Not only is information about BMI's affiliates and extensive catalogue publicly available on its website, but BMI has *already produced* a list of BMI affiliates that changed affiliations to another PRO between January 2010 and May 2018, and has repeatedly offered to negotiate and potentially produce additional information about changes in affiliation for other dates.  NACPA has not requested this information despite numerous opportunities to do so.

Nor would BMI's production of hundreds of affiliation agreements at all be reciprocal, contrary to NACPA's suggestions otherwise.  NACPA's sole purpose is to negotiate live concert license agreements with BMI, ASCAP, and SESAC for its members, whereas BMI's affiliation agreements relate to all royalties from all sources and are not limited to live concerts.  On a numerical basis alone, the sheer number of documents that NACPA is requesting is many times the number of NACPA members for which NACPA has produced its boilerplate agreements.

NACPA appears to concede that its request is commensurate to looking for a needle in a haystack.  NACPA now states that it needs to learn whether an affiliate has modified the "licenses-in-effect" provision.  The relevant issue, however, is BMI's overall market share of songs performed at live concerts.  Whether any particular affiliate has modified a BMI affiliation agreement over the past ten years is a minor data point that has a tenuous relationship, at best, to determining the reasonable value of songwriters' essential contributions to the live concert industry.

The information sought by NACPA would not assist the Court in determining a reasonable blanket license rate for live concerts—a rate that appropriately should be based on the catalogue BMI delivers today, not on which songwriters or publishers in prior years had a "licenses-in-effect" provision in their affiliation agreement.  The top 50 songwriters and top 50 publishers vary – often dramatically – from year-to-year.  As such, the top 50 songwriters and top 50 publishers for a historical period is not a valuable proxy for the Court to consider.

At bottom, NACPA's argument in support of the purported relevance of this information involves speculation – namely, NACPA suggests it is possible that a particular songwriter or publisher at some point in the future may leave BMI for another PRO and simultaneously undertake the cumbersome task of moving its catalogue prior to the expiration of the current license.[12]  Any such risk is virtually non-existent.  ASCAP and BMI have never sought to enforce the licenses-in-effect provision against each other.  Newer PROs, such as GMR, have sought to limit their number of affiliates to very small numbers.  Finally, increasing the blanket

---

[12] BMI has already produced to NACPA a list of which affiliates have left BMI for another PRO or jointed BMI from another PRO during the period 2010-May 2018.

license rate to the rate proposed by BMI in this proceeding is likely to have the effect of keeping affiliates within the BMI family, not drive them to a competing PRO.

Any concerns NACPA may have about whether certain BMI affiliates' agreements contain "licenses-in-effect" provisions are best addressed during the negotiation or determination of the license between NACPA and BMI.  Similar concerns previously have been addressed by using "reopener" provisions which permit a party to renegotiate the license terms if certain conditions precedent are satisfied.  Because NACPA's expansive and invasive request is irrelevant for any valid litigation purpose, the Court should deny NACPA's request.

DATED:   New York, New York
         June 4, 2019

MILBANK LLP

By:/s/ *Thomas A. Arena*
Scott A. Edelman
sedelman@milbank.com
Thomas A. Arena
tarena@milbank.com
Atara Miller
amiller@milbank.com

55 Hudson Yards
New York, NY 10001-2163
Tel:  212.530.5000
Fax:  212.530.5219

*Attorneys for Petitioner Broadcast Music Inc.*

WEIL, GOTSHAL & MANGES LLP

By: /s/ *Benjamin E. Marks*
Benjamin E. Marks
benjamin.marks@weil.com
David Yolkut
david.yolkut@weil.com

23

Erin M. James
erin.james@weil.com
Eliza M. Cotter
eliza.cotter@weil.com

767 Fifth Avenue
New York, New York 10153
Tel:   212.310.8000
Fax:  212.530.8007

*Attorneys for NACPA on behalf of itself and as licensing representative for the NACPA members identified in Amended Notice of Appearance*

LATHAM & WATKINS LLP

By: /s/ *Andrew Gass*
Andrew Gass (*pro hac vice* pending)
andrew.gass@lw.com
505 Montgomery St.
San Francisco, CA 94107
Tel: 415.391.0600
Fax: 415.395.8095

*Attorneys for Live Nation Entities, as identified in Notice of Appearance*