**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BROADCAST MUSIC, INC., | |
| Petitioner, | 18 Civ. 8749 (LLS) |
| v. | Related to *United States v. Broadcast Music, Inc.*, 64 Civ. 3787 (LLS) |
| NORTH AMERICAN CONCERT PROMOTERS ASSOCIATION, as licensing representative of the promoters listed on Exhibit A to the Petition, | |
| Respondent. | |

## NORTH AMERICAN CONCERT PROMOTERS ASSOCIATION'S PRE-TRIAL BRIEF

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 6

I.   THE NATURE AND FRAMEWORK OF THIS PROCEEDING................................. 6

    A.   BMI and the BMI Consent Decree ......................................................... 6

    B.   NACPA and Its Role in Licensing Public Performances of Music at
        Concerts Promoted by Its Members...................................................... 10

    C.   The License at Issue ............................................................................. 11

II.  THE LIVE CONCERT INDUSTRY AND THE IMMERSIVE, MULTIMEDIA
    EXPERIENCES THAT ATTRACT CONCERTGOERS ............................................. 12

    A.   The Structure of the Live Concert Industry ......................................... 12

        1.   The Role of Concert Promoters and the Financial Risks They
            Assume.................................................................................... 12

        2.   The Central Role of the Performing Artist ............................. 13

        3.   The Roles of Venue Operators and Ticketing Companies and Their
            Non-Music Contributions to the Concertgoer's Experience.................... 15

        4.   The Roles of Songwriters and the PROs.................................. 16

    B.   Changes in the Live Concert Industry over Time—And What Has Not
        Changed ................................................................................................ 17

        1.   Concert Promoters Have Invested Heavily over Time to Improve
            the Non-Musical Elements of the Live Concert Experience ................... 17

        2.   Revenues Earned by NACPA Members from Ticket Sales, and
            Correspondingly the Royalties Paid by NACPA to BMI, Have
            Increased Dramatically over Time........................................... 18

        3.   The Industry Consolidation BMI Cites as a Basis for the Dramatic
            Fee Increase It Seeks Began in the 1990s.................................. 19

        4.   The Ancillary Revenue Streams that BMI Cites as a Basis for the
            Dramatic Fee Increase It Seeks Have Existed for Decades ..................... 20

        5.   Ticketing Companies and Changes Over Time in Ticket Delivery
            Have Provided Additional Value to Concertgoers that Is Unrelated
            to the Value of the Music Performed........................................ 22

        6.   The Crushing Impact of the COVID-19 Pandemic on Concert
            Promoters ............................................................................... 23

III. NACPA'S RELATIONSHIP WITH BMI AND PRIOR BMI-NACPA
LICENSES ......................................................................................................... 25

    A.    Early Negotiations Between NACPA and BMI ................................... 25

    B.    The Initial 1998 BMI-NACPA License Agreement (1998-2006) ........ 25

    C.    The 2006 BMI-NACPA License Agreement (2006-2013) .................... 26

    D.    BMI Imposed a New Rate Schedule on Non-NACPA Promoters in 2009
But Did Not Try to Renegotiate the NACPA Rates at that Time ......... 27

    E.    BMI's Cancellation of the 2006 BMI-NACPA Agreement, the Interim Fee
Agreement, and the Unsuccessful Efforts to Finalize a New License ... 28

    F.    The Royalties Paid and Administrative Services Provided by NACPA
During the Interim License Period (2014 to Date) .............................. 31

IV. NACPA'S LONGSTANDING, VOLUNTARY LICENSE DEALINGS WITH
ASCAP AT RATES SIMILAR TO THOSE PAID TO BMI ............................. 31

    A.    The 2001 ASCAP-NACPA Agreement (2000-2017) ......................... 32

    B.    The 2005 Amendment to the 2001 ASCAP-NACPA Agreement ........ 32

    C.    The 2018 ASCAP-NACPA Agreement (2018-2021) .......................... 33

V. PROMOTERS' LICENSES WITH UNREGULATED PROS THAT WIELD
UNCONSTRAINED MARKET POWER ...................................................... 34

    A.    The Unconstrained Market Power of Unregulated PROs .................... 34

    B.    NACPA's Licenses with SESAC ........................................................ 35

    C.    Individual Promoter Licenses with GMR .......................................... 36

VI. THE PARTIES' FEE PROPOSALS ............................................................. 37

    A.    BMI's Fee Proposal .......................................................................... 37

    B.    NACPA's Fee Proposal ..................................................................... 38

ARGUMENT ................................................................................................................. 39

VII. THE GOVERNING PARAMETERS OF THE BMI CONSENT DECREE AND
THE RATE COURT'S ROLE IN SETTING ROYALTY RATES ................. 39

VIII. NACPA'S FEE PROPOSAL IS REASONABLE .......................................... 40

    A.    The Use of Relevant Benchmarks to Determine Reasonable Fees ...... 40

    B.    The 2006 BMI-NACPA Agreement Is an Excellent Benchmark that
Accounts for Relevant Industry Changes over Time ........................... 41

    C.    ASCAP's Agreements with NACPA During the Relevant Period Also
Provide Useful Benchmarks .............................................................. 46

    D.    The Range of Reasonable Rates Derived from the BMI-NACPA and
ASCAP-NACPA Benchmarks ........................................................... 48

IX. BMI'S FEE PROPOSAL IS UNREASONABLE .......................................... 49

A.     BMI's Proposed Royalty Rate Is Unreasonable ................................................... 49

      1.     Foreign PRO Rates Are Not Reliable Benchmarks for Fee-Setting Here .......................................................................................................... 50

      2.     SESAC and GMR Licenses Are Not Reliable Benchmarks for Fee-Setting Here and, in Any Event, Properly Adjusted, Would Point to Fees Lower than BMI Has Proposed ......................................................... 51

      3.     BMI and ASCAP Licenses with Non-NACPA Promoters Are Not Reliable Benchmarks .................................................................................. 57

      4.     BMI's License Agreements with Radio Broadcasters and Music Streaming Services Further Demonstrate the Unreasonableness of BMI's Fee Proposal Here .......................................................................... 59

B.     BMI's Proposed Expansion of the Revenue Base Subject to the Royalty at Issue Is Unreasonable ............................................................................................ 60

      1.     Even BMI's Own Proposed Benchmarks Do Not Support the Expansion of the Revenue Base BMI Seeks ............................................. 60

      2.     BMI's Proposed Revenue Base Would Include Revenues that Promoters Do Not Receive, Are Not in a Position to Identify, and Are Untethered to the Public Performances of Music Subject to the License ................................................................................................... 61

      3.     BMI's Proposed Revenue Base Is Unnecessarily Complicated and Unworkable .............................................................................................. 64

C.     BMI's Proposal to Eliminate NACPA's Administrative Discount Is Unreasonable .................................................................................................... 65

CONCLUSION ................................................................................................................ 67

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Application of MobiTV, Inc.*,
    712 F. Supp. 2d 206 (S.D.N.Y. 2010), *aff'd*, 681 F.3d 76 (2d Cir. 2012) ..............................55

*ASCAP v. MobiTV, Inc.*,
    681 F.3d 76 (2d Cir. 2012)....................................................................................39, 45, 55

*ASCAP v. Showtime/The Movie Channel, Inc.*,
    912 F.2d 563 (2d Cir. 1990)....................................................................................40, 41, 58

*Broad. Music Inc. v. DMX Inc.*,
    683 F.3d 32 (2d Cir. 2012) ............................................................................................ *passim*

*Meredith Corp. v. SESAC, LLC (Meredith Corp. I)*,
    No. 09-cv-9177, 2011 WL 856266 (S.D.N.Y. Mar. 9, 2011)..........................................51, 52

*Meredith Corp. v. SESAC, LLC (Meredith Corp. II)*,
    1 F. Supp. 3d 180 (S.D.N.Y. 2014)......................................................................................52

*Meredith Corp. v. SESAC, LLC (Meredith Corp. III)*,
    87 F. Supp. 3d 650 (S.D.N.Y 2015).................................................................................52, 53

*In re Pandora Media, Inc.*,
    6 F. Supp. 3d 317 (S.D.N.Y. 2014), *aff'd sub nom. Pandora Media, Inc. v.*
    *Am. Soc. of Composers, Authors & Publishers*, 785 F.3d 73 (2d Cir. 2015) .........................55

*Radio Music License Comm., Inc. v. SESAC, Inc. (RMLC/SESAC I)*,
    No. 12-cv-5807, 2013 WL 12114098 (E.D. Pa. Dec. 23, 2013).......................................51, 52

*Radio Music License Comm., Inc. v. SESAC, Inc. (RMLC/SESAC II)*,
    29 F. Supp. 3d 487 (E.D. Pa. 2014) ................................................................................51, 52

*United States v. ASCAP*,
    1940-43 Trade Cas. (CCH) ¶ 56,104 ...............................................................................8, 46

*United States v. ASCAP (In re Application of Buffalo Broad. Co.)*,
    No. 13-5 (WCC), 1993 WL 60687 (S.D.N.Y. Mar. 1, 1993)...........................................16, 40

*United States v. ASCAP (In re Capital Cities) (Capital Cities I)*,
    831 F. Supp. 137 (S.D.N.Y. 1993)........................................................................................41

*United States v. ASCAP (In re Capital Cities) (Capital Cities II)*,
    157 F.R.D. 173 (S.D.N.Y. 1994) ..........................................................................................41

*United States v. ASCAP (RealNetworks)*,
627 F.3d 64 (2d Cir. 2010)..................................................................40, 41, 61, 61

*United States v. Broad. Music, Inc.*,
1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. 1966) ......................................................8

*United States v. Broad. Music, Inc.*,
1996-1 Trade Cases ¶ 71,378 (S.D.N.Y. 1994) ..........................................................8

*United States v. Broad. Music, Inc.*,
207 F. Supp. 3d 374 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 14 (2d Cir. 2017)........................9

*United States v. Broad. Music Inc.*,
720 F. App'x 14 (2d Cir. 2017) ......................................................................7, 9

*United States v. Broad. Music Inc., (Music Choice III)*, No. 64 Civ. 3787(LLS),
2004 WL 1171249 (S.D.N.Y. 2004)......................................................................46

*United States v. Broad. Music Inc. (In re Application of Music Choice) (Music
Choice IV)*,
426 F.3d 91 (2d Cir. 2005)........................................................................ *passim*

*United States v. Broad. Music, Inc.*,
1940-43 Trade Cas. ¶ 56,096 (E.D. Wisc. 1941) ......................................................8

**Statutes**

Music Modernization Act, Pub. L. No. 115-264, 132 Stat. 3676 (2018) ..................................9, 48

**Legislative Materials**

S. Rep. No. 115-339 (2018)..............................................................................9, 48

**Other Authorities**

*About*, BMI, http://www.bmi.com/about (last visited Oct. 5, 2022). ....................................7

*BMI Announces Record-Breaking Revenue and Royalty Distributions*, BMI (Sept.
13, 2022), https://www.bmi.com/news/entry/bmi-announces-record-breaking-
revenue-and-royalty-distributions......................................................................24

*Catalog*, Global Music Rights, https://globalmusicrights.com/Catalog (last visited
Oct. 7, 2022) ........................................................................................53

Neil Strauss & James Sterngold, New York Times*, Concert Juggernaut; How
One Company Is Transforming the Live Entertainment Industry* (Jul. 20,
1998), https://www.nytimes.com/1998/07/20/arts/concert-juggernaut-one-
company-transforming-live-entertainment-industry.html ................................................19

*Newest PRO*, SoundMachine (June 18, 2018), https://sound-machine.com/blog/2018/06/18/global-music-rights/ .............................................................53

*RMLC Responds To SESAC Discount Offer*, Radio and Television Business Report (July 31, 2017), https://www.rbr.com/rmlc-responds-to-sesac-discount-offer/...........................................................................................................................53

*Record Levels During Unprecedented Year,* BMI (Sept. 8, 2021), https://www.bmi.com/news/entry/bmi-grows-revenue-and-distributions-to-record-levels-during-unprecedented-y .....................................................................24

*Statement of the Dep't of Justice on the Closing of the Antitrust Division's Review of the ASCAP and BMI Consent Decree*, Dep't of Justice (Aug. 4, 2016), https://www.justice.gov/atr/file/882101/download..................................................8

*Statement of the Dep't of Justice on the Closing of the Antitrust Division's Review of the ASCAP and BMI Consent Decrees*, Dep't of Justice (Jan. 15, 2021), https://www.justice.gov/atr/page/file/1355391/download........................................................9

# INTRODUCTION

This rate proceeding emanates out of a longstanding consent decree between the Antitrust Division of the U.S. Department of Justice ("DOJ") and Broadcast Music, Inc. ("BMI") that is designed to constrain BMI's exercise of market power. BMI's recent attempt to impose fees on the North American Concert Promoters ("NACPA") that are *multiples* of what NACPA has ever paid to either BMI or ASCAP across decades of voluntary license dealings demonstrates precisely why the protections of the decree and the availability of judicial rate-setting remain vitally necessary.

The Court is tasked here with setting reasonable fees for a blanket license that grants the right to publicly perform the works in BMI's repertoire at live concerts and music festivals promoted by NACPA members for the period commencing on January 1, 2014 and ending on December 31, 2022. NACPA's members—the leading concert promoters in the United States— facilitate immersive, multimedia live concert experiences for millions of attendees each year. They are responsible for planning, organizing, and coordinating virtually every component of the live concert experience.

The ability to see and hear a particular performing artist in person is the principal driver of attendance at live concerts. The value of the live concert experience is enhanced by the appeal of the communal experience of seeing the performance with a crowd of other fans; the lighting, choreography, pyrotechnics, and other sensory elements of a live performance; and the food, beverages, concessions, and merchandise offered by the venue that hosts the concert. In addition to the essential contributions of performing artists, concert promoters, and venue operators, numerous others play vital roles as well, including security personnel, stagehands, talent managers, light and sound technicians, choreographers, and many others. The contribution of a

license covering public performances of the musical works that the artist does not already have the right to perform is but one small component of a much larger whole.

Because performing artists drive the appeal of the live concert experience, they are compensated accordingly. They typically receive the greater of a guaranteed fee and 85% or more of the profits from ticket sales after deduction of the expenses of putting on the show, and thus, the concert promoter typically bears all of the risk of an unprofitable show. Even though performing artists—not concert promoters—make the public performances that necessitate the type of license at issue in this proceeding, concert promoters as a matter of industry practice secure music performance rights licenses from performing rights organizations ("PROs") on the artists' behalf as one of the many "show costs" they bear before dividing earnings from profitable shows with the artists.

For decades, ASCAP and BMI have licensed NACPA's members through agreements negotiated with NACPA itself, in which NACPA—in exchange for an administrative discount—collects concert information and music performance royalty payments from its members, and consolidates payment and reporting, so that ASCAP and BMI need only deal with a single entity to cover many thousands of concerts, across dozens of promoters, each year. For fifteen years, from 1998-2013, BMI and NACPA enjoyed a harmonious relationship. NACPA paid licensee fees to BMI based on a percentage of "Gross Ticket Revenues," which was defined to include revenues from ticket sales subject to various specified deductions and a discount that rewarded NACPA for its role in the license. For concerts in venues with a seating capacity of less than 10,000, NACPA members paid 0.30% of Gross Ticket Revenues, and for concerts in larger venues NACPA members paid 0.15% of Gross Ticket Revenues. By agreement with BMI, NACPA retained 10% of those fees as an administrative discount.

Those fees and terms were the product of extensive negotiations between BMI and NACPA over a five-period and embodied in a license agreement that first took effect on January 1, 1998. At the end of the initial license term, BMI revisited those rates and, other than establishing a new, separate rate category for festivals, agreed to extend the live concert rates and to retain the administrative discount for NACPA's role. At the conclusion of the new license's initial term, the parties again ratified the rates and rate structure and extended the license annually each year between 2009 and 2012.

BMI and its affiliates fared extraordinarily well under these license terms. The number of concerts promoted by NACPA members has grown significantly over time, and the ticket prices NACPA members have charged, and therefore BMI's fees, have increased at a rate much faster than inflation. Because the royalties were set as a percentage of Gross Ticket Revenues, they automatically captured changes over time in ticket prices, the size of the audiences for the licensed events, and the number of NACPA members and events covered by the license. That is how properly calibrated percent-of-revenue rates should operate: while the royalty rates have remained the same, the actual license fees paid each year have increased dramatically over time. In short, BMI has directly benefited from the benefits of the growth of the live concert industry, without any increase in the relative contribution that musical works make to the live concert experience.

BMI nonetheless terminated the license effective December 31, 2013. The parties agreed on an interim license that required both payments at the prior rates and NACPA's ongoing role in the administration of the license. Following several rounds of negotiations, BMI offered a new five-year license at the prior license rates in 2014, but negotiations broke down over BMI's unwillingness to provide adequate protection for NACPA in the event of significant withdrawals

by BMI affiliates during the term of the license that would crater its value.  In 2017, BMI withdrew that offer in favor of a new, dramatically higher fee proposal:  a unitary royalty rate that was *more than five times* the effective rate NACPA paid under the prior agreement; a massive and utterly unworkable expansion of the revenue base to which that rate would be applied; and elimination of the 10% discount for NACPA.  Taken together, BMI's proposed terms would result in an almost tenfold increase in NACPA fees for no reason other than that BMI demanded it.  NACPA rejected that proposal out-of-hand, BMI refused to moderate its demands, and this proceeding followed. [1]

Rate Court precedent makes plain that a logical starting place for a determination of reasonable fees is the most recent voluntary final license agreement between the parties.  That is why BMI's Petition seeks to justify its exorbitant demand on purported industry changes over time, including: industry consolidation, the emergence of "ancillary" revenue streams, and a decline in the "mechanical" royalties earned by its affiliates from album sales.  The discovery record, however, has laid bare that these asserted changes all significantly predated BMI's repeated ratifications and voluntary extensions of the prior rates between 2009 and 2012, not to mention BMI's offer to extend them during 2014 and 2015.

Second Circuit and Rate Court precedent also make plain that voluntary dealings between the license applicant and ASCAP, BMI's closest comparator and competitor, are also instructive of a reasonable fee for BMI given the similarity of the two organizations.  ASCAP-NACPA licenses in place during the interim period dramatically undercut BMI's claimed entitlement to a massive fee increase here.  For the first three years of the interim period at issue here, NACPA

---

[1] BMI has moderated its fee demands somewhat since commencing this proceeding, *see infra*, but its fee proposal remains profoundly unreasonable.

operated under a final fee agreement with ASCAP that resulted in net effective payments to ASCAP slightly below the interim fees paid to BMI. In 2017, ASCAP and NACPA agreed on a new final fee agreement for the 2018-2021 period that yielded payments to ASCAP slightly above the interim fees paid to BMI. While the rates and rate structure under its ASCAP licenses for the period at issue here have not been identical to those in its license agreements with BMI, the total royalty payments over that period have been quite similar.

Tellingly, the record shows that ASCAP also was well aware of all the factors that BMI contends support its rate proposal when it agreed to a new license with NACPA for the 2018-2021 period at rates *less than one-third* of what BMI has ultimately proposed here. And ASCAP surely knew about this proceeding and the arguments in BMI's Petition when it declined to exercise its right to terminate the NACPA license in 2020, preferring instead to leave that agreement in place. BMI offers no credible reason for this Court to award it fees any higher than those ASCAP agreed to accept in arm's-length dealings with NACPA, let alone fees that are higher by several multiples.

Lacking support for higher rates in the two kinds of agreements that this Court and the Second Circuit routinely have recognized as useful benchmarks, BMI's economic expert, Professor Tucker attempts instead to justify BMI's proposal by examining a hodge-podge of other PRO rates that are uninformative of a reasonable rate here, including: (i) rates charged by foreign PROs for live concerts in other countries; (ii) rates charged to NACPA or NACPA members by smaller, unregulated PROs; and (iii) rates charged by ASCAP and BMI to promoters too small to bear the cost of a Rate Court proceeding. Because BMI's rate proposal falls somewhere within the vast range of rates charged around the world for PRO licenses, Professor Tucker contends it is reasonable. But no Rate Court has ever based ASCAP or BMI

fees on the types of benchmarks offered by Professor Tucker, and several have outright rejected them for good reason. They do not reflect the rates that would emerge in a competitive market for performance rights; they are simply rates charged by other monopolists without the safeguards that the consent decrees provide to NACPA in its dealings with ASCAP and BMI.

Because BMI has failed to carry its burden of demonstrating that its proposed license fees and terms are reasonable here, the Court must set the fees based on the available evidence. Consistent with the Second Circuit's admonition that rate-setting courts must take seriously the fact that "they exist as a result of monopolists exercising disproportionate power over the market for music rights," *United States v. Broad. Music Inc. (In re Application of Music Choice) (Music Choice IV)*, 426 F.3d 91, 96 (2d Cir. 2005), NACPA's economic expert, Professor Jaffe, will explain that the rates previously (and repeatedly) agreed to by BMI and NACPA provide an upper bound on the reasonable royalty for the license at issue here and why, if anything, industry changes point to lower rates, not higher ones. Because NACPA's rate proposal as described herein would continue the prior rates, under which BMI songwriters have seen increasing revenues that have both kept pace with the growth of the live event industry and outstripped inflation, it continues to represent the upper bound of reasonable fees and should be adopted.

## STATEMENT OF FACTS

### I. THE NATURE AND FRAMEWORK OF THIS PROCEEDING

#### A. *BMI and the BMI Consent Decree*

BMI is one of several PROs in the United States that licenses public performance rights to the works in its repertoire (some on a full-work basis and others on a fractional basis) to music users, collects license fees from those users, and distributes royalties to its affiliated songwriters, composers and music publishers. NACPA's Proposed Findings of Fact ("NACPA PFOF")

¶¶ 12-13. BMI represents more than 1.2 million affiliated composers and music publishers, and

it licenses rights in more than 18.7 million musical works (collectively, the "BMI Repertoire"). BMI's Proposed Findings of Fact ("BMI PFOF") ¶ 3. BMI exists to maximize the copyright royalties earned by its affiliates arising out of public performances of their musical works in the U.S. *See About*, BMI, http://www.bmi.com/about (last visited Oct. 5, 2022).

BMI licensees include (among many others) concert promoters, commercial radio stations, digital music streaming services, broadcast television stations, broadcast and cable television networks, internet websites, background/foreground music services, concert halls, universities, airlines, retail stores, health clubs, restaurants, bars, and nightclubs. NACPA PFOF ¶ 15. BMI historically has licensed performances at live concerts only on a blanket basis. *Id.* ¶ 16. A BMI blanket license gives a licensee the right to perform any or all of the works in the BMI Repertoire during the license term, as many times as the licensee wishes to do so, except to the extent that works in the repertoire are licensed only on a fractional basis, in which case the licensee must secure additional rights from other rightsholders to perform the work without risk of copyright infringement liability. NACPA PFOF ¶¶ 16, 25; *see United States v. Broad. Music Inc.*, 720 F. App'x 14, 16 (2d Cir. 2017).

BMI and ASCAP, BMI's primary competitor for affiliates, are subject to longstanding antitrust consent decrees with DOJ. In 1941, DOJ brought a civil antitrust action challenging certain of BMI's licensing activities. NACPA PFOF ¶ 17. DOJ was concerned that BMI's mass aggregation of copyrights into a single repertoire gave BMI unlawful market power over the licensing of those rights because music users had no other practical alternatives to secure the rights they needed. *Id.* In short, DOJ contended that BMI was able to charge music users supracompetitive prices for a license as a result of its market power. *Id.* BMI and DOJ agreed to settle DOJ's antitrust concerns through a consent decree that was approved by the court. *See*

*United States v. Broad. Music, Inc.*, 1940-43 Trade Cas. ¶ 56,096 (E.D. Wisc. 1941). The decree was intended to mitigate, at least to some extent, the otherwise unchecked market power that BMI would be able to exert when pricing its licenses. NACPA PFOF ¶ 18.

In 1964, DOJ brought another civil antitrust action against BMI. *Id.* ¶ 20. The parties settled this matter with another consent decree to resolve the same type of competition concerns as the original decree. *See United States v. Broad. Music, Inc.*, 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. 1966) (the "1966 Consent Decree") (updating and replacing prior decree).

The 1966 Consent Decree was again amended in 1994. Among other things, the amendment added an automatic licensing provision and recourse to a rate court to resolve rate disputes between BMI and licensees. *United States v. Broad. Music, Inc.*, 1996-1 Trade Cases ¶ 71,378 (S.D.N.Y. 1994) (as amended, the "BMI Consent Decree"). NACPA PFOF ¶ 21. ASCAP, too, is subject to a consent decree (the "ASCAP Consent Decree") with substantively similar terms. NACPA PFOF ¶ 19; *United States v. ASCAP*, 1940-43 Trade Cas. (CCH) ¶ 56,104 (S.D.N.Y. 1941, amended 2001 WL 1589999, 200-2 Trade Cas. (CCH) ¶ 73,474 (S.D.N.Y. June 11, 2001).

At the request of ASCAP and BMI, DOJ has periodically reviewed their decrees over the past two decades and determined that they should remain in effect without modification. *See*, *e.g.*, *Statement of the Dep't of Justice on the Closing of the Antitrust Division's Review of the ASCAP and BMI Consent Decree*, Dep't of Justice (Aug. 4, 2016), https://www.justice.gov/atr/file/882101/download ("the current system has well served music creators and music users for decades and should remain intact"); *see also* NACPA PFOF ¶ 22. As recently as 2021, DOJ "considered the proper role of the federal government in safeguarding a vibrant and competitive music licensing marketplace," and determined that the ASCAP and

BMI Consent Decrees remain necessary to mitigate the market power created by the PROs' respective aggregation of rights from numerous rightsholders into a single, jointly licensed repertoire.  *See Statement of the Dep't of Justice on the Closing of the Antitrust Division's Review of the ASCAP and BMI Consent Decrees*, Dep't of Justice (Jan. 15, 2021), https://www.justice.gov/atr/page/file/1355391/download; NACPA PFOF ¶ 22.[2]

The BMI Consent Decree defines BMI's repertory as "those compositions, the public performance right of which [BMI] has or hereafter shall have the right to license or sublicense." Consent Decree § II.  In response to a declaratory judgment action brought by BMI, this Court has held that, if BMI affiliates only own part of a particular work, BMI need only include that fractional interest in the work in its licenses to music users.  *United States v. Broad. Music, Inc.*, 207 F. Supp. 3d 374, 376-77 (S.D.N.Y. 2016), *aff'd*, 720 F. App'x 14 (2d Cir. 2017); NACPA PFOF ¶ 24.  Thus, as noted above, when BMI's license only covers a fractional interest in a work, the licensee must still obtain licenses from other parties for the other fractional interests in that work in order to perform the work without risk of copyright infringement.  *See United States v. Broad. Music Inc.*, 720 F. App'x at 16; NACPA PFOF ¶ 25.

The BMI Consent Decree provides that, upon applying in writing to BMI for a license to publicly perform the compositions in the BMI Repertoire, the applicant is automatically licensed from the date that BMI receives the application, even if the parties continue to negotiate fees or

---

[2] Congress recently chose to leave the substantive provisions of the ASCAP and BMI decrees intact when it enacted the Music Modernization Act.  In fact, that legislation includes a requirement that DOJ must notify the Judiciary Committee and ranking members and provide a written report before seeking to terminate a consent decree with ASCAP or BMI.  NACPA PFOF ¶ 23; Music Modernization Act, PL 115-264, October 11, 2018, 132 Stat 3676.  This provision reflects the Senate Judiciary Committee's concern that "terminating the ASCAP and BMI decrees without a clear alternative framework in place would result in serious disruption in the marketplace, harming creators, copyright owners, licensees, and consumers."  S. Rep. No. 115-339, at 16 (2018).

other terms. BMI Consent Decree, § XIV. Either the requesting party or BMI may petition the

Court, as specified by the BMI Consent Decree, to set final rates and terms for the license

retroactive to the date of BMI's receipt of the written application, or the start of the license

period, whichever is later. *Id.* § XIV. BMI affiliates, however, are free to withdraw from BMI

and prevent future performances of their works by BMI license applicants and licensees without

separate licensing.

<blockquote>
B.    *NACPA and Its Role in Licensing Public Performances of Music at Concerts Promoted by Its Members*
</blockquote>

NACPA is an industry association for concert promoters that, among other activities,

negotiates and administers music performance rights licenses with ASCAP, BMI, and SESAC

that cover performances of music at the concerts its members promote. NACPA PFOF ¶¶ 1, 4.

Although performing artists—not promoters—make the public performances at issue in this

dispute and they frequently perform compositions that they themselves wrote, as a matter of

industry practice, promoters secure blanket licenses from PROs as a service to the performing

artist to ensure that all of the musical works that may be performed at a given concert are

licensed. Agreed Findings of Fact ("AFOF") ¶ 12.

NACPA represents a collection of the largest concert promoters in the United States. To

qualify for NACPA membership, a promoter must stage at least 60 shows a year, including at

least five club shows, five theater shows, and five shows in venues with more than 10,000 seats.

*Id.* ¶ 11. Some NACPA members are subsidiaries of larger companies that also engage in lines

of business other than concert promotion; other NACPA members are independent companies.

NACPA PFOF ¶¶ 9-10; AFOF ¶ 15.[3]

_____

[3] Live Nation Worldwide and certain affiliated concert promoters (collectively, "Live Nation")
are subsidiaries of Live Nation Entertainment, Inc. ("LNE"), which operates other lines of
business beyond concert promotion. NACPA PFOF ¶ 9. AEG Presents is a subsidiary of the

Although its members are ultimately responsible for the license fees owed under the agreements it negotiates with PROs, NACPA plays a significant and ongoing administrative role in connection with each of those agreements. NACPA PFOF ¶ 5. NACPA collects fees from its members and transmits them in a single payment to each PRO; it prepares, verifies, and submits detailed quarterly reports related to concert activity by each of its members; and it acts as a resource to both its members and each of those PROs, answering questions about the licenses in a timely manner and resolving any issues that arise. *Id.* As compensation for the valuable role NACPA plays in license administration and enabling PROs to cover the many concerts promoted by dozens of disparate promoters across the country under a single license, every agreement that NACPA has reached with a PRO includes an administrative discount for NACPA. *Id.* ¶¶ 6-7.

C.      *The License at Issue*

The most recent final license agreement between BMI and NACPA terminated on December 31, 2013. AFOF ¶ 61. Since June 1, 2014, by agreement with BMI, NACPA has been operating pursuant to an interim license with the same rates and terms as that most recent final agreement. NACPA PFOF ¶ 175. BMI commenced this proceeding on September 24, 2018 seeking a determination of reasonable fees and terms for the period from January 1, 2014 through December 31, 2022. Pet. ¶ 1, ECF No. 7. The scope of the license at issue is identical to the scope of rights contained in NACPA's most recent final fee agreement with BMI: a blanket license covering public performances of the musical works in BMI's Repertoire at live concerts and festivals in the U.S. promoted by NACPA members.

---

Anschutz Entertainment Group, which also operates other lines of businesses. NACPA PFOF ¶ 10.

## II. THE LIVE CONCERT INDUSTRY AND THE IMMERSIVE, MULTIMEDIA EXPERIENCES THAT ATTRACT CONCERTGOERS

### A. The Structure of the Live Concert Industry

#### 1. The Role of Concert Promoters and the Financial Risks They Assume

Concert promoters are in the business of arranging, producing, marketing, and promoting live performances of music, with the goal of generating ticket sales through their efforts. NACPA PFOF ¶ 34. The concert promoter is responsible for virtually every component of the live concert experience other than the live performances themselves, including contracting with the various performers; arranging for the venue in which the performance(s) are to occur; advertising and marketing the event; ensuring that any intellectual property rights necessary for the performances have been secured; and arranging for all of the services necessary for the performances to occur that are not provided by the artists themselves or by the venue. *Id.* ¶ 41.

Promoters not only take on the work of promoting shows, but also assume the associated financial risks. For a given concert, the profit of the concert promoter (if any) is typically its share of the revenue from ticket sales minus the costs of securing and paying for all of the necessary inputs that go into staging a concert, such as the artist, venue, advertising, production expenses, insurance, and intellectual property rights, including any required public performance rights to the musical works performed at the show. *Id.* ¶ 42. In particular, the promoter is responsible for the "show costs"—also called "Pot Expenses" or "Pool Expenses"—which include advertising costs, venue rental fees, security costs, stagehand and other labor expenses, local catering costs, promoter liability insurance charges, PRO license fees, and similar categories of show-specific expenses. *Id.* ¶ 43. All of these show costs must be paid by the promoter regardless of whether the concert turns a profit. *Id.* ¶ 42.

## 2. The Central Role of the Performing Artist

Live concert fans pay to attend shows to see and hear their favorite or new artists or ensembles perform music, often as part of an immersive, multimedia live experience. *Id.* ¶ 45. Unlike the songwriter's contribution to a live concert, which is complete once the song is written because performances of that song at concerts do not require any additional input or effort from the songwriter, each live performance by a performance artist (who may have written the songs they perform) requires additional commitments of time, energy, skill, financial resources, and physical exertion often in combination with the efforts of a coterie of supporting personnel such as stagehands, makeup artists, costume designers, managers, light and sound technicians, and the like. *Id.* ¶ 43; NACPA Counter-Findings of Fact ("NACPA Counter Findings") ¶ 9. Performing artists often seek to deepen fan engagement and loyalty and to build on and exploit the excitement generated by live concerts through the use of social media, pop-up appearances, and immersive live performances. NACPA PFOF ¶ 49.

Fans attend live concerts not only because they appreciate the performer and want to experience their performance in person, but also to experience the performance with other fans. *Id.* ¶ 47. There is no guarantee that any particular fan's favorite song is going to be played on any particular night—especially if the artist performs more than a few dozen songs. *Id.* ¶ 48. Rather, fans trust that the artist will independently come up with a set list that they will want to hear and wait to see what will be played. *Id.* ¶ 47. Contracts between the performing artists and promoters do not require the artists to perform specific works or even specify which musical works will be performed at a concert, nor do promoters typically advertise what specific songs will be performed when promoting shows, who wrote them, or the PROs with which the songwriters are affiliated. *Id.* ¶¶ 60, 61.

This is particularly true for the thousands of concerts performed every year at smaller venues like clubs, where new and emerging artists are just starting out. While some attendees are already fans, many simply go for the experience of something to do for the evening; they are not expecting or hoping to hear any particular songs. *Id.* ¶ 49.

Concert promoters enter into agreements either with the performing artist or a corporation acting on behalf of the performing artist in advance of and in connection with promoting either a single event or a tour. AFOF ¶ 32. While the precise terms of these agreements vary, they typically include both general information concerning the concert (the date, length of performance, venue), and the financial arrangements between the promoter and the artist. AFOF ¶ 33.

In contrast to promoters, artists are largely insulated from the financial risks associated with live concerts. NACPA PFOF ¶ 53. Most typically, contracts between promoters and headline performers include an agreement to split revenues from ticket sales according to a negotiated percentage following the deduction of specified show costs, subject to a guaranteed minimum fee for the performer. *Id.* While the split between the artists and promoters is subject to individual negotiation and varies somewhat, a common split is 85% for the artist and 15% for the promoter, and the percentage compensation for highly successful artists is typically 90% or more. AFOF ¶ 34, NACPA PFOF ¶¶ 55-56.[4] While artists are typically responsible for certain preproduction costs of a tour—such as entering agreements to lease sound equipment and lights and to hire staff with the relevant expertise for staging and lighting—promoters bear all of the

---

[4] Supporting acts are typically paid a flat fee. NACPA PFOF ¶ 57. Similarly, for festivals, concert promoters often pay performers flat fees rather than sharing a percentage of ticket sales. *Id.* ¶ 58.

"show costs" and often reimburse or otherwise compensate artists for the costs of traveling with their own sound equipment, lights, and other production-related expenses. *Id.* ¶ 59.

        3.    <u>The Roles of Venue Operators and Ticketing Companies and Their Non-Music Contributions to the Concertgoer's Experience</u>

Concerts, whether individual events or as part of tours, can occur in a variety of venues, including clubs, theaters, arenas, amphitheaters, stadiums, and outdoor sites. AFOF ¶ 35. Many venues host both live concerts and non-music events such as basketball games, hockey matches, or comedy shows. *Id.* ¶ 35; NACPA PFOF ¶ 66. Some venues are rented by the concert promoter on an event-by-event basis, while others are owned by an affiliate of the concert promoters (or in some cases, by the promoter itself) or operated by the promoter pursuant to a long-term lease. *Id.* ¶ 36.

Venue operators typically provide security, food and beverage options for customers, merchandising (in conjunction with the artist), and, in some cases, parking facilities. NACPA PFOF ¶ 64. In addition to the rental or lease fees that venues receive from promoters, venues also earn revenues during live concerts by selling artist merchandise (the revenues from which are largely paid to the artist), by selling food and beverages, and by charging for parking (if they own a parking facility at the venue). *Id.* ¶ 65. Some venues also generate revenue from sponsorships and the sale of corporate box suites, but these revenue streams are not specific to live concerts and are not shared with the promoters that host concerts at those venues. *Id.* ¶ 67.

Venue operators typically contract with a ticketing company (such as Ticketmaster, AXS, or Eventbrite), which handles the sales and distribution of tickets for events hosted by that venue. AFOF ¶ 37. Typically, when a promoter rents a venue, it is required to work with the venue's designated ticketing company. Because venues have competitive options in terms of which ticketing company they use and where they award their business, the longstanding practice is for

15

ticketing companies to compensate the venue in exchange for the exclusive rights to sell tickets for that venue.  NACPA PFOF ¶ 74.

Promoters, by contrast, do not typically share in this compensation.  *Id.* ¶ 76.  When a promoter rents the venue, the promoter is not privy to the contractual terms between the venue and the ticketing company, other than knowing the amount of any service fees, which are paid by consumers to ticketing companies and not to concert promoters.  *Id.* ¶ 75.  The contract between the venue operator and the ticketing company governs ticket service charges, as well as any compensation paid to the venue for the right to distribute tickets.  *Id.* ¶ 69.

### 4. The Roles of Songwriters and the PROs

In practice, all or virtually all songwriters and publishers of the songs performed or likely to be performed at concerts promoted by NACPA members are affiliated with one of the several PROs in the United States.  AFOF ¶ 39.  Each of the PROs licenses a different repertoire of works and, because concert promoters do not typically know what songs the artist will perform at any given concert, to avoid the risk of copyright infringement they must secure licenses from every U.S. PRO that has aggregated a sufficiently large repertoire.  *Id.* ¶ 40, NACPA PFOF ¶ 82.

In some other contexts (*e.g.*, television, background music services), music users engage in "direct licensing" for at least some of the performance rights they need in competitive-market transactions with songwriters or publishers and utilize alternatives to the traditional blanket license, such as "per program" licenses and "adjustable fee" blanket licenses for their remaining music license needs to reduce their overall costs for music licensing.  *See, e.g.*, *Broad. Music Inc. v. DMX Inc.*, 683 F.3d 32, 44-45 (2d Cir. 2012); *United States v. ASCAP (In re Application of Buffalo Broad. Co.)*, No. 13-5 (WCC), 1993 WL 60687, at *42 (S.D.N.Y. Mar. 1, 1993); NACPA PFOF ¶ 84.  But in the live concert setting, traditional PRO blanket licenses that do not

provide a mechanism to adjust fees on account of performances licensed directly have been the norm. *Id.* Unless they have assigned away their copyrights without reserving their right to publicly perform their own works, or agreed to a contractual restriction giving up their right to publicly perform their own works, artists performing songs that they wrote would not need permission from anyone else to make those performances, and therefore neither they nor the promoter would need PRO licenses to avoid infringement. *Id.* ¶ 85. This is no mere academic point, as the performers in many of the top grossing U.S. concerts wrote, in whole or in part, many (and sometimes even all) of the songs they perform. *Id.* Because BMI has historically licensed performances of songs in its repertoire at live concerts only on a blanket basis, there has been no mechanism to secure permission for performances of other BMI-affiliated music at concerts without at the same time securing the right of artist-songwriters to perform their own songs, a right they do not need so long as they have retained their right to perform their own works. *Id.* ¶ 86. Artist-songwriters, therefore, derive no benefit from efforts by PROs to overcharge live concert promoters for PRO licenses that are then deducted from a show's overall ticket revenues before they receive their split.

        B.    *Changes in the Live Concert Industry over Time—And What Has Not Changed*

                1.    Concert Promoters Have Invested Heavily over Time to Improve the Non-Musical Elements of the Live Concert Experience

Over the course of the past several decades, Live Nation, AEG Presents, and other NACPA members have invested enormously in improving the immersive live concert experience for consumers, increasing the value of concert tickets for buyers. When people go to a concert, they buy tickets for a number of reasons, including to see their favorite artists perform live and in person, to be part of a crowd, to experience the lighting, choreography, pyrotechnics and other sensory elements of the live performance, and to enjoy the food, concessions, merchandise and

other general attributes of a live concert venue—all of which have become increasingly diverse and sophisticated over the last twenty years. *Id.* ¶ 94. As a result of promoters' investments in non-musical elements of live performances, concerts increasingly have become multimedia extravaganzas with expensive visual, choreographic, and other non-musical elements. *Id.* ¶¶ 94, 123.

> 2. <u>Revenues Earned by NACPA Members from Ticket Sales, and Correspondingly the Royalties Paid by NACPA to BMI, Have Increased Dramatically over Time</u>

The improvements over time in non-musical elements of the live concert experience have increased the prices that promoters can charge and consumers will pay for tickets. Jaffe Aff. ¶ 112. Concert ticket prices since 1996 have "skyrocketed" and, correspondingly, so have the royalties paid by NACPA to BMI. AFOF ¶ 44. The increases have far outstripped the rate of inflation over that time period. Between 1996 and 2018, the price of the average concert ticket rose 190 percent; in contrast, overall consumer prices rose by just 59%. NACPA PFOF ¶ 116; *see also id.* ¶ 119. At NACPA concert events specifically, the average ticket price increased 26.9% between 2009 and 2019, which represents an increase of 7.7 percentage points over and above general inflation for that same period. *Id.* ¶ 120; *see also* Ex. 1. There also has been a significant increase in the number of concerts promoted by NACPA members, further increasing the revenue pool in which BMI shares. In 1998, the first year of the NACPA-BMI license relationship, NACPA submitted reports and payments on behalf of its members for 6,385 shows. RX524, NACPA_EX_00000006-32, at 20. By 2019, the number of live music events covered by NACPA's license had grown to 34,384. *Id.* As a result, total royalties paid by NACPA to BMI have increased dramatically—by 174% just between 2009-2019. NACPA PFOF ¶ 125.

Over this period, however, the relative role played by public performance licenses for musical works in the concert experience has not increased at all. There will be no evidence at

trial showing that individual concerts involve more performances of musical works today than in years past or that musical works somehow have become more important to the live concert experience. Nor is there any record evidence that the musical works being performed in recent years are somehow just better—and hence more valuable—than the ones that were performed under or prior to past BMI-NACPA agreements. *Id.* ¶ 122. Even if there were, BMI already shares directly in the increased revenues earned by concert promoters through its percent-of-revenue rate structure, and no adjustment in those *rates* is warranted.

3.     The Industry Consolidation BMI Cites as a Basis for the Dramatic Fee Increase It Seeks Began in the 1990s

Concert promoters generally operated on a local level for several decades before the mid-1990s. *Id.* ¶ 88. The year 1996 ushered in a period of rapid and dramatic industry consolidation, with the concert business undergoing its "biggest transformation in history" in a period of just 18 months. *See*, *e.g.*, Neil Strauss & James Sterngold, New York Times, *The Concert Juggernaut; How One Company Is Transforming the Live Entertainment Industry* (Jul. 20, 1998), https://www.nytimes.com/1998/07/20/arts/concert-juggernaut-one-company-transforming-live-entertainment-industry.html. By 2000, the modern concert industry changed more than it had since its inception in the 1960s. Anticipated Testimony of Dean Budnick; NACPA PFOF ¶ 88.

Specifically, during this period, LNE's predecessor company acquired certain regional companies, thereby creating a concert promoter with a large geographic footprint that could more effectively generate revenue and profits for the artists who chose to have Live Nation-affiliated entities promote their live concerts. *Id.* ¶ 91. Anschutz Entertainment Group launched AEG Live (later named AEG Presents) around the same time and acquired regional promoters Concerts West (in December 2000) and Goldenvoice (in March 2001). AFOF ¶ 15.

In addition to investments in improving the value of the immersive live concert experience for concertgoers, Live Nation and AEG Presents have each also brought efficiencies to live concert productions, and leveraged their broad industry expertise to develop artists as they progress throughout their careers. NACPA PFOF ¶ 95. Both LNE and the Anschutz Entertainment Group thus have acquired or launched certain ancillary businesses—including a number of venues, ticketing companies, and artist management services—where doing so has furthered these goals. *Id.* ¶¶ 93-95. A significant number of the concerts that Live Nation and AEG Presents promote today, however, still require these promoters to contract with independent third-party companies responsible for the venue, ticket sales or artist management. *Id.* ¶ 95. Because of this dynamic, Live Nation and AEG Presents' respective relationships to the companies that control or operate the venue, ticket sales, and artist management varies from concert to concert, no differently than for other concert promoters. Neither Live Nation nor AEG Presents in its role as a promoter typically shares in revenues derived by the ticketing company or collected by third-party venues or artist-management teams. *Id.*

Other promoters—including the many NACPA members that are not affiliated with Live Nation or AEG Presents—always have been and today remain a critical part of the live concert industry. Prominent independent concert promoters that are NACPA members include Nederlander, Another Planet Entertainment, Music and Event Management (MEMI), JAM Productions, Bill Blumenreich Presents, Knitting Factory, and Waterfront Concerts. *Id.* ¶ 97. None is affiliated with a ticketing company. *Id.*

4. The Ancillary Revenue Streams that BMI Cites as a Basis for the Dramatic Fee Increase It Seeks Have Existed for Decades

As explained more fully below, BMI's rate proposal in this proceeding deviates from longstanding industry precedent by seeking to capture, in addition to a percentage of ticket sales

revenues, a share of certain ancillary sources of revenues that are earned by various industry participants. These ancillary sources of revenue are not new; they have existed for decades, if not from the inception of the live concert industry. *Id.* ¶ 98.

For example, there has long been a robust market for the re-sale of concert tickets by the original purchaser. For many years, the re-sale market was principally the province of ticket "scalpers." For popular, sold-out shows, ticket scalpers sometimes charged prices well above the original purchase price (or "face value") of the ticket. *Id.* ¶ 99. Around the turn of the century, technology platforms like Stubhub (an eBay-like platform for individuals to resell concert tickets) emerged to serve the re-sale market. *Id.* ¶ 100. Resellers of tickets sold on the secondary market—not concert promoters—earn revenue from those sales. *Id.* ¶ 101.

Nor are premium, or VIP, packages new. VIP packages are offered by artists to their fans, and typically include preferred seating and additional perks, such as special merchandise and backstage passes. *Id.* ¶ 102. It is the artist, not the promoter, who primarily generates the incremental income from VIP ticket packages. *Id.* ¶ 103. Similarly, venues that host concert performances have generated additional revenues from box suites as far back as 1965. *Id.* ¶ 104. Box suites typically refer to a luxury suite within a venue that the venue usually markets to companies for a stretch of time, such as a calendar year or a sports team's season, rather than to individuals for a predetermined date or set of dates. Purchasers of box suites typically receive access to all of the types of events hosted by that venue (music and non-music alike) during the term of the agreement. Venues typically keep the revenues they receive from selling access to box suites and do not share those revenues with concert promoters or even disclose to promoters what those revenues are. *Id.*

Since at least the 1990s, venues have often pursued additional potential revenue opportunities through sponsorship and advertising sales. For example, the stadium in East Rutherford, New Jersey, where the New York Giants and New York Jets play "home" football games, is sponsored by MetLife and known as "MetLife Stadium." *Id.* ¶ 105. As with revenues from the sale of box suites, these types of sponsorship and advertising revenues are received by venues and not typically shared with or disclosed to promoters. *Id.* ¶ 106.

Finally, in some instances, performance artists sometimes obtain corporate sponsors for large tours. Corporate sponsors of tours pay the performing artist directly, and those revenues are not typically shared with promoters. *Id.*

5.  Ticketing Companies and Changes Over Time in Ticket Delivery Have Provided Additional Value to Concertgoers that Is Unrelated to the Value of the Music Performed

Due to technological innovations developed and paid for by ticketing companies, it is now easier to buy, hold, and transfer a ticket to a live event—whether a concert, play, or sporting event—than ever before. In particular, the advent of digital ticketing has provided significant convenience benefits to concertgoers. Rather than undertake the time, expense, and inconvenience of going down to an arena box office in person or ordering physical delivery of tickets by mail, fans can now order tickets, from wherever they are, in a matter of minutes electronically and transfer them to others nearly instantaneously. *Id.* ¶ 107.

As has been their decades-long practice, ticketing companies usually charge consumers a ticketing, or "service," fee for their services, typically referred to as "administration" or "handling" charges. *Id.* ¶ 70. These fees reflect the value that consumers gain from the convenience and ease of digital ticket buying. *Id.* ¶ 72. Although many venues have continued to offer physical box office locations since the advent of online ticket buying, customers increasingly use electronic ticketing—and, in doing so elect to pay the service fees charged by

those entities—even though buyers could have purchased their tickets at physical box office locations and avoided the electronic ticket vendor's service fee.  *Id.* ¶ 71.

Of course, ticketing companies are not a new phenomenon in the live concert industry. Ticketmaster, for instance, was founded in 1976, and it has transformed the ticketing business, playing a big role in the ticketing of concerts and other live events since at least 1982.[5]  *Id.* ¶ 112. Ticketmaster developed a revenue-sharing model with venues in the 1980s and 1990s.  *Id.* ¶ 115. And ticketing companies have incurred significant costs in connection with developing and refining ticketing technology over time.  *Id.* ¶ 111.  According to BMI's own expert, Professor Budnick, although service fees have existed as long as there have been ticketing companies, the practice of increasing service fees gained momentum in the late 1990s.  *Id.* ¶ 113, AFOF ¶ 43. By the mid-2000s, service fees could sometimes add 30-40 percent to the total cost paid by the consumer.  *Id.* ¶ 43; Anticipated Testimony of Dean Budnick.

6.      The Crushing Impact of the COVID-19 Pandemic on Concert Promoters

The COVID-19 pandemic, beginning in early 2020, brought the live concert industry to a grinding halt for over a year and highlighted the risky nature of an industry centered around live events.  AFOF ¶ 67, NACPA PFOF ¶ 129.  Given the near-total shutdown of the industry and the risk they already bear, concert promoters suffered precipitous drops in revenue and sustained dramatic losses due to the existence of unavoidable costs, all while owing significant sums of money.  *Id.* ¶ 128.

---

[5] Ticketmaster was acquired by LNE in 2010 but remains a separate company from any of the entities in LNE's U.S. Concerts division.  Court-mandated conditions put in place at the time of the acquisition restrict Ticketmaster from sharing information about its dealings with third-party venues and promoters with Live Nation.   NACPA PFOF ¶ 96.

In contrast to concert promoters, who bear the obligation to cover significant fixed and sunk costs regardless of whether performances take place, songwriters' numerous other sources of royalty income continued and grew throughout the COVID-19 pandemic, such as royalties from streaming, radio broadcasts, synchronization licenses, and other non-live media that were not interrupted and, in some cases, experienced a surge in revenues. *Id.* ¶¶ 129, 130. Overall royalties distributed by BMI and ASCAP to songwriters and music publishers continued to *increase* during the pandemic as the loss of income from live concerts was more than offset by increases in royalties collected from music users in other industries. *Id.* ¶ 131. Indeed, in 2021, BMI set its all-time "revenue record[]." *See BMI Grows Revenue and Distributions to Record Levels During Unprecedented Year,* BMI (Sept. 8, 2021), https://www.bmi.com/news/entry/bmi-grows-revenue-and-distributions-to-record-levels-during-unprecedented-y. And it surpassed that number yet again in 2022. *See BMI Announces Record-Breaking Revenue and Royalty Distributions*, BMI (Sept. 13, 2022), https://www.bmi.com/news/entry/bmi-announces-record-breaking-revenue-and-royalty-distributions.

The suspension of live concerts due to the pandemic starkly illustrated just how important the physical environment (as opposed to the musical works performed) is for creating concert value. Online streaming offered a variety of in-person concert substitutes to consumers during the pandemic. NACPA PFOF ¶ 133. Certain of these digital events involved live performances by the same performers who one would see at a concert promoted by a NACPA member; in *all* cases they involved exactly the same kind of musical works that would be performed at such concerts. Nonetheless, tickets for the streamed performances listed by Billboard.com were either free or available at a small fraction of the cost of a typical live concert ticket. *Id.* While the contribution of public performance licenses for the musical works streamed in those

performances was at least the same as their contribution to in person concerts, if not substantially more, the market demonstrated that streamed performances were far less valuable to consumers than live, in person concert experiences.  Jaffe Aff. ¶ 43.

## III.    NACPA'S RELATIONSHIP WITH BMI AND PRIOR BMI-NACPA LICENSES

### A.    *Early Negotiations Between NACPA and BMI*

NACPA began negotiating rates with BMI for licenses to cover performances of music at live concerts promoted by its members at BMI's request in the early 1990s.  Discussions began in 1992, when BMI was considering how to restructure its licensing of the live concert industry and wanted to move away from its then-prevailing rate card, which consisted of a grid of flat fees that varied by size of venue and ticket price.  NACPA PFOF ¶ 134.  BMI sought to increase fees for live concerts, simplify its administrative burden, and move from "per attraction" reporting to reporting on gross receipts.  *Id.* ¶ 136.

BMI proposed to license NACPA at a unitary rate of 1.0% of gross receipts, but NACPA was unwilling to agree to that rate, believing it far too high.  *Id.* ¶¶ 140-41.  Over the next several years, the parties negotiated extensively over the rate structure, rates, the revenue base to which those rates would be applied, the term, and a discount for NACPA's role in the license.  *Id.* ¶¶ 142-47.  A seasoned and well-respected licensing executive led BMI throughout the negotiations.  *Id.* ¶ 163.  The parties exchanged numerous proposals as they worked toward a mutually acceptable rate, and BMI's internal records reflect careful and considered evaluations of numerous competing proposals and various alternatives.  *Id.* ¶¶ 135-37.

### B.    *The Initial 1998 BMI-NACPA License Agreement (1998-2006)*

On December 26, 1997, BMI and NACPA entered into their initial license (the "1998 BMI-NACPA Agreement").  Effective January 1, 1998, the initial license term ended on December 31, 2004, subject to a one-year rollover period unless canceled by either party.  Joint

Ex. 24; AFOF ¶ 52. For venues seating 0-9,999 people, NACPA paid 0.30% of "Gross Ticket Revenues"; and for venues seating 10,000 or more, NACPA paid 0.15% of "Gross Ticket Revenues." Joint Ex. 24; AFOF ¶ 50. In both cases, payments were subject to a 10% administrative discount to compensate NACPA for its role in administering the license, including consolidating reporting and payment on behalf of its disparate members. Joint Ex. 24; AFOF ¶ 51.

The 1998 BMI-NACPA Agreement defined "Gross Ticket Revenues"—*i.e.*, the revenue base to which the rates applied—as the total monies received by NACPA or its members from all the ticket sales per attraction, subject to the following exclusions: (1) taxes; (2) building/facility charges per ticket sold; (3) ticket agent/service charges placed on each ticket sold; and (4) facility parking fees. Joint Ex. 24; NACPA PFOF ¶ 149. By design, this definition is consistent with the base of ticket sales revenues typically used by promoters to settle the artist's compensation following deduction of show costs for each concert according to whatever split the promoter and performing artist negotiated. NACPA PFOF ¶ 147. The agreement provided that NACPA pay a fee per benefit or free concert, ranging from $15 (for events up to 250 seats) to $480 (for events with more than 40,001 seats). *Id*.

C.    *The 2006 BMI-NACPA License Agreement (2006-2013)*

Beginning in 1999 and continuing intermittently through 2005, BMI and NACPA negotiated whether a separate definition for festivals needed to be included in their agreement. AFOF ¶ 55; NACPA PFOF ¶¶ 150-55. BMI's position was that festivals were not included in the 1998 BMI-NACPA Agreement, and NACPA's position was that its license already covered all live music attractions, including festivals. *Id*. ¶ 150. Apart from this one issue, both parties agreed that the licensing arrangement had been successful. *Id*. ¶ 155.

In 2004, near the end of the 1998 BMI-NACPA License term, BMI indicated that it wanted to raise rates paid by NACPA going forward because it believed it did not enjoy parity with the rates NACPA was paying to ASCAP. *Id.* ¶ 157. After BMI received assurances from NACPA that it did enjoy rate parity with ASCAP, the parties agreed to extend the 1998 BMI-NACPA Agreement for another year. *Id.* ¶ 158.

In November 2005, BMI and NACPA entered into a new multi-year license deal, effective January 1, 2006 (the "2006 BMI-NACPA Agreement"). The 2006 BMI-NACPA Agreement contained the same rates for concerts and the same definition of "Gross Ticket Revenue" as the 1998 BMI-NACPA Agreement. The agreement also incorporated new negotiated rates for festivals, including a rate of 0.4% of gross ticket revenue for venues seating 0-9,999 people, and 0.30% of gross ticket revenue for venues seating 10,000 and above, as well as a modest increase in the flat fees owed for free or benefit concerts. Joint Ex. 29; NACPA PFOF ¶ 160. NACPA continued to receive a 10% administrative discount and continued to provide consolidated reporting and payment for its members. NACPA PFOF ¶ 161. The agreement had an initial term that lasted until December 31, 2009, and provided for rolling one-year extensions following that initial term, which the parties agreed to every year until BMI terminated the license in 2013. Joint Ex. 29; NACPA PFOF ¶ 159.

D.     *BMI Imposed a New Rate Schedule on Non-NACPA Promoters in 2009 But Did Not Try to Renegotiate the NACPA Rates at that Time*

In 2009, in order to catch up with the rates ASCAP had been charging to smaller promoters that were not NACPA members, BMI cancelled its existing agreements with non-NACPA promoters and unilaterally imposed a new five-tiered rate structure on them, which

became effective in the last quarter of 2009.  NACPA PFOF ¶ 164.[6]  These rates, which included

dramatic increases for concerts held at smaller venues, were referred to as BMI's "Street Rate,"

to distinguish them from the lower rates charged to NACPA members.  BMI's definition of the

revenue base for the Street Rate license was the same as the definition included in the 1998 BMI-

NACPA Agreement and the 2006 BMI-NACPA Agreement.  *Id.*  Despite complaints from non-

NACPA promoters about the rate increase, BMI was unwilling to negotiate different terms.  *Id.* ¶

165.

BMI executive Tom Annastas informed NACPA of the new non-NACPA promoter rates

in 2009, but he made clear that BMI was not seeking to change its agreement with NACPA.  *Id.*

¶ 166.  Nor did BMI even try to initiate negotiations over new rates for NACPA members in

2010, 2011, or 2012, preferring instead to let the 2006 BMI-NACPA Agreement carry over each

year.  *Id.*

   E.   *BMI's Cancellation of the 2006 BMI-NACPA Agreement, the Interim Fee Agreement, and the Unsuccessful Efforts to Finalize a New License*

On August 8, 2013, BMI terminated the 2006 BMI-NACPA Agreement, effective

December 31, 2013.  AFOF ¶ 61.  On October 8, 2013, NACPA requested, pursuant to Section

XIV of the BMI Consent Decree, a new performance rights license for NACPA members from

BMI for the period commencing January 1, 2014.  NACPA PFOF ¶ 168.  BMI and NACPA

agreed that, pending the establishment of a final license agreement for NACPA members for the

period commencing January 1, 2014, BMI and NACPA would operate on an interim basis

---

[6] The new fee schedule included the following rates: 0.80% of gross ticket revenues for venues with up 2,500 seats; 0.60% of gross ticket revenues for venues with 2,501 to 3,500 seats; 0.40% of gross ticket revenue for venues with 3,501 to 5,000 seats; 0.30% of gross ticket revenue for venues with 5,001 to 9,999 seats; and 0.15% of gross ticket revenue for venues with 10,000 or more seats.  NACPA PFOF ¶ 164.

pursuant to the terms of the 2006 BMI-NACPA Agreement, including NACPA's continued administration of the license in return for the administrative discount it had already received. *Id.* ¶ 169.[7]

On November 13, 2013, BMI offered NACPA the Street Rate that BMI had imposed on smaller, non-NACPA promoters in 2009. BMI also offered a 10% discount on license fees for both concerts and festivals reported by NACPA members, which BMI described at the time as a "standard association discount." *Id.* ¶ 170. While BMI had been charging NACPA members and non-NACPA members the same rates for venues with seating capacity of 5001 or more, the Street Rate for smaller venues was substantially higher than rates NACPA members had previously agreed to pay. *Id.*

Negotiations over the course of the following year focused on whether any publisher withdrawals from BMI had diminished or would diminish the value of a license to the BMI Repertoire to NACPA and on the size of NACPA's royalty payments to ASCAP, BMI had a change of heart with respect to its attempt to increase the rates charged to NACPA. *Id.* ¶¶ 171-178. In September 2014, BMI formally offered to replace the interim agreement with a new final fee agreement *with the exact same rates and terms as the 2006 BMI-NACPA Agreement* for another five years (*i.e.*, through December 31, 2019). *Id.* ¶ 178.

Further to its offer, on January 5, 2015, BMI sent a draft agreement to NACPA for a five-year term (January 1, 2014 through December 31, 2019) with the same rates as those found in the BMI-NACPA 2006 Agreement, but with additional representations and warranties that

---

[7] On June 13, 2014, NACPA and BMI executed an interim license, retroactive to 2013, that memorialized the parties' prior agreement to continue to operate under the terms of the 2006 BMI-NACPA Agreement, including with respect to NACPA's administrative role and the 10% discount. BMI has never proposed to modify the interim license. NACPA PFOF ¶ 175.

imposed increased risk on NACPA in connection with withdrawals and potential future

withdrawals by BMI-affiliated publishers. *Id.* ¶ 180. BMI and NACPA continued to negotiate

the representations and warranties contained in the draft agreement throughout 2015, but the rate

terms were not the subject of any further negotiation. *Id.* ¶ 181. Because DOJ had initiated a

review of the ASCAP and BMI Consent Decrees, including with respect to issues concerning

partial withdrawal of "new media" rights from ASCAP and BMI, the negotiations stalled while

the parties awaited the outcome of that review.

      After the conclusion of that DOJ review, NACPA followed up with BMI to finalize the

new agreement. On November 29, 2017, BMI instead notified NACPA that it would not proceed

with that agreement, withdrew its final fee quote from 2013, and announced its intention to

introduce an unspecified "new unitary rate" for both concerts and music festivals, starting July 1,

2018. *Id.* ¶ 182. For the period from January 1, 2014, through June 30, 2018, BMI again offered

the "Street Rate" schedule that remained in effect for non-NACPA promoters (the range of

0.15% to 0.80% of ticket sales for concerts, depending on venue size, and 0.30% to 0.40% of

ticket sales for festivals). *Id.* On April 27, 2018, BMI sent a new rate proposal for the post July

1, 2018 period: 1.15% of a radically expanded revenue base (which BMI defined to include in

addition to revenues from ticket sales, revenues from ticket sales, service fees, VIP packages,

sponsorships, advertising, monies received by the licensee directly from the secondary market

and any other relevant revenue streams"). *Id.* ¶ 184. BMI did not offer the 10% administrative

fee, but stated that it was willing to discuss a "more modest" discount. *Id.* BMI's proposal to

increase the effective royalty rate by more than 500%, significantly expand the revenue base to

which that rate was applied to include multiple new revenue sources (most of which are

recognized by entities other than promoters), and reduce NACPA's administrative discount was

rejected out-of-hand by NACPA as a non-starter. BMI did not offer a lower rate, and this proceeding followed. *Id.* ¶ 185.

       F.      *The Royalties Paid and Administrative Services Provided by NACPA During the Interim License Period (2014 to Date)*

Throughout the time NACPA has been subject to the interim license, NACPA has timely paid royalties owed under the license—nearly $50 million in total. *See* Deposition of Brian Philbin, Tr. 54:20-22; 67:11-19. And for the interim period beginning on January 1, 2014, and continuing to the present, NACPA has provided the same type of administrative services in connection with the BMI license that it provided under the parties' prior agreements. NACPA PFOF ¶ 176. NACPA has managed the reporting and payment process for BMI, ensuring that each promoter submitted timely quarterly reports reflecting the concerts held and associated revenues, and collecting the license fees from promoters for timely remittance to BMI. BMI wanted NACPA to provide these services under the interim license, accepted these services, and continues to accept them, just as it has throughout the parties' relationship. *Id.* NACPA would not have been willing to provide its services to BMI in connection with an interim license without compensation. *Id.* ¶ 177.

## IV.    NACPA'S LONGSTANDING, VOLUNTARY LICENSE DEALINGS WITH ASCAP AT RATES SIMILAR TO THOSE PAID TO BMI

NACPA has operated under license agreements with ASCAP for over two decades. Numerous BMI executives have described ASCAP as BMI's primary competitor for affiliates, and NACPA's rates with ASCAP frequently have been a lodestar for NACPA's negotiations with BMI, and vice versa. *Id.* ¶ 213. The rates and rate structure have not been exactly the same, but NACPA has paid roughly equivalent amounts to ASCAP and BMI over the course of their decades-long license relationships. Jaffe Aff. ¶¶ 94-95, 114 & n.72, Ex. 1.

31

*A.      The 2001 ASCAP-NACPA Agreement (2000-2017)*

NACPA's first agreement with ASCAP (the "2001 ASCAP-NACPA Agreement")

contained the following tiered rate structure for NACPA and its members: 0.45% of gross ticket

revenue for venues with 1-2,500 seats; 0.30% of gross ticket revenue for venues with 2,501 to

5,000 seats; 0.25% of gross ticket revenue for venues with 5,001 to 10,000 seats; 0.15% of gross

ticket revenues for venues with 10,001 to 25,000 seats; and 0.10% of gross ticket revenues for

venues with more than 25,000 seats.  NACPA PFOF ¶ 189.  The revenue base was defined in a

manner consistent with the revenue base in the 1998 BMI-NACPA Agreement (which was, in

turn, consistent with the revenue base used by promoters to settle with artists).  Pursuant to the

2001 ASCAP-NACPA Agreement, NACPA was entitled to deduct and retain a 6%

administrative fee from the total license fees payable each quarter by NACPA to ASCAP on

behalf of NACPA members.  *Id.* ¶ 190.  While the 2001 ASCAP-NACPA Agreement had more

rate tiers, a slightly wider range of rates than the BMI-NACPA license in effect at the time, and a

different administrative discount, the total annual royalties paid under the two licenses were quite

similar.  Jaffe Aff. ¶¶ 93-94, 114 & n.72, Ex. 1.

*B.      The 2005 Amendment to the 2001 ASCAP-NACPA Agreement*

On September 29, 2005, ASCAP and NACPA agreed to amend their initial agreement at

the same rates and terms as the 2001 ASCAP-NACPA Agreement.  The amended agreement

provided that the license would continue for rolling additional terms of two years each after

December 31, 2005, but either party could terminate the license at the end of a two-year term by

giving the other 60 days' written notice.  NACPA PFOF ¶ 191.  The 2001 ASCAP-NACPA

Agreement, as amended, remained in effect until December 31, 2017.  *Id.* ¶ 192.

Following more than a year of extensive negotiations and multiple rounds of proposals and counter-proposals, ASCAP and NACPA entered into a new, four-year license agreement for the period beginning January 1, 2018 (the "2018 ASCAP-NACPA Agreement"). NACPA PFOF ¶¶ 193-200. The new license replaced the prior multi-tier rate structure with a unitary rate. Joint Ex. 57. Fully cognizant of the rates paid by concert promoters to other PROs in the U.S. and abroad and all of the industry changes over time that BMI contends warrant a rate increase, ASCAP agreed to license NACPA at rates much closer to NACPA's proposal here than to BMI's, with the same revenue base of ticket sales used in prior ASCAP and BMI agreements, and an ongoing administrative discount for NACPA. Joint Ex. 57.

The 2018 ASCAP-NACPA Agreement provides that for calendar years 2018 and 2019, NACPA was to pay ASCAP 0.23% of "Net Revenue," and that for years 2020 and 2021, NACPA was to pay ASCAP 0.275% of "Net Revenue."[8] Joint Ex. 57. The 2018 ASCAP-NACPA Agreement provides an administrative fee for NACPA equal to 5% of fees for the years 2018 and 2019, and 4.75% of fees for the years 2020 and 2021. *Id.* The 2018 ASCAP-NACPA Agreement also includes a "license-in-effect" provision, providing that the ASCAP repertoire shall not be materially diminished as a result of resignation by an ASCAP publisher or withdrawal of works. Joint Ex. 57. NACPA viewed this provision as important to protect the value of the ASCAP license, given its heightened awareness of the problems caused by publisher withdrawals that could require it to take additional licenses for the same musical works during

---

[8] "Net Revenue" is defined as all amounts received by NACPA or its members from the sale of tickets minus (a) taxes; (b) fees paid to third-party ticket distributors; (c) amounts paid to third party theater or facility operators; (d) parking fees; and (e) for benefit concerts amounts paid to the charitable institution. Joint Ex. 57.

the term in the absence of such protection. BMI, by contrast, has been unwilling to offer

NACPA "license-in-effect" protection during negotiations over the license at issue in this

proceeding. NACPA PFOF ¶ 203. The license at issue here therefore does not include that

significant value provided by ASCAP. In fact, NACPA's license with ASCAP would continue

to cover public performances of works that moved from ASCAP's repertoire to BMI's during the

term of the ASCAP license and, to avoid double payments, BMI would not owe those

songwriters distributions in connection with those performances.

## V. PROMOTERS' LICENSES WITH UNREGULATED PROS THAT WIELD UNCONSTRAINED MARKET POWER

### A. The Unconstrained Market Power of Unregulated PROs

While BMI and ASCAP represent the overwhelming majority of the market for music

rights, two other PROs each control a critical mass of works aggregated from numerous

prominent rightsholders that render their licenses "must haves" for NACPA members.[9] *Id.*

¶¶ 270-71. SESAC and GMR therefore enjoy market power over NACPA and its members,

which they can and do exploit to extract supracompetitive rates for SESAC and GMR licenses.

Jaffe Aff. ¶¶ 34-35 170-71. This unequal dynamic infects any negotiations between SESAC and

GMR, and NACPA and/or its members, as well as any price that results from any such

agreement between the two sides. NACPA PFOF ¶ 272.

---

[9] In addition, promoters often do not know with certainty every song that an artist will perform live during a given performance. Even if it were possible to identify the contents of the SESAC and GMR repertoires with certainty at any particular point in time, neither NACPA nor its members have the ability to keep up with the SESAC and GMR repertoires in real time as a practical matter. NACPA PFOF ¶ 271 n.2.

*B.      NACPA's Licenses with SESAC*

SESAC was for many decades a small PRO that played a limited role in the industry, focusing on a small number of often esoteric genres of music. *Id.* ¶ 252. Within this context, DOJ never filed a lawsuit against it, and SESAC never became bound by a consent decree. Beginning in the 1990s, however, SESAC embarked on a new strategy. Abandoning its narrow genre focus, SESAC began recruiting high-profile songwriters and eliminated the potential for price competition among its affiliates. *Id.* Then, even though SESAC's repertoire was much smaller than ASCAP and BMI's, SESAC began seeking large fee increases from music user licensees, threatened licensees with copyright infringement litigation and the prospect of statutory damages awards significantly in excess of the fees sought if licensees did not acquiesce to its rate demands, and refused to offer any type of license other than a blanket license to the works in its repertoire. *Id.*

In this context, NACPA has maintained a licensing agreement on behalf of its members with SESAC since December 18, 2003. *Id.* ¶ 260. Until recently, NACPA paid SESAC based on a per-ticket sold factor multiplied by the number of tickets sold at a particular event. Each of NACPA's agreements with SESAC has included an "Administrative Service Credit" for NACPA in return for NACPA's timely reporting, payment and other administrative services. *Id.* ¶ 260.

In May 2020, NACPA and SESAC entered into a new licensing agreement for the period starting January 1, 2019, through March 31, 2024 (the "2019 SESAC-NACPA Agreement"). Joint Ex. 62; NACPA PFOF ¶ 261. The parties agreed to switch from a per-ticket sold factor to a percentage-of-revenue rate schedule. The agreement provides that the parties' interim fees became final fees for the period January 1, 2019 through March 31, 2020. *Id.* The agreement uses the same ticket revenue base as NACPA's agreements with BMI and ASCAP and includes a

5.5% administrative fee for NACPA. Joint Ex. 62; NACPA PFOF ¶ 261.[10] NACPA negotiated the 2019 SESAC-NACPA Agreement—covering the years 2019-2024—without the ability to require SESAC to submit to binding arbitration to determine a fair and reasonable rate for a license to its works. NACPA PFOF ¶ 262.

### C. Individual Promoter Licenses with GMR

NACPA does not maintain a licensing agreement with GMR. Shortly after its inception and recruitment of a number of prominent songwriters previously affiliated with ASCAP and BMI, GMR reached out to NACPA to commence discussions about a potential license agreement. NACPA PFOF ¶ 263. Irving Azoff, the founder and Chairman of GMR and a powerful force within the music industry, also began reaching out to NACPA members individually to explain that an agreement with GMR should not increase the overall costs for NACPA. Instead, he contended, such an agreement should be easily accommodated by a realignment of the existing rates for BMI, ASCAP, and SESAC. Id. ¶ 265.

NACPA did not believe that GMR's proposed rates were reasonable given the size of its repertoire and sought to negotiate lower rates, but GMR was unwilling to negotiate and terminated discussions. Id. ¶ 266. Instead, GMR informed NACPA members that it would only license them directly without any involvement from NACPA. Id. ¶ 267. GMR ultimately signed agreements with AEG Presents, Live Nation, Another Planet Entertainment, JAM Productions, Nederlander, and MEMI. Id. ¶ 268.[11]

---

[10] The revenue base in the 2019 SESAC-NACPA Agreement is thus the same as the revenue base in prior NACPA agreements with ASCAP and BMI.

[11] GMR also initially executed a license with ███████████████ which was almost immediately superseded when, just five days after execution, GMR informed ███████████ ████████████████████████████████████████████████████████████████ The license was executed following nearly a year of communications from GMR, including multiple

## VI. THE PARTIES' FEE PROPOSALS

### A. *BMI's Fee Proposal*

In its Petition, BMI proposed different fees for the periods from January 1, 2014-June 30, 2018 and the period from July 1, 2018-December 31, 2022. For the earlier period, BMI proposed a multi-tier rate schedule, ranging from 0.15% to 0.80% of ticket sales, depending on the venue's seating capacity: 0.80% for a venue seating up to 2,500; 0.60% for a venue seating up to 3,500; 0.40% for a venue seating up to 5,000; 0.30% for a venue seating up to 9,999; and 0.15% for a venue seating 10,000 or more. Pet. ¶ 19. For the later period, BMI proposed a blanket license fee of 1.15% of "Gross Revenues," which included a number of additional revenue streams, most of which are earned by entities other than promoters. *Id.* ¶ 7. BMI proposed eliminating any administrative discount for NACPA, even though NACPA had continued to provide the same administrative services that it had provided under its prior agreements with BMI. *Id.* ¶ 23.

Following two years of litigation, BMI revised its rate quote for the final BMI blanket license fees and terms for concerts and festivals for NACPA promoters. Joint Ex. 63; NACPA PFOF ¶ 248. For the period from January 1, 2014-June 30, 2018, BMI's revised proposal was the same as its earlier proposal, but for the period commencing July 1, 2018, BMI's revised proposal included a blanket licensee fee of 0.80% of Gross Revenues, regardless of venue capacity, with the fees and terms to commence July 1, 2018 and continue through December 31, 2022. *Id.* BMI also narrowed its proposed expansion of the revenue base in its Petition somewhat. In this revised rate quote, BMI defined Gross Revenues to include: (1) the total

---

threats from GMR that ▮▮▮▮▮ would be in violation of U.S. copyright laws absent a retroactive license. NACPA Response to BMI PFOF ¶ 190.

revenues from all primary-market ticket sales; (2) the total revenues from secondary-market ticket sales; (3) total revenues for service charges, administration or handling charges by any ticket broker, such as Ticketmaster; (4) the total revenues for the sale of VIP packages and box suites; and (5) the total revenues from sponsorships and other forms of advertising. As with its earlier proposal, BMI proposed to eliminate the 10% administrative discount for NACPA. Joint Ex. 63; NACPA PFOF ¶ 248.

BMI again narrowed its proposed expansion of the revenue base for the NACPA license at issue in this proceeding for the post-July 1, 2018 period in its Proposed Findings of Fact. BMI's proposed definition of Gross Revenues for that period now includes: (1) revenues from primary ticket sales paid or payable to the licensee, or a contractually-related third party; (2) revenues from service, administration, and/or handling charges paid or payable to the licensee; (3) revenues from the sale of VIP packages and box suites paid or payable to the licensee, or a contractually-related third party; (4) revenues from sponsorships and other forms of advertising paid or payable to the licensee; and (5) revenues from direct-to-secondary market ticket sales paid or payable to the licensee. BMI PFOF ¶ 47. While BMI has moderated its fee demands since the inception of the litigation, its proposed rates remain well above a reasonable level.

### B.    *NACPA's Fee Proposal*

NACPA proposes that final fees be set at the level of interim fees paid, which matches the rates contained in the most recent final fee agreement between NACPA and BMI. For concerts, the rate should continue to be 0.30% of "Gross Ticket Revenues" (as defined in the 2006 BMI-NACPA Agreement)[12] for venues seating 0-9,999 people, and for venues 10,000 and

---

[12] As noted above, Gross Ticket Revenues are defined in the 2006 BMI-NACPA Agreement as the total monies received by NACPA or its members from all the ticket sales per attraction. The

greater, 0.15% of "Gross Ticket Revenues."  AFOF ¶ 65.  For festivals, the final fee should be

0.40% for venues seating 0-9,999 people, and 0.30% for venues with 10,000 people or greater.

*See* NACPA PFOF ¶ 160.   In both cases, the rates should remain subject to a 10% discount to

reflect NACPA's ongoing role in the administration of the license, including the services that

NACPA has already provided throughout the entirety of the interim period.[13]

## ARGUMENT

### VII.   THE GOVERNING PARAMETERS OF THE BMI CONSENT DECREE AND THE RATE COURT'S ROLE IN SETTING ROYALTY RATES

BMI bears the burden of proof as to the reasonableness of the fees it seeks.  Consent

Decree § XIV(A).  "Should BMI not establish that the fee requested by it is a reasonable one,

then the Court shall determine a reasonable fee based upon all the evidence."  *Id.*

Both the BMI Consent Decree and Rate Court proceedings such as this one serve to

insulate music users from BMI's market power to the extent feasible.  *See Music Choice IV*, 426

F.3d at 96  ("[R]ate-setting courts must take seriously the fact that they exist as a result of

monopolists exercising disproportionate power over the market for music rights.");  *see also*

*DMX Inc.*, 683 F.3d at 49;  *ASCAP v. MobiTV, Inc.*, 681 F.3d 76, 82 (2d Cir. 2012) (when

approximating the "fair market value" of a license, "the rate-setting court must take into account

the fact that ASCAP, as a monopolist, exercises market-distorting power in negotiations for the

uses of its music.").  In so doing, the Rate Court endeavors to set fees at a level that would be set

in a hypothetical competitive market and reflect "the price that a willing buyer and a willing

seller would agree to in an arm's length transaction."  *Music Choice IV*, 426 F.3d at 95. The

---

definition expressly excluded (1) taxes; (2) building/facility charge per ticket sold; (3) ticket
agent/service charge placed on each ticket sold; and (4) facility parking fees.  Joint Ex. 29.

[13] NACPA also proposes to finalize the rates for free and benefit shows at the interim level.

Second Circuit has underscored repeatedly that the Rate Court's role is to determine what license applicants would pay in a competitive market. In *DMX*, for example, the Second Circuit reaffirmed that "fundamental to the concept of 'reasonableness' is a determination of what an applicant would pay in a competitive market." *DMX*, 683 F.3d at 45; *see also United States v. ASCAP (RealNetworks)*, 627 F.3d 64, 76 (2d Cir. 2010); *ASCAP v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 576 (2d Cir. 1990) (observing that the Rate Court must concern itself principally with "defin[ing] a rate or range of rates that approximates the rates that would be set in a competitive market.").

## VIII.  NACPA'S FEE PROPOSAL IS REASONABLE

### A.  *The Use of Relevant Benchmarks to Determine Reasonable Fees*

In assessing the "fair market value of the music" to fulfill the mandate in the ASCAP and BMI Consent Decrees to set reasonable fees, the Second Circuit repeatedly has endorsed "the use of benchmarks—agreements reached after arms' length negotiation between other similar parties in the industry." *Music Choice IV*, 426 F.3d at 94; *see also DMX*, 683 F.3d at 45 ("Benchmarks, or agreements reached after arms' length negotiation between other parties in the industry, are often used by the rate court in determining the fair market value of the music.") (citing *RealNetworks*, 627 F.3d at 76).

The Second Circuit has made clear that "[i]n choosing a benchmark and determining how it should be adjusted, a rate court must determine 'the degree of comparability of the negotiating parties to the parties contending in the rate proceeding, the comparability of the rights in question, and the similarity of the economic circumstances affecting the earlier negotiators and the current litigants,' as well as the 'degree to which the assertedly analogous market under examination reflects an adequate degree of competition to justify reliance on agreements that it has spawned.'" *Music Choice IV*, 426 F.3d. at 95 (quoting United *States v. ASCAP (In re*

*Application of Buffalo Broad. Co.*), No. 13-5 (WCC), 1993 WL 60687, at *18 (S.D.N.Y. Mar. 1, 1993) (Dolinger, M.J.) and *Showtime*, 912 F.2d at 577); *see also DMX*, 683 F.3d at 48-49 (same).

Rate courts choosing a benchmark frequently start with prior voluntary agreements between the parties—here BMI and NACPA—particularly where there are no material changes that warrant a departure from the status quo. *See United States v. ASCAP (In re Capital Cities) (Capital Cities II)*, 157 F.R.D. 173, 195 (S.D.N.Y. 1994) ("fairly negotiated prior agreements are the proper starting point from which to determine reasonable fees for subsequent periods"); *see also Showtime*, 912 F.2d at 582; *United States v. ASCAP (In re Capital Cities) (Capital Cities I)*, 831 F. Supp. 137, 144-45 (S.D.N.Y. 1993). Indeed, "prior negotiated arms-length agreements are the *best* starting point for determining reasonable license fees for subsequent periods." *Capital Cities II*, 157 F.R.D. at 198 (emphasis added). Where necessary, the Rate Court will make adjustments to the base figure that "account for changes in the economic circumstances affecting the parties and changes in the nature and value of the rights at issue." *Id*. at 196.

When setting rates for either ASCAP or BMI, prior Rate Courts also have looked to agreements with either ASCAP or BMI as a guide for setting fees for the other due to their "equivalent" roles. *Showtime*, 912 F.2d at 594 (finding BMI agreement a "useful benchmark" for setting ASCAP fees); *see also RealNetworks*, 627 F.3d at 83 (finding BMI license "instructive" for setting ASCAP rate).

      B.      *The 2006 BMI-NACPA Agreement Is an Excellent Benchmark that Accounts for Relevant Industry Changes over Time*

The best benchmark in this proceeding is the 2006 BMI-NACPA Agreement, which covered the period from January 1, 2006, through December 31, 2013. It features the same buyer and same seller, it concerns the same rights, it was reached in an environment in which both parties could seek rate-setting from this Court for a reasonable fee, and the rates were

repeatedly reaffirmed by the parties between 2009 and 2012, as evidenced by their willingness to continue to operate under its terms without adjustment, rather than exercise an annual right of termination.  *See* Jaffe Aff. ¶¶ 88, 90-91 (recommending use of the 2006 BMI-NACPA Agreement, and the 2009-2013 period in particular, as the best benchmark for rate-setting here).

BMI and NACPA voluntarily entered into the 2006 BMI-NACPA Agreement following arm's-length negotiations among seasoned executives for both parties.  The parties concluded that the rates from the 1998 BMI-NACPA Agreement, which was itself the product of extensive, multi-year negotiations, should carry over in the new multi-year deal, notwithstanding any intervening changes in the live concert industry that may have occurred between 1998 and 2006, with the exception of establishing new, separate rates to apply to festivals.  *See supra* § III.C.

Even after BMI's termination of the 2006 BMI-NACPA Agreement in 2013 in order to negotiate new rates, the evidence will show that BMI remained a willing seller at those rates well into the interim period.  In September 2014, BMI offered NACPA a five-year license (through December 31, 2019) with the exact same rates and terms as the 2006 BMI-NACPA Agreement. NACPA PFOF ¶ 178.  On January 5, 2015, BMI sent a draft long-form agreement to NACPA embodying that offer.  *Id.* ¶ 180.  Because BMI had added new language concerning representations and warranties that NACPA found objectionable and was unwilling to provide the same type of "license-in-effect" protection provided by ASCAP's agreements with NACPA, the parties negotiated the form of the license throughout 2015 but the rate terms—which, again, were the same as those in the 2006 BMI-NACPA Agreement—were not the subject of any further negotiation.  *Id.* ¶ 181.  It was not until November 2017, when BMI withdrew the fee quote it previously offered, that BMI changed course.  *Id.* ¶ 182.

Indeed, it is not surprising that BMI voluntarily and repeatedly subscribed to the same rates and terms contained in the 1998 BMI-NACPA Agreement and the 2006 BMI-NACPA Agreement during the two decades that preceded this lawsuit. The rates and rate structure embodied in those agreements were designed to grow flexibly with the industry and led to substantial increases in royalties paid to BMI during that time. Because the royalty rates first established in the 1998 BMI-NACPA Agreement and reaffirmed in the 2006 BMI-NACPA Agreement are based on a percentage of ticket sales revenue, they are self-adjusting to account for the dramatic rise in ticket prices (which have outpaced inflation significantly during the period at issue here) and the increase in the number of concerts and festivals promoted by NACPA members over time. Jaffe Aff. ¶ 142. Accordingly, as ticket revenues increased over time due to the investment of NACPA's members in an array of non-musical perks and features, BMI and its affiliates have benefited tremendously—even as (1) concert promoters themselves continued to operate on razor-thin majors and shoulder the enormous financial risk of promoting concerts that often fail to recoup their costs, and (2) there was no change in the nature and manner of contributions by musical works to live concerts. *See*, *e.g.*, NACPA PFOF ¶¶ 121-24. Indeed, annual royalties paid by NACPA members to BMI increased by approximately 174% just between 2009 and 2019. *Id.* ¶ 125. In short, BMI has done extremely well under the terms of its prior agreements with NACPA.

While BMI's prior agreement with NACPA is the best and most logical starting point for the Court's analysis of a reasonable fee here, BMI asks the Court to ignore it completely. But its criticisms of that agreement as a benchmark fall flat. In its Petition, BMI contended that industry changes warranted a significant upward adjustment in rates, but the industry changes BMI cites in support of the contention all occurred well before its repeated ratifications of the rates in the

2006 BMI-NACPA Agreement.  *See supra* § II.B.  Ancillary revenue streams earned by various industry participants in connection with live concerts such as revenues from parking, food and beverage sales, merchandise, ticketing service fees, luxury box suites, and tour sponsorship have all existed for decades.  NACPA PFOF ¶¶ 98, 102, 104, 105.  The precipitous decline in sales of recorded music—which was neither caused nor exacerbated by live concert performances— began well before the parties negotiated the 2006 BMI-NACPA License when, prior to the turn of the century, the rise of internet piracy caused album sales revenue to plummet.  Deposition of Dean Budnick, Tr. 170:16-171:7; RTX 114.  And the industry consolidation that BMI cites as a basis for a fee increase began in the 1990s.  NACPA PFOF ¶¶ 88-90.

BMI's real complaint with the rates in the 2006 BMI-NACPA Agreement is not that those rates have failed to keep pace with industry changes, but rather that BMI no longer likes the rates it voluntarily and repeatedly agreed to accept.  BMI's economic expert, Professor Tucker, has opined that the 2006 BMI-NACPA Agreement is an inappropriate benchmark because BMI purportedly for decades has been underpaid by the concert promotion industry, and was apparently just too preoccupied at any time between the 1990s and 2013 to try to charge more.  In particular, Professor Tucker posits that the time and uncertainty of the Rate Court made it unavailable even as an option to BMI, whose sole function is to license public performance rights and can tap the full scope of licensing revenues it collects for its activities, spreading any litigation costs across its vast collections on behalf of its approximately 20 million affiliates.

As a theoretical matter, this is implausible: it requires believing that the time, cost, and uncertainty of Rate Court would have induced BMI to forgo over $100 million in royalties that would have been due to its affiliates, despite BMI's core function of generating public performance royalties for them.  Jaffe Aff. ¶ 155.  As an evidentiary matter, this requires

believing that not just BMI, but also ASCAP, which negotiated similar economic terms with NACPA, has been chronically underpaid for decades but did nothing about it—and has not done anything about it in the four years since this Petition was filed. That is, BMI's theory presupposed that *two* sophisticated PROs, which each employ experienced negotiators specifically to represent their interests in their primary function of contract negotiations with licensees, and that possess market power in negotiations with NACPA and its members (except to the consent constrained by the consent decrees), would simply not have bothered to try collecting hundreds of millions of dollars in reasonable royalties. This theory beggars belief and, unsurprisingly, finds no support in Rate Court precedent. To the contrary, accepting it would countermand the Second Circuit's mandate that "rate-setting courts must take seriously the fact that they exist as a result of monopolists exercising disproportionate power over the market for music rights." *Music Choice IV*, 426 F.3d at 96; *see also DMX Inc.*, 683 F.3d at 49; *MobiTV, Inc.*, 681 F.3d at 82 ("the rate-setting court must take into account the fact that ASCAP, as a monopolist, exercises market-distorting power in negotiations for the uses of its music.").

Moreover, BMI's contention that it has been underpaid because the "historical rates" undervalue songs (more specifically, BMI public performance rights) as an essential input to live concerts is unfounded. NACPA and its members do not dispute that PRO licenses are an essential component of live concerts. But so are the performers, the stage hands, electricity, water, sound equipment, musical instruments, food, security, and bathrooms. Concerts could not occur without *any* of these elements. Whether musical works are essential has little to do with how public performance licenses covering any necessary rights would be priced in a competitive market. If anything, the historical rates result in overpayments: because the non-music values of concerts have increased, the prior rate may exceed the competitive level. Jaffe Aff. ¶¶ 112-13.

And, at bottom, the BMI Consent Decree and the presence of Rate Court should make the prior

BMI-NACPA agreement a *better* benchmark than agreements with dissimilar PROs not subject

to such constraints, not worse.  *See infra* § IX.A.2.

  C. *ASCAP's Agreements with NACPA During the Relevant Period Also Provide*
    *Useful Benchmarks*

  NACPA's agreements with ASCAP during the relevant period also provide useful

benchmarks for determining a reasonable fee for BMI.  *See, e.g., Music Choice IV*, 426 F.3d at

95.  According to BMI's own data, ASCAP licenses a comparably large repertoire and has at

least as large a share of the musical works performed at concerts promoted by NACPA members.

NACPA PFOF ¶ 226.  Moreover, the ASCAP agreements cover the same concerts and festivals

at issue here.  The agreements were the product of extensive negotiations in which ASCAP was

represented by experienced and well-informed executives.[14]  And ASCAP, like BMI, is subject

to a consent decree designed to constrain the market power obtained by aggregating rights from

numerous rightsholders into a single, jointly licensed repertoire.  *United States v. ASCAP*, 1940-

43 Trade Cas. (CCH) ¶ 56,104 (S.D.N.Y. 1941, amended 2001 WL 1589999, 200-2 Trade Cas.

(CCH) ¶ 73,474 (S.D.N.Y. June 11, 2001); *see also* NACPA PFOF ¶ 19.

  The royalties NACPA paid to ASCAP for the 2014-2017 period were slightly lower than

the interim fees paid to BMI during that period; the royalties NACPA paid to ASCAP from

2018-2021 were slightly higher; and the total royalties NACPA has paid to ASCAP over the

---

[14] None was influenced by a recent Rate Court decision and thus are unlike the ASCAP-Music Choice agreement that the Court declined to use as a benchmark in *Music Choice III*.  *See United States v. Broad. Music Inc., (Music Choice III)*, No. 64 Civ. 3787(LLS), 2004 WL 1171249, at *3 (S.D.N.Y. 2004) (rejecting license agreement as benchmark because it "rested so heavily on the rate set in my 2001 decision, later vacated by the Court of Appeals"), *rev'd on other grounds*, 426 F.3d 91 (2d Cir. 2005).  There has never been any prior ASCAP or BMI Rate Court proceeding involving the live concert industry.

entirety of the interim period is approximately the same as the interim fees paid to BMI. Jaffe Aff. ¶¶ 88-90, Ex. 1. This equivalence further confirms the reasonableness of NACPA's fee proposal to finalize fees for the period at issue here at the interim rates. ASCAP songwriters, many of whom wrote shares of works written by BMI songwriters, already have willingly accepted NACPA's fees as final license fees including for their shares in the exact same performances of the exact same works licensed by BMI here.

To whatever extent BMI contends that its own prior agreement with NACPA did not account for industry changes after the deal was reached, those arguments are not applicable with respect to the 2018 ASCAP-NACPA Agreement. The evidence will show that, during its negotiations with NACPA that culminated in the 2018 ASCAP-NACPA Agreement, ASCAP raised or was aware of every single issue that BMI now claims warrants a dramatic spike in the rates. NACPA PFOF ¶ 193. Moreover, although ASCAP had the right to terminate the 2018 ASCAP-NACPA Agreement in 2020, it chose not to do so. *Id.* ¶ 219.

Professor Tucker is left to contend that, *because* of the Consent Decrees, the ASCAP and BMI benchmark license rates are less likely to reflect terms that would have resulted from a competitive-market negotiation process. *See* Anticipated Testimony of Tucker. But as Professor Jaffe will explain, Professor Tucker's contention has it exactly backwards. The entire point of Rate Court, as codified in the Consent Decrees, is to move transactions with ASCAP and BMI that would otherwise be unreasonable as a result of their market power towards a more reasonable level. *See* Jaffe Aff. ¶¶ 137-38. To suggest that the mere existence of the Rate Court *contaminates* an observed voluntary transaction and invalidates its use as a benchmark, as Professor Tucker does, is to believe that the Rate Courts have systematically failed to implement their own standard or have sent some other signal that misinforms market participants about what

the standard is. *Id.* ¶ 138. There is no reason to believe that is the case here. Indeed, if it were true that the Rate Courts' effect on royalties constrain them away from a reasonable level, then the policy conclusion would be that Rate Court should be abolished. *Id.* ¶ 140. Yet DOJ has repeatedly decided over the past decade that the Consent Decrees and the Rate Courts remain a vital part of public policy today and should be kept in force without modification. NACPA PFOF ¶¶ 22-23. And Congress expressly left the Consent Decrees in place without substantive alteration when it revisited the licensing of musical works in the Music Modernization Act in 2018. *See* S. Rep. No. 115-339, at 16 (2018); Music Modernization Act, Pub. L. No. 115-264, 132 Stat. 3676 (2018).

D.     *The Range of Reasonable Rates Derived from the BMI-NACPA and ASCAP-NACPA Benchmarks*

Using the most recent agreement between BMI and NACPA and NACPA's agreements with ASCAP during the relevant period as benchmarks lead to the following conclusions:

(1) the fees NACPA has paid to BMI on an interim basis are at or above the upper bound of reasonable fees for the period at issue;

(2) the reasonable revenue base to which the rates should be applied is "Gross Ticket Revenues," as defined in the 2006 BMI-NACPA Agreement; and

(3) NACPA is entitled to an administrative discount of 5-10%.

NACPA's fee proposal is consistent with those conclusions. Setting final fees at the same level of the interim fees has the added practical benefit of avoiding the need to recalculate payments over what is now an eight-year period and, moreover, prevents the inequity of NACPA members bearing post-hoc additional costs for music performance rights that would have largely been borne by performing artists as part of the settlement of shows had they been known at the time, and years after BMI songwriters have already been paid for those shows.

## IX.     BMI'S FEE PROPOSAL IS UNREASONABLE

BMI's fee proposal is unreasonable in every respect.  Its proposed royalty rate and proposal to significantly expand the revenue base to which that rate is applied are unsupported by any valid benchmark.  Its proposal to eliminate the administrative discount for NACPA is likewise unsupported by relevant benchmarks and, moreover, is profoundly inequitable since NACPA has already rendered the services it has historically supplied to BMI in exchange for the discount for nearly the entire period that BMI has placed at issue in this proceeding.

### A.     BMI's Proposed Royalty Rate Is Unreasonable

BMI has eschewed benchmarks that feature the same willing buyer, the same or a highly similar willing seller, the same rights, the same market, and the same competitive conditions in favor of (1) royalty rates charged by foreign PROs in other markets; (2) royalty rates charged by dissimilar and unregulated domestic PROs that possess and exercise market power to extract supracompetitive fees; and (3) royalty rates imposed without negotiation by BMI and other U.S. PROs on non-NACPA members, *i.e.*, concert promoters that are too small to bear the cost of a Rate Court proceeding.  None of these is a reliable benchmark.  Jaffe Aff. ¶¶ 162, 172, 178. BMI's expert also looks to royalty rates charged by BMI to other music users outside of the concert promotion industry that operate very different businesses, including radio broadcasters and digital streaming services, purportedly for confirmation of the reasonableness of increasing fees paid by concert promoters.  But, as Professor Jaffe will explain at trial, those agreements, properly analyzed, show that the interim fees NACPA has paid are, in fact, too high, rather than too low.  *Id.* ¶ 18.  BMI will be unable to show that its proposed royalty rate is reasonable for the reasons that follow.

1. <u>Foreign PRO Rates Are Not Reliable Benchmarks for Fee-Setting Here</u>

It is only by looking to the rates charged by PROs in certain other countries that BMI can find rates at or above the level it has proposed for NACPA here. But these foreign PRO rates are patently deficient as benchmarks: they do not reflect the workings of a competitive market;[15] they do not involve either the same sellers or the same buyers; they do not involve the same performances; and they reflect different economic markets and materially different legal and regulatory regimes governing licensing of musical work performance rights.[16] *See* Jaffe Aff. ¶ 178; Affidavit of Benjamin David Allgrove ("Allgrove Aff.") ¶¶ 8-15; Affidavit of Gerald (Jay) Kerr-Wilson ("Kerr-Wilson Aff.") ¶¶ 6-22. Accordingly, these foreign PRO rates fail every metric identified by the Second Circuit for the Court to consider when evaluating the reliability of a benchmark. *See, e.g.*, *DMX*, 683 F.3d at 45. Unsurprisingly, there is no prior Rate Court precedent utilizing a foreign PRO royalty rate to determine reasonable fees for an ASCAP or BMI license. Moreover, rates in the other countries to which BMI points have *always* been higher than rates in the U.S., and BMI and ASCAP voluntarily agreed to much lower rates for decades, across multiple negotiated agreements, fully cognizant of the significant rate differentials between the U.S. market and foreign markets at the time. NACPA PFOF ¶¶ 138, 193; Jaffe Aff. ¶ 178. The evidence therefore is that the licensors and licensees in the foreign markets have not benchmarked their rates to prevailing rates in the U.S. Nor is there any evidence of uniformity more generally between rates charged by U.S. PROs and foreign PROs

---

[15] BMI's experts cite zero examples of foreign rates from countries with multiple PROs, let alone four different PROs that music users in the United States must navigate in order to be fully licensed. *See* Allgrove Aff. ¶ 13; Kerr-Wilson Aff. ¶¶ 19-20.

[16] The foreign PRO rates that BMI cites also vary widely from each other.

for public performances of musical works by other types of music users outside of the live concert industry.

        2.    <u>SESAC and GMR Licenses Are Not Reliable Benchmarks for Fee-Setting Here and, in Any Event, Properly Adjusted, Would Point to Fees Lower than BMI Has Proposed</u>

BMI also asks this Court to consider the rates charged by SESAC to NACPA, by SESAC to non-NACPA concert promoters, and by GMR to individual promoters as benchmarks for the license here. Both the SESAC agreements and the GMR agreements use the same revenue base of ticket sales that NACPA's prior agreements with BMI and ASCAP use. And the rates charged by SESAC and GMR are meaningfully lower than BMI's proposed rate even after accounting for relative market share, but are higher than the rates NACPA has negotiated with BMI and ASCAP. Jaffe Aff. ¶ 176. No rate court has ever used a SESAC or GMR license to set fees for ASCAP or BMI.

BMI's expert, Professor Tucker, posits that because SESAC and GMR operate without consent decree constraints, their licenses are better benchmarks than NACPA's prior license dealings with ASCAP and BMI. Not so. As Professor Jaffe will explain at trial, while SESAC and GMR are both substantially smaller than ASCAP and BMI, they each control a critical mass of works and wield considerable market power to command license royalties in excess of a competitive-market rate. Jaffe Aff. ¶¶ 173-74. Indeed, numerous courts have found that SESAC is able to exercise market power in a way that likely (or at least potentially) violates the antitrust laws. *Radio Music License Comm., Inc. v. SESAC, Inc. (RMLC/SESAC I)*, No. 12-cv-5807, 2013 WL 12114098, at *13-20 (E.D. Pa. Dec. 23, 2013) (Sitarski, M.J.) (finding RMLC likely to succeed on Section 2 claim); *Radio Music License Comm., Inc. v. SESAC, Inc. (RMLC/SESAC II)*, 29 F. Supp. 3d 487, 502-03 (E.D. Pa. 2014) (Jones, J.) (denying SESAC's motion to dismiss RMLC's Section 2 claim); *Meredith Corp. v. SESAC, LLC (Meredith Corp. I)*, No. 09-cv-9177,

2011 WL 856266, at *1 (S.D.N.Y. Mar. 9, 2011) (Buchwald, J.) (denying SESAC's motion to

dismiss); *Meredith Corp. v. SESAC, LLC (Meredith Corp. II)*, 1 F. Supp. 3d 180, 221-24

(S.D.N.Y. 2014) (Engelmayer, J.) (denying SESAC's motion for summary judgment).

Multiple courts have rejected the argument that, because SESAC was significantly

smaller than BMI or ASCAP, it lacked market power over music users to command

supracompetitive rates for its licenses. *See RMLC/SESAC I*, 2013 WL 12114098, at *11 ("[T]he

practical result [is] that a radio station must buy a SESAC license"); *RMLC/SESAC II*, 29 F.

Supp. 3d at 501 ("SESAC excludes competitors by obtaining a critical mass of must-have works,

selling them exclusively in the blanket license format, discouraging direct licensing by refusing

to offer carve-out rights and obscuring the works in its repertory."); *Meredith Corp. I*, 1 F. Supp.

at 222. Because licensees had no meaningful alternative to purchasing a SESAC license given

the critical mass of works that SESAC controlled, these courts properly concluded that SESAC

plausibly possessed market power over music users. *E.g.*, *id.* at 217 ("Thus, based on the

summary judgment record, a jury could find that a local station cannot avoid SESAC's blanket

license, because no alternative to it is realistically available.").

Following these decisions, SESAC agreed to a settlement containing a set of restrictions

resembling those in the ASCAP and BMI consent decrees, but only with respect to the parties

that brought the lawsuits and their constituents. *See Meredith Corp. v. SESAC, LLC (Meredith

Corp. III)*, 87 F. Supp. 3d 650 (S.D.N.Y 2015) (approving settlement). As a result, television

and radio stations obtained a measure of recourse against SESAC's exorbitant demands for rates,

including the ability to require binding arbitration to determine an appropriate rate for its

licenses. *Id.* at 657.

The results of the radio industry's first arbitration with SESAC confirm the type of market power unregulated PROs can wield. In 2017, after RMLC and SESAC arbitrated a rate dispute concerning a reasonable rate to publicly perform the contents of SESAC's repertoire, an arbitration panel reportedly determined that the prices SESAC had previously demanded from radio stations and that SESAC had argued were "reasonable" to the panel were *over 60% too high*. *RMLC Responds To SESAC Discount Offer*, Radio and Television Business Report (July 31, 2017), https://www.rbr.com/rmlc-responds-to-sesac-discount-offer/. And SESAC settled antitrust claims brought by local television broadcasters by returning more than $40 million in overcharges. *See Meredith Corp. III*, 87 F. Supp. 3d at 657. Unlike radio and local television broadcasters, however, other entities like concert promoters do not yet have any rate court or arbitration backstop to attempt to mitigate SESAC's market power. *See* Jaffe Aff. ¶ 34. Thus, SESAC's rates reflect unconstrained market power, and cannot be used as a reliable benchmark to determine what royalty rates would be in a competitive market. *Id.* ¶ 170.

Like SESAC, GMR also wields unconstrained market power. Founded by Hollywood power broker Irving Azoff, GMR emerged in 2013. GMR represents over 100 iconic talents who were invited to join GMR after establishing themselves as some of the highest-paid songwriters in the industry. *See* NACPA PFOF ¶ 271; *see also Global Music Rights, All You Need to Know About the Newest PRO*, SoundMachine (June 18, 2018), https://sound-machine.com/blog/2018/06/18/global-music-rights/; *Catalog*, Global Music Rights, https://globalmusicrights.com/Catalog (last visited Oct. 7, 2022). Accordingly, given the numerous, frequently performed songs these songwriters represent, NACPA members believe that a GMR license is a "must have" for the live concerts they promote. NACPA PFOF ¶ 271.

The radio industry (through RMLC) brought antitrust claims against GMR in 2016, and the federal court overseeing the case found that the radio industry plausibly alleged that GMR's business is a *per se* violation of the antitrust laws. Order, *Radio Music License Comm., Inc. v Global Music Rights, LLC*, No. 19-cv-03957-TJH-AS (C.D. Cal. Feb. 13, 2020), ECF No. 201. GMR countersued RMLC, and the parties ultimately settled those two dueling litigations in one global settlement. But, as with SESAC, NACPA and its members do not enjoy automatic licensing and protection against copyright infringement lawsuits, nor do they have any rate court or arbitration backstop to attempt to mitigate GMR's market power. These litigation results confirm that SESAC and GMR rates are infected by their market power and thus are not indicative of a reasonable rate.

Even apart from the market power that unregulated PROs wield, SESAC and GMR are inappropriate benchmarks due to the vast differences in their repertoire relative to BMI. *See*, *e.g.*, Jaffe Aff. Exs. 2 & 3. The parties agree that comparing any GMR and SESAC licenses to BMI's proposed license here would require an adjustment to account for their considerably smaller share of performances. But any such extrapolation risks magnifying small errors in the inexact science of estimating these PROs' respective market shares, and hence produce an unreliable comparison. *See* Jaffe Aff. ¶ 172; NACPA PFOF ¶ 276.[17] As Judge Cote, in her role as the ASCAP Rate Court, recognized, it is difficult to adjust "a SESAC license rate to arrive with confidence at an implied ASCAP rate. This problem is exacerbated by the fact that SESAC's small size, when compared to ASCAP and BMI, not only amplifies any error in a

---

[17] For example, Professor Tucker treats GMR as having a market share of 4.5% for purposes of her market share adjustment, whereas Professor Jaffe's market share study showed a GMR share of 8.6%. This results in Professor Tucker identifying an adjusted rate twice as high as Professor Jaffe. Jaffe Aff. ¶ 186.

projection, but also reduces the incentive to resist SESAC's rate requests." *In re Pandora Media, Inc.*, 6 F. Supp. 3d 317, 362 (S.D.N.Y. 2014), *aff'd sub nom. Pandora Media, Inc. v. Am. Soc. of Composers, Authors & Publishers*, 785 F.3d 73 (2d Cir. 2015).

Unsurprisingly, then, no Rate Court applying the ASCAP or BMI consent decree has ever used either a SESAC or GMR agreement as a relevant benchmark. On the contrary, whenever a Rate Court has been presented with a SESAC agreement as a potential benchmark, the Rate Court has rejected it as unhelpful and inapplicable. *In re Application of MobiTV, Inc.*, 712 F. Supp. 2d 206, 254 (S.D.N.Y. 2010), *aff'd*, 681 F.3d 76 (2d Cir. 2012) ("SESAC agreements have never been used as benchmarks in ASCAP rate court proceedings and a departure from that practice is not warranted here."); *In re Pandora Media, Inc.*, 6 F. Supp. 3d at 362 ("The SESAC license has historically been a benchmark of limited value because the public knows little about the size of the SESAC repertoire.").

In *MobiTV*, for example, Judge Cote found the applicant's payment to SESAC to be "a poor yardstick to measure the fairness of any fee to ASCAP," and, ultimately, of "limited relevance." 712 F. Supp. 2d at 222. In particular, the Court found that ASCAP's failure to account for the Consent Decree's copyright infringement protection was alone "sufficient to undermine use of the SESAC [] agreement as a reliable measure of the reasonableness of the fee adopted" there. *Id.* at 254. Finding no reason to adopt the SESAC agreements as a benchmark, Judge Cote declined to consider the SESAC rate contained within them. *Id.* Similarly here, it would subvert the very purpose of the Consent Decree if BMI could obtain rates based on reference to those secured by an unregulated seller that has the kind of market power that the Consent Decree was meant to address.

GMR's agreements are not reliable benchmarks for the same reasons that SESAC's are not, as well as due to the unique role of GMR's founder, Irving Azoff, in the live concert industry and his personal relationships that promoters aim to leverage, for which there is no BMI analog, augments their unsuitability. NACPA PFOF ¶¶ 281-85. GMR agreements have never even been proffered as a potential benchmark in Rate Court litigation until now.

In any event, even were the Court inclined to consider the rates SESAC and GMR have extracted, they do not support BMI's proposed rate. Even without an adjustment to account for undue market power, the 2019-2024 SESAC-NACPA license would imply a rate of 0.40%, which is just half of BMI's proposed rate, and considerably closer to the previous NACPA-BMI benchmark effective rate of 0.21%. *See* Jaffe Aff. ¶ 176; BMI PFOF ¶ 179, Fig. 4. Professor Jaffe calculates an implied rate from the GMR licenses, again without accounting for undue market power, of 0.32%, whereas Professor Tucker uses a lower share estimate for GMR to estimate an implied rate of 0.63%. Jaffe Aff. ¶¶ 176, 186. This significant discrepancy underscores the infirmity of trying to extrapolate a rate for BMI from the rate charged by a PRO with a much smaller share of performances. Yet even Professor Tucker's implied rate for BMI based on the GMR agreements is still significantly lower than BMI's proposed rate.

More fundamentally, as Professor Jaffe will explain, ignoring the evidence of the most significant benchmarks (BMI and ASCAP), and declaring BMI's proposal reasonable because much smaller and more distant agreements are higher is not a valid way to summarize the benchmark evidence, even if one were to consider the rates charged by SESAC and GMR without adjusting for their market power. *Id.* ¶ 204. Weighting the effective rates of all four agreements by the PROs' respective shares of performances at concerts promoted by NACPA members would result in a weighted average royalty rate of 0.24%—a result that is 13% higher

than the 21% that Professor Jaffe concludes is reasonable (because it includes supracompetitive rates charged by SESAC and GMR) but only 30% of the rate BMI proposes. *Id.*

        3.    <u>BMI and ASCAP Licenses with Non-NACPA Promoters Are Not Reliable Benchmarks</u>

The rates imposed by ASCAP and BMI on smaller, non-NACPA promoters are not useful benchmarks for setting a reasonable rate for NACPA promoters, particularly in light of the far more informative agreements that exist as benchmarks between NACPA itself, on the one hand, and BMI and ASCAP, respectively, on the other. Jaffe Aff. ¶ 162.

*First*, both BMI and ASCAP have long charged considerably higher rates to non-NACPA promoters than the rates negotiated at arms-length with NACPA. As their consent decrees forbid charging different rates to similarly situated users, the longstanding, significant fee differential must reflect their view that these small promoters have not been similarly situated to NACPA and its members.[18] *Id.*

*Second*, the rates that BMI and ASCAP have charged to non-NACPA promoters were not the product of any negotiations at all. For example, when BMI imposed new rates on non-NACPA promoters in 2009, it offered the rate on a "take it or leave it basis"—for which leaving it would expose those promoters to significant copyright infringement liability. *See* NACPA PFOF ¶ 287. As Professor Jaffe will explain at trial, the rates charged by ASCAP and BMI to non-NACPA promoters involve a comparably small amount of money, such that it would be prohibitively expensive for those promoters to commence a Rate Court proceeding to obtain more reasonable fees. Jaffe Aff. ¶ 164. As a result, BMI's negotiating power with those non-NACPA promoters was effectively unconstrained because the role of Rate Court as a critical

---

[18] While SESAC is not required to treat similarly situated users the same, it too charges higher rates to non-NACPA members than it charges to NACPA. BMI PFOF ¶¶ 195, 202-03.

backstop was reduced, if not eliminated altogether. *Id.* This Court has rejected as "not reliable benchmarks" agreements where one party "had no realistic opportunity freely to negotiate the future fees for their license." *DMX,* 683 F.3d at 47 (quoting *Broad. Music, Inc. v. DMX, Inc.*, 726 F. Supp. 2d 355, 359 (S.D.N.Y. 2010); *see also Showtime*, 912 F.2d at 570 ("The opportunity of users of music rights to resort to the rate court whenever they apprehend that ASCAP's market power may subject them to unreasonably high fees would have little meaning if that court were obliged to set a 'reasonable' fee solely or even primarily on the basis of the fees ASCAP had successfully obtained from other users.").

Even were one to use the rate BMI or ASCAP has charged to non-NACPA members as a benchmark, however, the result would still be an effective rate well below BMI's proposed fee here. While those licenses include a rate of 0.80% for the smallest venues, both ASCAP and BMI have licensed concerts by non-NACPA members in larger venues at much lower rates. Indeed, BMI's Street Rates for venues with a seating capacity in excess of 5000 are the same as its prior rates with NACPA for comparably sized venues. Non-NACPA promoters have paid an average effective rate of approximately 0.42% of ticket sales revenues to BMI under the Street Rate structure—well above the reasonable level but still well below BMI's proposed fee. BMI PFOF, at 33, Fig. 4; Anticipated Testimony of Tucker. A higher percentage of the concerts promoted by NACPA members, however, are in venues with larger seating capacities. Applying BMI's Street Rate structure to NACPA promoters would yield an effective rate of 0.28% of ticket sales revenues—less than one-third of BMI's proposal for the post-July 1, 2018 period— further demonstrating the unreasonableness of BMI's fee proposal.[19] NACPA PFOF ¶ 289.

---

[19] BMI contends that an effective rate of 0.28% for NACPA is reasonable for the January 1, 2014-June 30, 2018 period because it has proposed a rate structure that would generate that

4. BMI's License Agreements with Radio Broadcasters and Music Streaming Services Further Demonstrate the Unreasonableness of BMI's Fee Proposal Here

In its Petition, BMI also cites the rates it charges in other music-centric contexts, such as the rates charged to radio broadcasters and digital streaming services, as a basis to increase the rates paid by NACPA. Dkt. 7, at 12, ¶ 33. Properly analyzed, however, those licenses suggest that the interim rates that NACPA has been paying are already too high, not too low.

As Professor Jaffe will explain, the contribution of public performances of musical works to consumer value is relative to the contribution of other inputs. Jaffe Aff. ¶ 151. The percentage of revenue paid for public performances of musical works is at its highest when the contribution of other inputs to value is the smallest, and, conversely, the royalty percentage ebbs when other, non-music contributions are most significant. That BMI's license rate for cable sports channels, for example, is significantly lower than its rate for commercial radio stations and music streaming services is economically consistent with the proportional contribution of the public performances of musical works to value being lower on cable sports than on radio or in music streaming. *Id.* ¶¶ 206-08. By the same reasoning, the percent of revenue royalty for live music concerts should also be much lower than on radio or music streaming, because so much of the value in and revenue generated by live concerts derives from the multimedia experience and the excitement of seeing beloved performers live and in person, together with thousands of other fans. *Id.* ¶ 112, 207. While radio broadcasters and digital music streaming services may pay a higher percentage of their revenues to BMI than concert promoters, they pay *significantly less*

---

result. BMI offers no credible explanation for why the reasonable fee would more than triple overnight on July 1, 2018.

*per song per listener*, which is the far more relevant metric for establishing the value of the right to perform musical works. *Id.* ¶¶ 212-14, 216.

Moreover, radio stations and music streaming services need to acquire the rights to all of the music they perform. This stands in contrast to concert promoters, who only need to acquire the rights to perform musical works that the performing artist lacks the right to publicly perform. *See supra* § II.A.4. This distinction further explains why one would expect radio stations and music streaming services to pay a higher percentage of revenues than concert promoters in a competitive market for musical works performance rights.

      B.      *BMI's Proposed Expansion of the Revenue Base Subject to the Royalty at Issue Is Unreasonable*

           1.      <u>Even BMI's Own Proposed Benchmarks Do Not Support the Expansion of the Revenue Base BMI Seeks</u>

BMI's proposed expansion of the revenue base for the period after July 1, 2018 to include various revenue streams other than revenue from ticket sales is the antithesis of what a willing seller and a willing buyer would agree to in a competitive market for music performance rights. Since the inception of its license relationships with BMI and ASCAP, NACPA has used the same revenue base when calculating the royalties owed: revenue from ticket sales, subject to specified deductions for taxes, building and facility fees, ticket service fees, and parking fees. Joint Exs. 24, 29, 57. When NACPA and SESAC agreed to move from a flat fee per ticket sold to a percentage-of-revenue model, they agreed to use this same revenue base. Joint Ex. 62. While the licenses that ASCAP and BMI have offered to non-NACPA members are not reliable benchmarks for the reasons discussed above in Section IX.A.3, they, too, limit the revenue base used for royalty calculations to revenue from ticket sales, subject to the same reasonable deductions contained in their agreements with NACPA. BMI Ex. 394. Likewise, GMR's agreements with individual concert promoters are based on ticket sales revenues and do not

attempt to include any of the ancillary revenue streams in BMI's proposal. BMI Exs. 544, 551, 563. BMI would thus require NACPA members to calculate royalties using a revenue base that is different from the ones they use to calculate royalties owed to every other PRO. Even the foreign PRO royalty rates to which BMI points do not utilize the vastly overbroad revenue base BMI proposes here. Jaffe Aff. ¶¶ 14, 230; Anticipated Testimony of Kerr-Wilson and Allgrove.

While the absence of benchmark support for BMI's proposed revenue base is reason alone to reject it, adopting it (even in part) would unnecessarily complicate the use of benchmarks to derive a reasonable royalty rate to apply to that base. As BMI itself recognizes, expanding the revenue base would require a proportional downward adjustment to the rate contained in any relevant benchmark in this proceeding to account for the difference in revenue base. *Id.* ¶¶ 222, 230-32 (discussing Professor Tucker's adjustments). There is no good reason to introduce that complication into the benchmarking analysis. *Id.*

      2.     BMI's Proposed Revenue Base Would Include Revenues that Promoters Do Not Receive, Are Not in a Position to Identify, and Are Untethered to the Public Performances of Music Subject to the License

In addition to being unnecessarily complex and difficult to administer (*see infra*), the new categories of revenue that BMI requests do not flow from the value of public performances of the musical works in BMI's Repertoire. Rate Court and Second Circuit precedent require a sufficient nexus between the public performance of the songs in a PRO's repertoire and the revenue source that is included in the revenue base. *See, e.g., RealNetworks*, 674 F.3d at 76 (citing cases); NACPA PFOF ¶ 303. That means that for any concert revenue to be included in the revenue base for BMI's proposed license agreement, that revenue must in some way be derived from, or tied to, the public performance of written compositions. BMI's fee proposal, however, seeks to include in the revenue base numerous categories of concert revenue that do not

have a sufficient, if any, nexus to the performance of BMI's works to warrant BMI songwriters sharing directly in those revenues.

*First*, BMI seeks to include in the revenue base any portion of the ticketing fees charged by ticketing companies such as Ticketmaster, AXS and Eventbrite that are shared by promoters. Ticketing companies provide consumers with the ability to buy tickets digitally and transfer them instantaneously, among other things. NACPA PFOF ¶ 305. As a result, when consumers pay ticketing fees, they are not paying for the value of the concert experience that is captured by the face value ticket price or the ability to hear any particular songs. They are paying for the separate service that allows them to obtain their ticket without the time and cost of traveling to a physical box office location. *Id.* Consumers are willing to pay for this added convenience that is untethered to performance rights or even to music. *Id.*; Jaffe Aff. ¶ 223.

*Second,* BMI seeks to include in the revenue base all revenues paid or payable to the licensee, or a "contractually-related third party," from "VIP packages" that artists sell to fans. As an initial matter, it is striking that BMI's proposal extends to revenues that are paid to unspecified "contractually-related third-part[ies]." It is unclear what this means, but it would not make any sense to require promoters to try to track down revenues that they do not themselves receive. *Id.* ¶ 220; NACPA PFOF ¶ 314.

In most cases, VIP packages reflect the perks—such as special concert-themed merchandise or backstage passes—that artists offer to consumers, at an additional cost, on top of the face value of a ticket to attend the concert. When consumers pay for VIP packages, they are paying for additional items, physical experiences, or personal interactions with the artist that have no obvious connection to the performance rights in any song. *Id.* ¶ 306. Instead, revenue from VIP packages should be included in the music performance royalty calculation based on the

face value of the tickets included in the VIP package—as they are now under the interim license. To the extent that VIP packages sell for more than the face value of the ticket because of non-music benefits bundled with the tickets, that increased revenue is not music-related and should not be part of the royalty base. *Id.* ¶ 307.

*Third*, BMI seeks to include in the revenue base "box suite" revenues that are paid or payable not just to the licensee, but also to a "contractually-related third party" (which raises all of the same issues regarding the vagaries and impracticalities of BMI's proposal that are discussed above). Box suites typically refer to a block of multiple seats located together within a venue, which a venue will market and sell to consumers (typically companies) for a predetermined set of dates. *Id.* ¶ 308. Concert promoters typically do not sell or receive any revenue for box suites. *Id.*

Moreover, when a corporate customer buys a box suite, it is typically buying access to the venue for all the events that occur there over a season or some other set period of time. *Id.* ¶ 309. By purchasing the box suite, the customer has access to all of the events at that venue during the specific time period, whether those events are concerts, sporting events or something else. *Id.* Due to this practice, box suites are rarely purchased on an event-by-event basis, and purchasers frequently purchase box suites before the venue has even *announced* the specific artists, or acts, that will be performing live on the dates covered by the package. *Id.* ¶ 310. In that context, purchasers often pay for box suites without even knowing the artist that they may see on a given date or the songs they will hear on a given night. *Id.*

Professor Tucker will testify that the licensed promoter could reasonably identify box suites sales thanks to its contractual relationship with venues. Anticipated Testimony of Tucker. But she proposes no method by which a venue's revenues from box suite sales would be

allocated to specific events to which the box suite purchaser has access. Moreover, there are myriad different kinds of relationships between promoters and venues; even if *some* promoters can learn this information through contractual relationships (and the record does not suggest that this is the case), this would introduce significant variation in the royalty obligations against promoters, completely unrelated to any variation in the value of the music performance rights. Such an uneven application would apply arbitrarily to otherwise similarly-situated NACPA members. Jaffe Aff. ¶¶ 220-21. The BMI Consent Decree does not permit such arbitrary distinctions among NACPA members. BMI Consent Decree, § VIII(A).

*Fourth*, BMI seeks to include in the revenue base revenue from advertising and sponsorships. Advertisers and sponsors typically do not pay for advertising at a venue on a concert-by-concert or event-by-event basis. Instead, they usually pay for the right to advertise at a select venue across a prolonged period of time. NACPA PFOF ¶ 311. For that reason, advertisers may purchase an advertising block at a venue before the venue has even announced the specific artists, or acts, that will be performing during the period of time in which the buyer has purchased advertising. It is not tied to the value of any specific music rights. *Id.*

In short, these revenue streams are generated by products and services untethered to the performance of music. Tying the performance royalty to such ancillary and non-music related streams would introduce spurious and arbitrary variations in the magnitude of the performance royalty. Jaffe Aff. ¶ 225. Their inclusion in the revenue base would be unreasonable.

### 3. BMI's Proposed Revenue Base Is Unnecessarily Complicated and Unworkable

It would be both administratively costly, and largely unworkable, to require promoters to expand the revenue base with the specific non-music related revenue streams that BMI seeks. This is particularly true because it is highly difficult—if not downright impossible—for licensees

to determine the actual amounts of revenue tied to the expanded categories that BMI has proposed for inclusion in the revenue base. NACPA PFOF ¶ 313. Significant portions of BMI's proposed expanded revenue base are not recognized by the concert promoter at all. It would be unworkable to require promoters to try to track down revenues that they do not themselves receive or have information about. *Id.* ¶ 314. For good reason, no relevant benchmark has required licensees to report as revenue amounts of this nature earned by third parties.

Requiring promoter-licensees to predict—much less track and determine—the revenue streams that BMI seeks to include in the revenue base would be virtually impossible without the cooperation of the third parties that actually receive them, and likely impossible even then, given the great variety of ways in which these entities track and treat these revenue streams. *Id.* ¶ 317. BMI has offered no cognizable methodology by which licensees would ascertain the amount of revenue attributable to the expanded revenue categories that BMI seeks on a prospective basis, let alone on a retroactive basis back to July 1, 2018. BMI's request is unmanageable, impractical, and should be rejected.

C.      *BMI's Proposal to Eliminate NACPA's Administrative Discount Is Unreasonable*

Every agreement between NACPA and a PRO contains an administrative discount to reflect the value that NACPA provides in consolidating reporting and payment and ensuring timely submissions, as well as the value of covering dozens of different promoters in a single license transaction. Joint Exs. 24, 29, 57, 62. Indeed, BMI routinely provides discounts to trade associations, even when the association has no responsibilities for administering the license. Jaffe Aff. ¶ 133; *see also* NACPA PFOF ¶ 170 (BMI note referring to 10% discount as its "standard association discount"). Moreover, the size of the administrative discount was part of negotiations between NACPA and PROs on the royalty rate, and there is no evidence that NACPA would have agreed to pay the royalties in that agreement in the absence of a discount.

Finally, eliminating the discount would be inequitable. BMI and NACPA agreed on an interim license that obligated NACPA to continue to provide the same type of administrative services during the interim fee period that it provided under the parties' prior final fee agreement (and has provided since the inception of the license relationship). *Id.* ¶ 176. NACPA has dutifully and timely fulfilled those obligations. NACPA would not have been willing to provide those services to BMI without compensation. *Id.* ¶ 177. It should be self-evident as a matter of fundamental fairness that BMI should not retain the benefit of NACPA's work without paying for it and, tellingly, BMI has never provided an explanation for why it should be allowed to free-ride on valuable administrative work already provided by NACPA. *See* Jaffe Aff. ¶ 134. Accordingly, BMI's proposal to eliminate the administrative discount should be rejected.

## CONCLUSION

For all the foregoing reasons, the Court should conclude following trial that: (i) BMI has failed to carry its burden of demonstrating that the fees and terms it proposes for the license at issue are reasonable; and (ii) NACPA's counter-proposed license rates and terms, as set forth in this brief and at trial, are reasonable.

Dated: New York, New York
      October 7, 2022

WEIL, GOTSHAL & MANGES LLP

By: */s/ Benjamin E. Marks*
    Benjamin E. Marks
    David Yolkut
    Sarah M. Sternlieb
    Elizabeth McLean
    Camilla Brandfield-Harvey
    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    New York, NY 10153-0119
    Tel: (212) 310-8000
    Fax: (212) 310-8007
    benjamin.marks@weil.com
    david.yolkut@weil.com
    sarah.sternlieb@weil.com
    elizabeth.mclean@weil.com
    camilla.brandfield-harvey@weil.com

*Attorneys for Respondent North American Concert Promoters Association*