USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/28/23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -X

BROADCAST MUSIC, INC.,

              Petitioner,         2018 Civ. 8749 (LLS)

- against -                  OPINION

NORTH AMERICAN CONCERT PROMOTERS
ASSOCIATION, as licensing
representative of the promoters
listed on Exhibit A to the
Petition,

              Respondent.
- - - - - - - - - - - - - - - - - -X

    Article XIV(A) of the Broadcast Music, Inc. ("BMI") Consent

Decree entered in United States v. Broadcast Music, Inc., 1966

Trade Cas. (CCH) ¶ 71, 941 (S.D.N.Y. Dec. 29, 1966), amended by,

United States v. Broadcast Music, Inc., 1996-1 Trade Cas. ¶ 71,

378 (S.D.N.Y. Nov. 18, 1994) ("BMI Consent Decree") requires BMI

to offer any prospective music user a license to publicly

perform the songs in its repertoire. If BMI and the licensee are

at an impasse over the licensing rate, either party can petition

this Court to set a "reasonable" rate. Id.  The Court must thus

authorize a rate that will allow songwriters and publishers to

obtain the benefits derived from the copyright protections

afforded to their works, while simultaneously avoiding overly

compensating them for the contributions made by others' live

performance of the works and eliminating any price inflation

derived from BMI's aggregated market power as a monopolist.

BMI petitioned this Court to determine the reasonable rate that the North American Concert Promoters[1] Association ("NACPA") owes for its members' right to perform BMI-affiliated music at live concerts. BMI seeks an order setting the final fee for two blanket licenses, one that covers the "Retroactive Period" stemming from January 1, 2014 through June 30, 2018 and the other that controls the "Current Period" running from July 1, 2018 through December 31, 2022.  The parties agree to structure the fee as a percentage of gross revenue but dispute the definition of gross revenue and the rate that applies to the revenue base.

For the reasons that follow, the Court adopts BMI's proposed rate for the Retroactive Period. For the Current Period, the reasonable rate is set at 0.5% of Gross Ticket Revenues, as defined below.

## BACKGROUND

### a.   BMI and Domestic PROS

BMI is a performing rights licensing organization ("PRO") that represents approximately 1.3 million songwriters, composers, and music publishers ("BMI affiliates"). Tr. 129:10-19. BMI licenses the public use of its affiliates' musical

---

[1]  The term "promoters" refers to concert organizers, who provide for the artist, venue, advertising, and general facilitating of a live concert event.

compositions to a broad range of businesses and music users including, radio and television broadcasters, satellite radio, cable television, streaming services, concert promoters, and restaurants. Tr. 130:16-24. BMI operates under the constraint of the Consent Decree, which prohibits it from refusing a license to any music user who is willing to pay a reasonable license fee. Consent Decree § XIV.

The BMI repertoire contains around twenty-one million musical works or approximately 45.4% of the total music market. Tr. 129:15-17; PX 980 at 24. The rest of the market is represented by three other PROs: the American Society of Composers, Authors, and Publishers ("ASCAP"), the Society of European Stage Authors and Composers ("SESAC"), and Global Music Rights ("GMR"). ASCAP's repertoire encompasses approximately 46.5% of musical compositions on the market. PX 980 at 24. It operates under a Consent Decree identical in practice to BMI's. Stip. Facts ¶¶ 21-22.

SESAC and GMR are smaller domestic PROs that do not operate under Consent Decrees. Stip. Facts ¶¶ 23-24. SESAC represents the licensing rights to approximately 3.6% of the market. PX 980 at 24. GMR, the newest PRO, licenses approximately 4.5% of the market. Id.

**b. NACPA and its Members**

3

NACPA is an association of concert industry promoters that was formed in 1988. Tr. 1420:12-18. NACPA licenses with BMI, ASCAP, and SESAC to cover the public performance of music at live concerts promoted by its members.[2] Stip. Facts ¶ 12; see JX 24 (1998 BMI-NACPA Agreement); JX 29 (2006 BMI-NACPA Agreement); JX 57 (2018 ASCAP-NACPA Agreement); JX 62 (2020 SESAC-NACPA Agreement). Although NACPA itself enters into these licenses on behalf of its collective membership, NACPA's members are the ones paying the rate. Tr. 496:10-17; see JX 29. NACPA and its members are thus aligned to keep the license fees low. Tr. 1001:2-11, 1086:23-1087:3. NACPA administers the license by verifying the gross revenues reported from each concert, collecting payments from members, and remitting them to BMI. Stip. Facts ¶ 14.

NACPA has forty-six concert-promoter members.[3] Tr. 141:4-6. Of those members, the most notable are Live Nation Entertainment, Inc. ("Live Nation") and AEG Presents, LLC ("AEG"). Live Nation is affiliated with approximately half of NACPA's other members, while another quarter of NACPA's members

---

[2] Unlike the other PROs that have entered into licensing agreements with NACPA itself, GMR has licenses with NACPA's individual members. See PX 83, 101.

[3] To become a NACPA member, a promoter must have staged at least sixty shows in the prior year, including at least five club shows, five theater shows, and five shows in venues with more than 10,000 seats. Stip. Facts ¶ 11.

are subsidiaries of AEG. Id. Live Nation, AEG, and their subsidiaries pay roughly 90% of the fees under NACPA's license with BMI. Tr. 141:8-11. NACPA members that are not associated with Live Nation and AEG include Another Planet Entertainment ("APE"), Jam Productions ("JAM"), Music and Event Management, Inc. ("MEMI"), and Nederlander Concerts ("Nederlander"). Stip. Facts ¶ 17.

Live Nation and AEG are conglomerates in the music industry. Their businesses include concert promotion, venue ownership, and ticket servicing. Tr. 628:25-629:1, 632:14-17, 638:6-7, 696:1-2, 699:13-17; 700:13-19. Live Nation is the largest concert promoter in the United States generating more revenue from concerts than any other promoter. Tr. 696:13-14; PX 748 at 2-3. It owns Ticketmaster, the largest ticketing servicing company in the nation. Tr. 638:6-7. Ticketmaster requires ticket buyers to pay service fees on virtually all tickets, which amount to an average of 20% of the face value of the ticket. See Tr. 642:12-24, 645:12-23.

AEG is the second-largest concert promoter in the United States. Tr. 696:8-10. It also owns the ticket servicing company AXS, which charges service fees comparable to Ticketmaster. Tr. 700:13-19, 720:10-723:16, 725:15-19.

### c. Music Industry

5

Concert promoters organize live music events by booking talent, securing venues, facilitating operations, and advancing costs, which often include a guarantee payment to the artist. Tr. 588:19-24, 589:16-590:4, 592:7-17. In the United States, the promoter's responsibilities include obtaining the license for the performance of the songs to be played at the concert. Tr. 779:24-780:5.

Historically, the concert promotion industry has been composed of small independent promoters operating in regional markets on slim margins. Tr. 110:13-24. In the early 1990s, "[p]romoters put on 90% of their shows at a loss in order to get 10% of the shows that make money." JX 8; see also JX 26 ("concert costs . . . frequently exceed ticket sales"). In the late 1990s, regional promoters began consolidating until the modern landscape of being dominated by Live Nation and AEG emerged. See Tr. 110:13-111:8; Tr. 141:8-10.

### d. BMI's and NACPA's Licensing History

In 1992, BMI approached NACPA to negotiate a blanket license for live concerts. Tr. 214:14-16; JX 6. BMI's initial proposal was a rate of 1% of gross ticket receipts. JX 26. NACPA protested that the concert industry was in economic distress and could not afford to pay BMI's requested rate. JX 6; JX 8; JX 26. Based on NACPA's representations and after years of negotiating, the parties finalized the 1998 BMI/NACPA license with a rate of

6

0.3% of "Gross Ticket Revenues" for concerts with under 10,000 seats and a rate of 0.15% for those with over 10,000 seats. JX 24. Gross Ticket Revenues were limited to monies received by concert promoters from ticket sales (i.e., the face price of the tickets). Id. The license also granted a 10% administrative discount for NACPA's assistance in consolidating its members' payments and reporting them to BMI. Id. NACPA's discount was contingent on at least 80% of NACPA members agreeing to the BMI license. Id. The 1998 BMI/NACPA License was set to run until 2004, whereafter the parties extended it for another year. Stip. Fact ¶¶ 52, 55.

In 2005, the parties began negotiations for a new license. The negotiations focused exclusively on a rate for music festivals, which BMI contended were not licensed under the 1998 BMI/NACPA License. The parties agreed to a separate festival rate[4] and entered into the 2006 BMI/NACPA License. JX 29. Throughout the negotiations, they did not discuss any other terms of the license, including the headline rate, and simply chose to continue the one set in 1998. See Tr. 982:6-983:2. The 2006 BMI/NACPA license had an initial four-year term, through

---

[4] The festival rate is 0.4%, if there are less than 10,000 attendees, or 0.3%, if there are more than 10,000, of the gross ticket revenue. JX 29.

December 31, 2009, with automatic annual renewals thereafter.
Id.; Tr. 1471:24-1472:4.

The 2006 BMI/NACPA license was renewed until BMI terminated
it effective December 31, 2013. Tr. 152:14-25. Since then, the
parties have been on an interim agreement and have engaged in
protracted negotiations for a new license without success. Tr.
153:1-6.

### e. Parties' Proposals

BMI's Rate Quote contains a dual proposal, one for the
Current Period (July 1, 2018 through December 31, 2022) and one
for the Retroactive Period (January 1, 2014 through June 30,
2018). JX 63. The Rate Quote for the Current Period is 0.8% of
"Gross Revenues," which is enlarged to include:

1. Revenues from primary ticket sales paid or payable to the
   licensee or a contractually-related third party; (2)
   Revenues from service, administration, and/or handling
   charges paid or payable to the licensee in connection with
   primary ticket sales; (3) Revenues from the sale of VIP
   packages and box suites for concerts paid or payable to the
   licensee or a contractually-related third party; (4)
   Revenues from sponsorships and other forms of advertising
   paid or payable to the licensee; and (5) Revenues from
   direct-to-secondary market ticket sales paid or payable to
   the licensee, meaning tickets whose initial distribution to
   the public is on the secondary market.

Id. It also eliminates the discount previously included in
former BMI-NACPA licenses that allowed NACPA, in exchange for
helping BMI administer the license and collect royalties from
promoters, to retain 10% of the fees. Tr. 190: 11-22. The

8

Current Period Rate Quote incorporates festivals into its definitions rather than having a separate festival rate.

For the Retroactive Period, BMI proposes a tiered rate structure, where the percentage owed is based on the size of the venue where the concert is held. JX 24. The tiers are as follows:

| Venue Size | Rate |
|---|---|
| 0 to 2,500 seats | 0.8% |
| 2,501 to 3,500 seats | 0.6% |
| 3,501 to 5,000 seats | 0.4% |
| 5,001 to 9,999 seats | 0.3% |
| 10,000 seats or more | 0.15% |

Id. The appropriate percentage rate is applied to the "Gross Revenue," defined to include only the face value of the ticket (exclusive of all fees and other charges). Id. The Rate Quote for the Retroactive Period also eliminates the 10% Administrative Discount. Id.

NACPA proposes continuing the same terms found in the 2006-2013 BMI-NACPA agreements, including the same revenue base and administrative discount. Tr. 1473:4-9 (Jaffe). It advocates for converting from a tiered system to a unitary rate between 0.21%-0.275% of the present gross ticket revenues. See Tr. 1531:17-13, 1546:9-14.

**DISCUSSION**

9

**I.General Standards**

In any fee-setting proceeding, BMI bears "the burden of proof to establish the reasonableness of the fee requested by it. Should [BMI] not establish that the fee requested by it is a reasonable one, then the Court shall determine a reasonable fee based upon all the evidence," including the proposal from the music user. BMI Consent Decree, art. XIV(A); Broad. Music, Inc. v. DMX Inc., 683 F.3d 32, 45 (2d Cir. 2012).

The Consent Decree does not provide guidance on how to determine whether a fee is reasonable. Nonetheless, courts in this circuit recognize that "fundamental to the concept of reasonableness" is a determination of the license's fair market value, the range of prices "that a willing buyer and a willing seller would agree to in an arm's length transaction" made in a hypothetically competitive market. DMX Inc., 683 F.3d at 45; United States v. Broad. Music, Inc., 316 F.3d 189, 194 (2d Cir. 2003) ("Music Choice II"). A truly competitive market for a music license is illusory. It cannot be perfectly competitive due to the Copyright Act's grant of exclusive rights to the copyright holder and the disproportionate market leverage wielded by BMI, as a monopolist. See Am. Soc. of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc., 912 F.2d 563, 577 (2d Cir. 1990) ("Showtime II"). The natural consequence of this means "the parties and the Court lack any

10

economic data that may be readily translated into a measure of competitive pricing for the rights in question." Id.

Out of necessity the Court's determination of the fair market value of the license in question is often facilitated by analogizing to benchmarks, agreements reached between similarly situated parties for the purchase of comparable rights. See Music Choice II, 316 F.3d at 194. Benchmarks are often imperfect and may need to be adjusted to produce a comparable fee. See Broad. Music, Inc. v. DMX, Inc., 726 F. Supp. 2d 355, 357 (S.D.N.Y. 2010), aff'd, 683 F.3d 32 (2d Cir. 2012). In assessing whether an agreement provides a valid benchmark, the Court must

> (1) determine the degree of comparability of the negotiating parties to the parties contending in the rate proceeding, (2) the comparability of the rights in question, and (3) the similarity of the economic circumstances affecting the earlier negotiators and the current litigants, as well as (4) the degree to which the assertedly analogous market under examination reflects an adequate degree of competition to justify reliance on agreements that it has spawned.

United States v. Broad. Music, Inc., 426 F.3d 91, 95 (2d Cir. 2005) ("Music Choice IV") (citation omitted).

The "fair market value of the *license*" may be determined "'by applying the appropriate percentage rate to the fair market value of the *music*.'" Am. Soc'y of Composers, Authors & Publishers v. MobiTV, Inc., 681 F.3d 76, 82 (2d Cir. 2012) ("MobiTV II") (quoting Music Choice II, 316 F.3d at 195) (emphasis in original). The Court thus determines the fair

11

market value of the music before turning to evaluate what percentage of it reflects the fair market value of the license.

## II.   License for the Current Period

The proposed licensing fee is structured as a percentage of the gross revenue from the live concert. The parties agree that the gross revenue reflects the fair market value of the music, but their agreement ends there. They disagree as to the components of the gross revenue base, the percentage rate to apply to it, and what benchmarks should be used to determine that percentage.

### A. BMI Proposal

#### 1. Gross Revenue Base

BMI advocates for expanding the gross revenue base. Principally through the testimony of its expert Professor Tucker, BMI proposes that the fair market value of the music is: (1) the face value of the ticket; (2) revenues received by the promoter from any tickets sold in the first instance directly onto the secondary market (including any amounts above the face value of the ticket); (3) any ticket service, handling, or other fees above the face value of the ticket paid by the consumer if received by the promoter; (4) box suite and VIP package revenues attributable to live concerts and paid to the promoter or a venue or artist with which the promoter has a contractual relationship; and (5) sponsorship revenues attributable to live

12

concerts and paid to the promoter. JX 63. BMI argues that this gross revenue base is reasonable because it only accounts for revenues received by the concert promoters and excludes those received solely by the ticketing service company, venue, or artist.

The Second Circuit is clear that "absent some valid reason for using a different measure, what retail customers pay to receive the product or service in question. . . seems to us to be an excellent indicator of its fair market value." Music Choice II, 316 F.3d at 95; see also In re Application of MobiTv, Inc., 712 F. Supp. 2d 206, 234 (S.D.N.Y. 2010), aff'd sub nom. MobiTV II, 681 F.3d 76 (2d Cir. 2012). What the consumer pays to attend the concert is the correct measure of the fair market value of the music.

BMI does not fulfill its burden of showing that every category of revenue in its proposed base reflects the cost consumers pay to attend a concert. Specifically, sponsorship and advertising contributions must be excluded because they do not reflect the music or its performance. Rather they reflect the value of a large, captive audience and their revenues should accrue to the promoter.

BMI argues that a consumer "pays" for sponsorships and advertisements by giving them his attention. The attempt to extend the definition of "pay" beyond a fiscal meaning to

13

encompass all burdens born by the consumer is fruitless. How consumers choose to disburse their attention is separate from any financial cost.

Instead of coming from the consumer, revenues from sponsorships and advertising are derived from what third parties pay for the ability to associate themselves with the show, such as by including their names in programs or on signs throughout the venue. Even though promoters can generate revenue for live shows through two different methods, ticket sales/related costs and sponsorships/advertising, the revenue sources are distinct and cannot be conflated. Only the former is paid for by consumers.

The amount of sponsorship or advertising revenues a concert generates does not affect the ultimate price the customer has to pay to attend the show. Contrary to Professor Tucker's assertions, no evidence was presented that showed promoters use sponsorship or advertising revenues to offset the price that consumers must pay.[5] Tr. 1221:21.

---

[5] BMI also argues sponsorships and advertising revenues should be included in the gross calculation because they are included in the revenue base for licenses in other industries, like in music-streaming via Spotify or Pandora. Tr. 182:22-183:9; 1223:5-18. But unlike in music streaming, where the customer can pay a premium to avoid listening to the advertisements, there is no option to attend a live concert and have the advertisements posted throughout the arena blacked out.

14

BMI's suggestion that sponsorship and advertising revenues be included in the gross revenue base in which the BMI affiliates should share unreasonably inflates its fee request.

## 2. Percentage Rate

Nor can BMI carry its burden to establish that the fair market value of the license is 0.8% of the gross revenue base.

BMI attempts to justify its proposed rate through the use of sixteen benchmarks which can be put into three groups: agreements between domestic, consent-decree governed PROs; agreements between domestic, non-consent-decree governed PROs; and foreign PROs. Because the agreements are ill-fitting, Professor Tucker made many adjustments to their headline rates to calculate implied rates that could be comparable to the proposed license rate. Tr. 1157:1-6; 1158:4-16.

Professor Tucker first did "primary analysis adjustments" to the agreements' headline rates to account for differences in how the agreements structured the license fee and variations in the value of the rights each license secured. Tr. 1169:2-4, 1169:16-1170:18, 1171:1-13; see also PX 980 Figure 2. She adapted all the licenses' rates into unitary rates by weighing the revenue of each license and converting it into a percentage rate. Tr. 1169:22-1170:6. Then she adjusted the rates to account for BMI's market share in comparison to the market share of the signatory PRO. Tr. 1170:8-25. Finally, she adjusted the revenue

15

base of each license to include revenues from box suites in addition to revenue from ticket sales. Tr. 1171:3-10. After making these adjustments, the "implied rates" of each license ranged from 0.27% to 2.13%. PX 980 Ex. 2A.

Primary Fee Base Adjustment Approach

| License | Period | Headline Rate | Rate Structure | Market Share | Fee Base | Implied Rate |
|---|---|---|---|---|---|---|
| GMR-Live Nation | 2015-2016 | .045%-0.15% | 0.06% | 0.64% | 0.63% | 0.63% |
| GMR-AEG | 2015-2016 | .045%-0.15% | 0.06% | 0.64% | 0.63% | 0.63% |
| GMR-APE | 2016-2018 | .045%-0.15% | 0.06% | 0.64% | 0.63% | 0.63% |
| GMR-JAM | 2015-2018 | .045%-0.15% | 0.06% | 0.64% | 0.63% | 0.63% |
| GMR-MEMI | 2016-2018 | .045%-0.15% | 0.06% | 0.64% | 0.63% | 0.63% |
| GMR-Nederlander | 2015-2016 | .045%-0.15% | 0.06% | 0.64% | 0.63% | 0.63% |
| SESAC-NACPA | 2019-2024 | .032% | NA | 0.41% | 0.40% | 0.40% |
| SESAC-non-NACPA | 2021 | $0.0378/ticket | 0.05% | 0.60% | 0.59% | 0.59% |
| BMI-non-NACPA | 2017 | 0.15%-0.80% | 0.43% | NA | 0.42% | 0.42% |
| ASCAP-NACPA | 2020-2021 | 0.275%-0.40% | 0.28% | 0.28% | 0.27% | 0.27% |
| ASCAP-non-NACPA | 2021 | 0.10%-0.80% | 0.45% | 0.44% | 0.43% | 0.43% |
| SOCAN | 2015-2017 | 3.0% | NA | 1.36% | 1.33% | 1.33% |

| PRS | June 2020-Present | 2.70%-4.20% | 4.00% | 1.81% | NA | 1.81% |
|---|---|---|---|---|---|---|
| IMRO | 2021 | 3.00%-6.00% | 4.80% | 2.18% | 2.13% | 2.13% |
| APRA AU | November 2020 | 1.65%-2.20% | 2.13% | 0.96% | 0.94% | 0.94% |
| APRA NZ | December 2021 | 1.50%-2.00% | 1.93% | 0.88% | 0.86% | 0.86% |

PX 980 Ex. 2A.

Because BMI's proposal substantially expands the gross revenue base beyond revenues from the face value of tickets and box suites, Professor Tucker also performed a "secondary fee base adjustment" analysis, "trading off of the license rate with the definition of the revenue base." Tr. 1227:17-18. In the analysis, she expanded the licenses' revenue bases and made the adjustments outlined above to their headline rates to calculate "implied rates" that were lower than the ones calculated in the primary analysis. Tr. 1225:21-1228:16, 1229:2-12; PX 980.

These adjustments reflect the reality that applying the same rate to a larger base produces a higher return. To mitigate this circumstance and ensure that the final amounts generated by the licenses are not overly inflated but remain a true reflection of the fees the parties negotiated for, their rates must be adjusted downwards when their revenue bases are expanded to account for BMI's proposal.

17

Secondary Fee Base Adjustment Approach

| License | Period | Headline Rate | Rate Structure | Market Share | Fee Base | Implied Rate |
|---|---|---|---|---|---|---|
| GMR-Live Nation | 2015-2016 | .045%-0.15% | 0.06% | 0.64% | 0.54% | 0.54% |
| GMR-AEG | 2015-2016 | .045%-0.15% | 0.06% | 0.64% | 0.54% | 0.54% |
| GMR-APE | 2016-2018 | .045%-0.15% | 0.06% | 0.64% | 0.54% | 0.54% |
| GMR-JAM | 2015-2018 | .045%-0.15% | 0.06% | 0.64% | 0.54% | 0.54% |
| GMR-MEMI | 2016-2018 | .045%-0.15% | 0.06% | 0.64% | 0.54% | 0.54% |
| GMR-Nederlander | 2015-2016 | .045%-0.15% | 0.06% | 0.64% | 0.54% | 0.54% |
| SESAC-NACPA | 2019-2024 | .032% | 0.03% | 0.41% | 0.34% | 0.34% |
| SESAC-non-NACPA | 2021 | $0.0378/ticket | 0.05% | 0.60% | 0.51% | 0.51% |
| BMI-non-NACPA | 2017 | 0.15%-0.80% | 0.43% | NA | 0.36% | 0.36% |
| ASCAP-NACPA | 2020-2021 | 0.275%-0.40% | 0.28% | 0.28% | 0.23% | 0.23% |
| ASCAP-non-NACPA | 2021 | 0.10%-0.80% | 0.45% | 0.44% | 0.37% | 0.37% |
| SOCAN | 2015-2017 | 3.0% | 3.00% | 1.36% | 1.15% | 1.15% |
| PRS | June 2020-Present | 2.70%-4.20% | 3.80% | 1.72% | 2.12% | 2.12% |
| IMRO | 2021 | 3.00%-6.00% | 4.80% | 2.18% | 1.90% | 1.90% |

| APRA AU | November 2020 | 1.65%- 2.20% | 2.13% | 0.96% | 0.81% | 0.81% |
| APRA NZ | December 2021 | 1.50%- 2.00% | 1.93% | 0.88% | 0.74% | 0.74% |

PX 980 Ex. 2B.

When arguing that the benchmarks show that its proposed rate is reasonable, BMI relied on the higher primary analysis implied rates, ignoring the rates from the secondary analysis. BMI attempted to justify using the implied primary rates on the grounds that "the percentage that you get of the revenue pie, and then how you define that revenue pie" are two separate concepts such that expanding the base does not require a downward adjustment to the headline rate. Tr. 1225:8-20.

That assessment of how the two parts interact disregards practical considerations. To adequately compare the benchmarks to a particular license with a much larger revenue base, the Court must adjust the benchmarks' rates downward to produce the dollar amount the parties to the licenses intended to capture. See Tr. 1227:9-1228:6, 1356:15-21, 1500:2-14. Relying on the implied rates from the primary analysis is thus unreasonable and the Court accordingly employs the implied rates from the secondary fee base adjustment analysis.

When looking at the secondary implied rates, only the foreign licensing agreements have rates above or close to BMI's proposed one of 0.8%-SOCAN (1.15%), PRS (2.12%), IMRO (1.90%),

19

APRA AU (0.81%), and APRA NZ (0.74%). The domestic licensing agreements all have implied rates (.023% to 0.54%) that are well below 0.8% and accordingly on their face fail to support BMI's proposal. Thus, the reasonableness of BMI's proposed rate of 0.8% rests on the foreign licensing agreements.

But these foreign licenses cannot be relied upon as valid benchmarks because BMI failed to show that the foreign parties are similar to BMI and NACPA and that the agreements were negotiated in similar economic circumstances. There was no attempt to show any similarities with IMRO, APRA AU, and APRA NZ. As to PRS and SOCAN, BMI offers no affirmative evidence that the foreign sellers are like it, besides noting that all are PROs and that SOCAN and PRS are subject to oversight regimes that are similar to the rate court system in the United States and apply the same willing-buyer/willing-seller standard. The mere existence of a foreign rate-setting tribunal does not prove the comparability of BMI to PRS or SOCAN, especially when the tribunals have different standard-setting criteria in each jurisdiction. SOCAN's oversight tribunal looks at four factors when setting a fair and equitable rate, only one of which is the willing-buyer/ willing-seller paradigm. Canadian Copyright Act, R.S.C. 1985, s. 66.501. Further, SOCAN and PRS are government-sanctioned monopolists with 100% of the market. Tr. 1170:8-15. Although BMI argues the difference between its and the

international counterparties' market shares can be adequately accounted for through Professor Tucker's market share adjustment, Professor Tucker admits she did not study how this structure may have impacted the rates that SOCAN and PRS can demand. Tr. 1396:8-21, 1397:6-1398:23.

BMI argues that the foreign economic circumstances are similar to those in the US market. That argument is based on the underlying business structure of global touring–that tours bringing the same artists, singing the same songs, across North America and international borders, are cross-collateralized by AEG and Live Nation under a single contract. Tr. 1396:22-25, 431:9-12, 447:5-448:1, 544:8-545:17, 760:20-761:17. That is some evidence of similarity at the micro level. Evidence at the macro level shows that the US live concert industry involves vastly different economics than live concerts in the UK or Canada. AEG's Chairman and CEO Mr. Marciano and Live Nation's President of US Concerts Mr. Roux both testified that the industry in the US is much larger and has higher revenues, ticket prices, and a completely different cost structure from those abroad. Tr. 667:15-668:5, 766:21-767:6, 843:5-10, 845:15-846:2.

Based on this analysis, BMI's proposed rate of 0.8% is unacceptable.

**B. Reasonable Rate**

If the fee proposed by BMI is unreasonable, then the Court is required to set the fee for the requested license itself based on consideration of all the evidence. Consent Decree Art. XIV(A).

## 1. Gross Revenue Base

The components of the fair market value of the music are best defined as: (1) the face value of the ticket; (2) revenues received by the promoter from any tickets sold in the first instance directly onto the secondary market (including for amounts above the face value of the ticket); (3) any ticket service, handling, or other fees above the face value of the ticket paid by the consumer if received by the promoter; (4) box suite and VIP package revenues attributable to live concerts and paid to the promoter or a venue or artist with which the promoter has a contractual relationship. JX 63.

Each of those categories reflect payments to "receive the product or service in question," a live concert, which is "an excellent indicator of its fair market value," Music Choice II, 316 F.3d at 95, while controlling for revenues that never flow to the promoters. The face value of the ticket is historically included in the gross revenue base. Defining the revenue base to include tickets sold for the first time in a secondary market is a natural clarification of what some promoters think the base already subsumes. Mr. Roux and Mr. Marciano confirmed in their

22

testimony that if they sold tickets on the secondary market in
the first instance, they included the sale proceeds in what they
reported to NACPA. Tr. 683:2-15, 737:1-738:3.

The same reasoning applies to box suites and VIP packages,
which include tickets to premium seats. Revenues from both are
in some instances already being reported in the base. Tr. 558:6-
8 (Live Nation), 717:20-24 (AEG).

NACPA argues that including revenues from box suites and
VIP packages is unreasonable because it includes revenues from
goods and services that have nothing to do with the musical
compositions in BMI's repertoire. But retail gross revenues
include "expenses for various processes and services not
provided by the owner of the music." Music Choice II, 316 F.3d
at 195. Thus, even though the retail price includes items that's
only relationship to the music is in connection with its
delivery to market, it reasonably reflects the value of the
music because the customer is willing to pay it to hear the
music, "notwithstanding that portions of those revenues were
needed to cover expenses for many services that were not
provided by the author of the music." Id. at 196.

Box suites and VIP packages may include charges in addition
to the seat ticket, like for food or merchandise; but the
consumer must pay the total price if she wishes to sit in these
premium seats and hear the music. For the customer, her choice

23

of the more expensive seat includes it in the base revenues under Music Choice II.

Consumers must also pay ticketing service fees to attend the concerts. Ticketing fees are labeled as service or delivery fees and are mechanically included on top of the face value of the ticket. There is virtually no way to opt out of paying the fees. See Tr. 721:20-723:16; PX 965, PX 966 (videos demonstrating the ticket purchase process, including the automatic addition of ticketing service fees). Although NACPA characterizes ticketing fees as a separate cost the consumers are electing to pay for ease of ticket delivery, Mr. Marciano, AEG's CEO, confirmed that "the amount that the fan is willing to pay to attend the concert is the combination of the face value of the ticket, and all of the fees that are charged as part of the transaction." Tr. 719:3-7; see also 723:14-15 (Marciano testified that the "price, including the fees, is the price that the customer has to pay if they want to go see the concert"). The amount of ticketing fees received by the promoter is thus included in the gross revenue base.

NACPA argues that calculating the gross in this manner is unworkable because promoters do not have access to all the revenue information, specifically revenues for boxes and VIP packages. Limiting the revenues to those received by the promoters or a contractually related third-party helps to

24

alleviate those concerns, even if it does not produce perfectly efficient administration.

Accordingly, the gross revenue base, the foundation of the license in question, is enlarged to include not only the face value of tickets, but also the value of tickets sold in the primary instance directly onto the secondary market, ticket servicing fees received by the promoter, and revenues from box suites and VIP package that are attributable to live concerts and paid to the promoter or a contractually related third-party.

### 2. Percentage Rate

#### i. Benchmarks

The parties collectively put forward nineteen proposed benchmarks. Having already found the five foreign candidates inapplicable, the Court addresses the remaining domestic fourteen agreements in turn.

#### a. Domestic Consent Decree Licenses

#### 1. BMI Licenses

In 1998, BMI and NACPA finalized a rate of 0.3% of "Gross Ticket Revenues" for concerts with under 10,000 seats and 0.15% for those with over 10,000 seats. JX 24. Gross Ticket Revenues were simply the face value of the ticket. In a 2006 agreement, the parties agreed to a separate festival rate but left the headline rate unchanged. That headline rate has remained and the

25

parties' disagreement on a new one is the cause of this litigation. Professor Jaffe argues the 2006 license has an implied rate[6] of between 0.19% to 0.21%, depending on how large the revenue base is expanded. Tr. 1491:4-8, 1501:9-15.

From 2009-2018, BMI and non-NACPA promoters were in a license that used the same definition of Gross Revenue but included the differing rates based on venue size:

| Venue Size | Rate |
|---|---|
| 0 to 2,500 seats | 0.8% |
| 2,501 to 3,500 seats | 0.6% |
| 3,501 to 5,000 seats | 0.4% |
| 5,001 to 9,999 seats | 0.3% |
| 10,000 seats or more | 0.15% |

PX 394. After converting into a unity rate and making adjustments to account for the expanded gross revenue base, Professor Tucker calculated the license to have an implied rate of 0.36%. PX 980 Ex. 2B.

## 2. ASCAP Licenses

In 2018, NACPA entered into a license with ASCAP for the 2018-2021 period, which had a unitary rate of 0.23% of the face value of the tickets for 2018 and 2019 and rose to 0.275% of the

---

[6] The implied rate of a license is the headline rate adjusted for license structure, relative market share, and differences in fee bases.

collective face value for 2020 and 2021. Professor Tucker calculated this to mean an implied rate of 0.23%, PX 980 Ex. 2B, and Professor Jaffee calculated a rate of 0.24%, Tr. 1508:1-14.

ASCAP also had a 2021 license with non-NACPA promoters with a tiered rate structure ranging from 0.10%-0.80% of the gross revenue, the face value of the tickets. When the expanded revenue base was accounted for, Tucker calculated an implied rate of 0.37%. PX 980 Ex. 2B.

### 3. Validity as benchmarks

All the BMI and ASCAP licenses are proper benchmarks. Both parties agree on the validity of the 2006 BMI/NACPA license but disagree over how much weight the Court should afford it. NACPA argues it is the best available measure; BMI contends that it is too old to be useful given the changes to the industry. Tr. 1166:23-1167:17, 1201:16-1202:8. Regardless of the persuasive effect of the 2006 BMI/NACPA license, "fairly negotiated prior agreements are the proper starting point from which to determine reasonable fees for subsequent periods." United States v. Am. Soc. of Composers, Authors & Publishers, 157 F.R.D. 173, 195 (S.D.N.Y. 1994) ("Capital Cities II"); see also 1473:23-1474:1 (Jaffe testifying the 1998 Agreement "was modified in 2006 when the parties renegotiated, so I think it's reasonable to believe that the agreement as modified is the best reflection of what the parties perceived to be a reasonable rate"). There have been

significant market changes since the rate was first set in 1998, but the 2006 license adopting that rate still sets the floor from which to determine the reasonableness of the new license.

The ASCAP-NACPA license is a valid benchmark. Professor Tucker called it "informative" and both sides' experts rely upon it. Tr. 1287:15-1288:6, 1270:7-21. ASCAP is indisputably BMI's closest comparator. Tr. 1266:10-23, 1268:1-11, 1270:18-21, 1272:15-22. The rights in question in the ASCAP agreement are essentially the same as those NACPA seeks to license from BMI. For those similar rights, NACPA has paid ASCAP and BMI at near parity in prior agreements. Tr. 1268:21-1269:17. The ASCAP agreement was entered into in 2018. There is no evidence in the record that the economic circumstances in 2018 are significantly different from the present day. The ASCAP agreement was also negotiated under the shadow of a rate court, meaning it was negotiated in a market that is adequately competitive with the market in which BMI and NACPA are operating.

The BMI/ASCAP-nonNACPA licenses are also valid benchmarks. Compared to the BMI-NACPA license, they arose in a market that reflects the same degree of competition and economic circumstances, and they cover the same rights. Although NACPA and non-NACPA promoters differ in the scope of their business operations, they are direct competitors for shows hosted in smaller venues. Tr. 569:13-17.

### b. Domestic Market Licenses

#### 1. SESAC Licenses

In May 2020, SESAC entered into a license for 2019-2024 with NACPA for 0.032% of gross revenues (i.e., face value of tickets), which Professor Tucker calculated to equal an implied rate of 0.34% when accounting for the expanded revenue base. PX 980 Ex. 2B. It also has a license for 2021 with non-NACPA promoters, which has an implied rate of 0.51%. Id.

#### 2. GMR Licenses

After failing to finalize an agreement with NACPA, GMR negotiated licenses directly with six NACPA members, including Live Nation and AEG. Tr. 469:5-8, 505:19-21; PX 83; PX 101. Each of those licenses had a tiered rate structure ranging from 0.045% to 0.15% of gross revenue, the collective face value of the tickets. Professor Tucker adjusted to account for the expanded gross revenue base to calculate an implied rate of 0.54%. PX 980 Ex. 2B. Three of the licenses run from 2015-2016, two cover 2016-2018, and one spans the entirety of 2015-2018.

#### 3. Validity as benchmarks

The SESAC and GMR licenses are appropriate benchmarks. Compared to proposed license, the SESAC and GMR licenses are between similar parties, for similar rights, and were negotiated in similar economic circumstances.

Much has been made over the fact that GMR and SESAC operate in the US outside of the shadow of a rate court and the constraints imposed by a consent decree. NACPA argues that the GMR and SESAC licenses are invalid benchmarks for that very reason and urges the Court to disregard them because the PROs' ability to extract supercompetitive prices means the market does not reflect an adequate degree of competition to justify reliance.

But, unconstrained by a consent decree, GMR and SESAC have been able to preserve the legal monopoly power granted by the Copyright Act that rate-setting is intended to incorporate. See United States v. Am. Soc. of Composers, Authors & Publishers, No. Civ. 13-95, 1989 WL 222654, at *22 (S.D.N.Y. Oct. 12, 1989), aff'd sub nom. Showtime II, 912 F.2d 563 (2d Cir. 1990) (the goal in rate setting is to eliminate improper monopoly power from aggregation while still providing "for a return for their labors that is generally commensurate with the value that a competitive market would place on both the musical fruits of those efforts and the benefits offered by the blanket license"). As Professor Tucker testified, GMR's and SESAC's market power comes, in part, from their freedom to terminate a negotiation, a capability which approximates the dynamics of a direct licensing negotiation between a music user and the individual music publisher. See Tr. 1162:13-1163:3, 1189:8-17. The analogous

30

market in which GMR and SESAC operate thus reflects the level of
competition that would be inherent in a direct licensing
negotiation, which is an adequate degree to justify relying on
the licenses as benchmarks. See Broad. Music, Inc. v. Pandora
Media, Inc., 140 F. Supp. 3d 267, 291 (S.D.N.Y. 2015) (holding
publisher-negotiated agreements with digital music services were
relevant benchmarks); Broad. Music, Inc. v. DMX, Inc., 726 F.
Supp. 2d 355, 359 (S.D.N.Y. 2010), aff'd, 683 F.3d 32 (2d Cir.
2012) (same).

Further, the market power that GMR and SESAC derive from
their aggregation of copyrights without the oversight of a
consent decree is not fatal to this Court's ability to rely on
them as benchmarks for a BMI-NACPA license. Because those PROs'
market shares are much smaller than that of BMI and ASCAP, their
market power from aggregation does not automatically mean their
negotiations were noncompetitive. Rather, their market sizes are
more comparable to those of the large music publishers that
music users would have to negotiate with directly in the absence
of PROs. Tr. 1187:3-1188:23, 1416:11-1417:4. In a direct license
with the copyright holder, the next best alternative to a
blanket license with a PRO, the music publisher has the same
market power from aggregation that GMR and SESAC have. Tr.
1162:5-21, 1602:10-24, 1603:22-1604:1.

Finally, the fact that SESAC and GMR operate free of a consent decree does not mean they are extracting supercompetitive rates. NACPA's argument to the contrary is premised on its belief that a SESAC and GMR license is a necessity for concert promoters. The fact that promoters elected to buy a blanket license for their own business goals and convenience does not establish that they did so under compulsion. Because of GMR's and SESAC's small repertoire, promoters may have attempted to obtain direct licenses of works in GMR's and SESAC's catalogs in advance of the show. But promoters opted to not ask performers for their song lists before the show because doing so, and then direct licensing, is, in the words of Mr. Marciano, "a lot of administrative work. Not impossible, but it's a lot of administrative work." Tr. 777:25. Instead promoters chose to negotiate heavily with GMR and SESAC for deals that they thought were "fair in the context of all of the collective PROs." Tr. 506:8-13 (Mr. Roux); see also Tr. 505:19-506:2 (Mr. Roux's testimony that the GMR/Live Nation negotiations included dozens of calls and multiple exchanges of drafts), 992:3-9 (NACPA's Executive Director testified that NACPA "negotiate[d] as hard as [it] can [with SESAC] to get a deal that's acceptable"), 773:23-25, 774:1-11, 1001:2-5, 1756:3-9. For the SESAC licenses specifically, NACPA admitted that it "had success in negotiating SESAC down significantly from its

32

initial ask." Tr. 502:18-503:1. The realities of the nature of the negotiations between SESAC, GMR, and promoters cannot be reconciled with NACPA's claim that the PROs are extracting rates that are anti-competitive.

Accordingly, the GMR and SESAC are valid benchmarks for the BMI-NACPA license.[7]

### c.   Range of Reasonable Rates

To determine a reasonable rate, the Court must "define a rate or range of rates that approximates the rates that would be set in a competitive market." Showtime II, 912 F.2d at 576. When looking at all of the benchmarks, the range of the implied rates accounting for the expansion in the gross revenue base includes rates of 0.21%, 0.23%, 0.34%, 0.36%, 0.37%, 0.51%, and 0.54%.

A rate of 0.5% of the expanded gross revenue base is therefore a reasonable one. See United States v. Am. Soc. of Composers, Authors & Publishers, 831 F. Supp. 137, 144 (S.D.N.Y. 1993) ("Capital Cities I")("demands the determination of a 'reasonable' fee; . . . it does not require the Court to create the 'platonic ideal' of a competitive market.").

---

[7] NACPA argues that promoters recognized GMR's and SESAC's small market shares and agreed to overly high rates because the actual dollar amount would still be minimal. No evidence at trial supports this argument. Rather the evidence shows that the licenses were actively negotiated by all parties and promoters knew that agreeing to the higher rates could drive up the rates for BMI and ASCAP. See PX 63; Tr. 1028:12-21.

Increasing the rate of a license for live concerts better reflects the fair market value placed on licenses in music intensive industries. See Tr. 1157:7-15. Licenses in music intensive industries, like commercial radio stations or virtual live concert streaming services, have higher rates because music is at the heart of the product being offered by the businesses. Tr. 154:5-13. Whereas, in a less-music intensive industry, like television sporting events or talk radio, the music is supplemental to the consumers' primary purpose and thus the rate owed to BMI's affiliates for their contributions is smaller. Tr. 155:9-17.

Live concerts are a music intensive industry. There was great debate between the parties over how much value the concertgoer was deriving from the music itself. But it is indisputable that music is essential to a live concert. Even though non-musical elements might be critical to the concert goer's experience, the fact that the show simply could not go on without the music forces the only conclusion that it is a music intensive industry. Those who contribute to the musical compositions should be compensated accordingly.

### C. Administrative Discount

Every license agreement that NACPA has made with BMI has included a 10% Administrative Discount. See JX 24, 29, 62. The terms of the discount are that NACPA retains 10% of the fees it

collects from its members on BMI's behalf as recompense for the
services it provides administering the license; thus, only 90%
of the fees owed under the license are actually paid to BMI.

BMI's license proposal eliminates this provision, requiring
NACPA to remit 100% of the fees. JX 63. NACPA would no longer
administer the license. Promoters would have the onus of
reporting their own music use, like non-NACPA promoters already
do, and BMI would handle any reporting verification internally.
Tr. 148:25-149:10; see JX 34.

The Court's inquiry into reasonableness extends to the
license terms as well. See, e.g., Pandora Media, Inc, 140 F.
Supp. 3d at 294 (discussing reasonableness of advertising
discount and the length of the license).

BMI argues that eliminating the discount is reasonable
because it no longer wants or needs NACPA's services. Tr.
1244:11-1245:11; 148:25-149:10; 276:21-277:1. That position
cannot be reconciled with the evidence. BMI expressly asked
NACPA to continue providing reporting and payment services
during the interim licensing period. Tr. 1129:10-13. BMI's
Executive Vice President Alison Smith conceded at trial that BMI
relied on NACPA's reporting data through 2021. Tr. 1795:21-
1797:12. NACPA admits that if it had known BMI's plan was to
accept those services for eight years but never pay for them,
then it would have ceased providing them. Tr. 1135:14-17. Even

35

though NACPA was on notice since 2013 that BMI was seeking to eliminate the discount, BMI still continued to accept the services NACPA provided.  It is thus unreasonable to eliminate the Administrative Discount when the work has been performed.

## III. **License for Retroactive Period**

The quotation for the Retroactive Period is lower than that for the Current Period. It retains the historical tiered rate structure and narrow revenue base. The quotation would align the NACPA rates with the rates paid to BMI by non-NACPA promoters during that time. Having already found that the BMI-nonNACPA benchmark is valid, BMI's proposed rate for the period is reasonable. However, for the reasons stated above, BMI's proposal to eliminate the Administrative Discount is unreasonable and disallowed.

### CONCLUSION

The Court adopts BMI's proposal of the reasonable rate for the Retroactive Period.

For the Current Period, the reasonable rate is 0.5% of gross revenues. Gross revenues are (1) the face value of the ticket; (2) revenues received by the promoter from tickets sold in the first instance directly onto the secondary market (including for amounts above the face value of the ticket); (3) any ticket service, handling, or other fees above the face value of the ticket paid by the consumer if received by the promoter;

36

(4) box suite and VIP package revenues attributable to live concerts and paid to the promoter or a venue or artist with which the promoter has a contractual relationship.

Both licenses retain the 10% Administrative Discount.

NACPA's Motion for Judgment as a Matter of Law, Dkt. No. 170, is accordingly denied as moot.

So Ordered.

Dated:   New York, New York
         March 28, 2023

Louis L. Stanton

LOUIS L. STANTON
U.S.D.J.

37